1        UNITED STATES DISTRICT COURT
2         DISTRICT OF PUERTO RICO

3   UNITED STATES OF AMERICA,

4        Plaintiff,                                   Criminal No. 09-427 (JAF)

5        v.

6   ALEXIS CANDELARIO-SANTANA,

7        Defendant.

8

9                            **MEMORANDUM OPINION**

10       This matter comes before the court as a pre-trial determination whether the

11   Defendant, Alexis Candelario-Santana ("Defendant" or "Candelario-Santana"),[1] is mentally

12   retarded for the purposes of Atkins v. Virginia, 536 U.S. 304 (2002), and the Federal Death

13   Penalty Act, 18 U.S.C. § 3596(c).[2]  The court held three days of evidentiary hearings on this

14   matter, on December 6, 7, and 21.[3]  Having carefully considered the parties' arguments, the

15   evidence before us, and the pertinent case law, this court now issues its opinion.[4]

16                                            **I.**
17
18                                     **Introduction**
19
20   **A.    Standards and Burden of Proof for Pre-Trial Determination**

21       The government has notified the parties of its intent to seek the death penalty in this

22   case.  (Docket No. 458.)  Candelario-Santana argues that because he is mentally retarded,

---

[1] Mr. Candelario-Santana Santana's brother, Wilfredo Candelario-Santana, is a co-defendant in this indictment. All references to "Candelario-Santana" are to Alexis Candelario-Santana unless otherwise noted.

[2] Consistent with Atkins, the Federal Death Penalty Act provides that "[a] sentence of death shall not be carried out on someone who is mentally retarded." 18 U.S.C. § 3596(c).

[3] The minute entries and transcripts of these hearings can be found at Docket Nos. 697; 698; 700; 706; 733; 734.  Throughout this order, we refer to the transcripts as "Dec. 6 TR," "Dec. 7 TR," and "Dec. 21 TR."

[4] On December 28, 2012, we issued a line order, announcing our decision that Defendant is not mentally retarded.  (Docket No. 736.)  This memorandum opinion explains the reasons for our decision.

Criminal No. 09-427 (JAF)                                                                                          -2-

1    the government cannot seek the death penalty.  (Docket No. 564 at 140-145.)  Both parties

2    agree that the Defendant bears the burden of proof on this issue by a preponderance of the

3    evidence, and that logically, the issue should be resolved before trial begins.[5]  Every district

4    court that has addressed the issue that we are aware of has held the same.  See, e.g., United

5    States v. Smith, 790 F.Supp.2d 482, 484 (E.D.L.A. 2011) (allocating burden of proof to

6    defendant by preponderance of the evidence standard and resolving before trial); United

7    States v. Sablan, 461 F. Supp. 2d 1239, 1242 (D.Colo. 2006) (establishing same burden of

8    proof and ruling that determination be made before trial).[6]

9    **B.      Definitions of Mental Retardation**

10          In Atkins, the Supreme Court held that execution of mentally retarded persons

11   violates the Eighth Amendment's prohibition of "cruel and unusual punishments."  536 U.S.

12   at 311, 316-21 (quoting U.S. Const. Amend. VIII). The Court twice discussed clinical

13   definitions of mental retardation, see id. at 308 n.3, 318, but did not provide a definition.  Id.

14   at 317.   After surveying a recent history of executions, the Court held that a national

15   consensus had developed against executing persons with a "known IQ less than 70," a

16   practice that had become "truly unusual."  Id. at 316.  The Court acknowledged that "[n]ot

17   all people who claim to be mentally retarded will be so impaired as to fall within the range

18   of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317.

19   The Court therefore left "to the States the task of developing appropriate ways to enforce the

20   constitutional restriction upon their execution of sentences." Id. (quoting Ford v.

---

[5] In his motion, Defendant requests a pretrial hearing "where the defendant bears the burden of establishing MR/ID by a preponderance of the evidence." (Docket No. 564 at 145.)

[6] We agree that deciding this issue before trial is logical, but we have found no case that demonstrates it must be so as a matter of law.  A case might arise in which this issue is deferred to the penalty phase.  We also note that there is no consensus as to whether the issue is foreclosed once decided by the judge.  We note that it would make no sense for the issue to remain open, other than on appeal.  Nor do we decide now whether Defendant may seek to introduce evidence of his low IQ as mitigating evidence during the penalty phase.

Criminal No. 09-427 (JAF)                                                                    -3-

1    Wainwright, 477 U.S. 399 (1986)).  The Court also cited a clinical definition of "mild"

2    mental retardation, a condition "typically used to describe persons with an IQ between 50-

3    55 and approximately 70." Id. at 308 n.3 (citing AMERICAN PSYCHIATRIC ASSOCIATION,

4    DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV 42-43 (4th ed.

5    2000) (hereinafter DSM-IV)).

6            In discussing two "similar" definitions provided by the American Association on

7    Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"), the

8    Court noted that "clinical definitions of mental retardation require not only subaverage

9    intellectual functioning, but also significant limitations in adaptive skills such as

10   communication, self-care, and self-direction that became manifest before age 18."[7]  Id. at

11   318.   When asked in court, both parties agreed that an individual must meet each of these

12   three prongs in order to be considered mentally retarded.  We agree.

13           It is important to note that while "the Supreme Court in Atkins could have adopted

14   the clinical standard" for defining and evaluating mental retardation, "it explicitly declined

15   to do so."  Hooks v. Workman, 689 F.3d 1148, 1168 (10th Cir. 2012).  Thus, our analysis

16   need not rigidly adhere to the clinical standards.  Though the clinical standards have

17   informed our analysis, we emphasize that "a clinical standard is not a constitutional

18   command." Id.  In evaluating Defendant's claim, therefore, we have taken our primary

19   guidance from Supreme Court precedent in Atkins and helpful expert testimony.  After

20   extensive deliberation, and for the reasons explained below, we conclude that Candelario-

21   Santana is not mentally retarded.

---

[7] Defendant's expert, Dr. Stephen Greenspan, also refers to these two definitions as "highly similar."  (Def. Exh. 10 at 5.)  Dr. Greenspan also endorses Dr. Margarida's definition of mental retardation as involving these three "prongs." Id.

1     ## II.

2     ## **Candelario-Santana's Background**

3         Candelario-Santana is a forty-one year old male from Puerto Rico. The following

4     background, unless otherwise noted, is derived from pages seven through twelve of the

5     report by Dr. María T. Margarida Juliá ("Dr. Margarida").[8]   Candelario-Santana was the

6     fourth of eleven children born to his mother, Adelaida Santana Pinto, who produced

7     children from five different unions.   Candelario-Santana's father, Hipólito Candelario-

8     Santana, abandoned Candelario-Santana's mother when Defendant was very young, and had

9     very little contact with him.   When Candelario-Santana was twelve years old, his mother

10    sent him to Florida to live with his father, but Candelario-Santana soon returned home to

11    Puerto Rico, because he and his father did not get along.   Candelario-Santana had very little

12    contact with his father after that.

13        Candelario-Santana was raised in Barrio Sabana Seca, in Toa Baja, in an area known

14    as "The Mangos."   The neighborhood he grew up in was filled with violence, drug sales,

15    and frequent shootings.   At one point, Candelario-Santana watched his uncle, Jorge, die

16    after being shot in a dispute over a watch.   The police would frequently enter the home

17    where Candelario-Santana grew up, searching for fugitives.   The home where Candelario-

18    Santana and his siblings lived was a two-bedroom dilapidated house made out of wood.   The

19    house was located in a larger plot of land owned by Candelario-Santana's aunt. The aunt

20    lived in a larger house on the same plot of land.   Conditions in Candelario-Santana's house

21    were very poor; he says that his family suffered from hunger.

---

[8] A copy of Dr. Margarida's report has been admitted into evidence as Defendant's Exhibit 2 ("Def. Exh. 2" or "Marg. Rep.").

Criminal No. 09-427 (JAF)                                                                    -5-

1    There are very few school records available from Candelario-Santana's childhood.

2    Candelario-Santana apparently told Dr. Margarida that he dropped out of school in the

3    seventh grade, because of his frustrations as a "slow learner."  In his interview with the

4    government's experts, Dr. Jaime Herrera Pino ("Dr. Herrera"), and Dr. Jaime Grodzinski

5    Schwartz ("Dr. Grodzinski"), Candelario-Santana provided an additional explanation for his

6    decision to drop out, which was his desire to work and help his mother overcome their

7    family's poverty.[9]

8    Later during the hearing, the court saw a diploma indicating that Candelario-Santana

9    had finished the ninth grade.[10]  The few available records suggest that Candelario-Santana

10   likely repeated one grade in school, though it is unclear which grade, or the reasons behind

11   that circumstance.

12   There are also several indications that Candelario-Santana never applied himself in

13   school.  He told Dr. Zahira Lespier Torres ("Dr. Torres"), a psychologist who interviewed

14   him in 2008, that he used to "cut classes."[11] Candelario-Santana admitted to Dr. Herrera that

15   he was often reprimanded for misbehaving and asked to leave the classroom.[12]  Candelario-

16   Santana also indicated to Dr. Herrera that he often behaved in ways that were distracting to

17   other students in the class. To Dr. Grodzinski, Candelario-Santana admitted that his

18   economic and family worries were continuously distracting him from his studies and that his

19   school attendance dropped because of family-related concerns.  He also told Dr. Grodzinski

20   that he liked to learn Spanish and Science. Candelario-Santana told Dr. Grodzinski that

---

[9] This explanation is provided in Dr. Grodzinski's report, entered as Defendant's Exhibit 11, at pages 2-3.
[10] Government's Exhibit 4.
[11] An English translation of Dr. Torres' report is available as Government's Exhibit 14.
[12] This can be found in Dr. Herrera's report, produced as Defense Exhibit 13, page 3. (Def. Exh. 13 at 3.)

1   despite his family's poverty, he remembers being playful, having a lot of fun going out with

2   friends, and enjoying fighting other kids in his neighborhood.

3        At some point between the ages of fifteen and seventeen years old, Candelario-

4   Santana moved to New York.[13]   While in New York, he worked for one year in a full-time

5   job at a factory.[14]   His sister Mildred worked at the same factory.[15]   After a year, he

6   returned to Puerto Rico.[16]   In addition to his job in the factory, Candelario-Santana has had

7   an assortment of other part-time jobs, including working in construction, where he earned

8   $120 per week after dropping out of the seventh grade;[17] landscaping, when he lived in

9   Detroit; performing odd jobs at stables, where he took care of horses for three years;[18] and

10  driving a truck to transport merchandise.[19]   On one occasion, Candelario-Santana was able

11  to save enough money to buy his own truck.   When he was twenty-two years old,

12  Candelario-Santana obtained a driver's license, which he still has.   Though he has had no

13  formal training, Candelario-Santana says he knows how to fix a car and change filters and

14  brake pads.   At some point, he also received a license to operate heavy equipment.

15        Candelario-Santana also stated that between the ages of eleven and thirty-eight years,

16  he enjoyed boxing and would sometimes train every day.   Even though he used protection,

17  Candelario-Santana says that he received several head concussions during training and

---

[13] Dr. Grodzinski's report indicates that Defendant was fifteen years old when he moved to Brooklyn.  (Def. Exh. 11 at 3.) Dr. Margarida's report suggests that Defendant was seventeen at the time of his move to New York.

[14] Dr. Grodzinski's report describes this as a windows factory, while Dr. Margarida's report describes it as a packing factory.  Def. Exh. 11 at 3; Def. Exh. 2 at 11.

[15] Def. Exh. 2 at 11.

[16] The government's cross-examination suggested that the reason for Defendant's return to Puerto Rico after a year was voluntary and not as a result of any problems at work.  This was uncontradicted by the defense.

[17] See Dr. Grodzinski's report, Def. Exh. 12 at 3.

[18] See Dr. Grodzinski's report, which states that Defendant worked for three years maintaining horses in stables, from the ages of 12 to 15. Def. Exh. 12 at 3.

[19] Defendant's work history was confirmed in his 2008 mental health evaluation by Dr. Torres.  That evaluation is discussed below. Gov. Exhibits 4; 14.

1    fights.  He estimates that he suffered approximately ten to twenty concussions, which

2    caused an altered state of consciousness and brief confusion.  Also, when Candelario-

3    Santana was twenty years old, he suffered a head injury in a motorcycle accident in which

4    he claims to have temporarily lost consciousness.  Upon regaining consciousness, he rode

5    his motorcycle home.  There are no medical records available regarding the injury.

6         While the exact chronology is unclear, Candelario-Santana has moved to and from

7    Florida; Puerto Rico; Brooklyn, New York; and Detroit, Michigan, throughout his life.  For

8    most of his life, Candelario-Santana has lived either with his relatives or the mothers of his

9    children.

10        Candelario-Santana has five children from two different unions.  When he was

11   sixteen or seventeen years old, Candelario-Santana married Sonia Benítez, with whom he

12   has two children, now twenty-three and twenty-two years old.  His second relationship with

13   Isabel Ocasio produced three more children, all of whom live in Detroit.[20]  Individuals who

14   know Candelario-Santana indicate that he is "a good father as far as people can tell."[21]

15        This court also received information from pretrial services regarding Candelario-

16   Santana's criminal background.  We have seen reports of Defendant's history from the

17   National Crime Intelligence Center (NCIC), as well as the original conviction records from

18   Puerto Rico's commonwealth courts.  In addition, a criminal history analysis, dated

19   December 6, 2012, and provided by the Puerto Rico Police Department, confirmed that

20   Defendant has been adjudged guilty of twelve murders.  Defendant also has several more

21   felony convictions on his record, including for firearms violations and destruction of

22   evidence.  During the hearing, the government and a defense witness agreed that Defendant

---

[20] Def. Exh. 2 at 6.
[21] See Dr. Herrera's testimony.  Dec. 7 TR at 68.

Criminal No. 09-427 (JAF)                                                                        -8-

1   had been convicted of "some sixty felonies."[22]  The list of convictions and brushes with the

2   criminal justice system is the longest and most impressive we have seen in twenty-seven

3   years on the bench.

4           In January 2008, while in Puerto Rico's commonwealth prison system, Candelario-

5   Santana was examined by mental health professionals.  Clinical psychologist Zahira Lespier

6   Torres ("Dr. Torres"), Psy.D, performed the evaluation.[23] Dr. Torres performed a Minnesota

7   Multiphasic Personality Inventory-2 (MMPI-2) and a Raven Progressive Matrices exam.

8   She based her evaluation on a structured clinical interview with Candelario-Santana, clinical

9   observations of him, as well as on information contained in his referring report from the

10  correctional institution.

11          Dr. Torres' report begins with a short description of Candelario-Santana's legal

12  background.  She states that Candelario-Santana indicated he was the chief ("jefe") of a

13  gang, and that after being implicated in a crime, he moved to Michigan to live, where he

14  stayed for several years until he was finally arrested there.  She made the following

15  "relevant clinical remarks" about Candelario-Santana: he had a proper appearance and

16  personal neatness; he stated that he understood the purpose of the evaluation; and seemed to

17  be well-oriented in time, place, and self. His thought process was logical and coherent,

18  pertinent to the questions asked.  His work rhythm was normal, and he performed the tasks

19  independently.  His linguistic expression was clear and with appropriate language.  The

20  interview flowed as anticipated, with Candelario-Santana maintaining eye contact.

---

[22] Dec. 6 TR at 115.

[23] A copy of Dr. Torres' report was entered into evidence at the Atkins hearing as Government's Exhibit 4. An English translation of the report is available as Government's Exhibit 14.

1    The results of Dr. Torres' exams did not indicate any signs of mental retardation.  On

2  the Raven test, which measures intellectual capacity using nonverbal exercises, Candelario-

3  Santana obtained a classification of "Average," compared to his age peer group.  On the

4  MMPI-2, which measures personality traits and clinical scales that may affect a person's

5  functioning, Candelario-Santana exhibited a profile of "valid."  The scales of validity

6  indicated that Candelario-Santana maintained a balance between self-protection and self-

7  exposure, as well as a moderate pretense of looking calm.  In her discussion of the results, as

8  well as in her clinical observations, Dr. Torres noted repeatedly that Candelario-Santana

9  appeared to be anxious and reserved during the interview.  According to Dr. Torres,

10  Candelario-Santana accepted responsibility for criminal behavior while invoking his right

11  not to elaborate.  She drew associations between Candelario-Santana's secretiveness and his

12  lifestyle and surroundings.

13    In her summary and recommendations, Dr. Torres again noted that Candelario-

14  Santana had "proper average intellectual resources to work and produce."  She indicated that

15  clinically, Candelario-Santana did not suffer from any severe pathology.  She observed that

16  Candelario-Santana possessed a neurotic, rigid, distant style, consistent with a person very

17  concentrated on himself.  Among the "protective factors" that Candelario-Santana had in his

18  favor, Dr. Torres included three factors: An absence of severe pathology, family support,

19  and "intellectual resources."  Among the dynamic factors, Dr. Torres noted: A tendency to

20  avoid managing his emotions, poor introspection, restrictions on his ability to manage

21  friendships, and location and stable work.  Her ultimate recommendation, if Candelario-

22  Santana was considered for parole, was preventive psychological follow-up and an

occupational   adjustment.   She   also   suggested   working   on   Candelario-Santana's
social/interpersonal relations with friends and acquaintances.

    While incarcerated in Puerto Rico's commonwealth prisons, Candelario-Santana
went on to earn his GED.[24]  In January 2008, he was selected as the "Student of the Month"
in the educational program at the Zarzal Correctional Institution, where he was serving
prison time.[25]

    A little more than one year later, after serving only six years of a twelve-year murder
sentence, Candelario-Santana was released from prison in February 2009.  Six months later,
on October 17, 2009, the massacre at La Tómbola occurred.  On November 10, 2009, the
government filed a criminal complaint against Candelario-Santana for two counts of being a
felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  (Cr. No.
09-mj-816, Docket No. 3.)   In support of the complaint, the government attached an
affidavit from FBI Special Agent Kristopher Pagano.  (Cr. No. 09-mj-816, Docket No. 3-2.)
In his affidavit, Agent Pagano describes evidence that Candelario-Santana illegally
possessed a firearm on two occasions, October 17 and November 4, 2009.  (Cr. No. 09-mj-
816, Docket No. 3-2.)  A confidential human source described seeing Candelario-Santana in
the Juana Matos Housing Project in Cataño, Puerto Rico, on November 4, 2009. (Id.)  The
source said that he/she saw Candelario-Santana in possession of a firearm with an extended
high capacity magazine in plain view.  (Id.)

---

[24] The report from Dr. Margarida indicates that he obtained his high-school equivalency degree.  During the
hearings, the government repeated its assertion that Defendant received his GED.  This was uncontradicted, except for
the Defendant's qualification that Defendant got help to do so.  Dr. Herrera's report also states that Defendant obtained
his GED.  Def. Exh. 13 at 3.
    [25] A copy of the ninth-grade equivalency certificate and the Student of the Month award were entered into
evidence as Government's Exhibit 4.

1    On November 10, 2009, U.S. Magistrate Judge Justo Arenas issued an arrest warrant

2    for Candelario-Santana.  (Cr. No. 09-mj-816, Docket No. 4.)  On December 16, Candelario-

3    Santana appeared before U.S. Magistrate Judge Camille Vélez-Rivé, under custody of

4    federal agents.  (Cr. No. 09-427, Docket No. 10.)  We take judicial notice of the following

5    facts surrounding Defendant's capture and arrest one day earlier, on December 15, 2009.

6    See Fed. R. Evid. 201(b) (providing that a court may take judicial notice of facts that "can

7    be accurately and readily determined from sources whose accuracy cannot reasonably be

8    questioned.").

9    On December 15, 2009, agents of the U.S. Customs and Border Patrol (CBP)

10   apprehended Candelario-Santana as he and four other individuals approached the shores of

11   St. Thomas, U.S. Virgin Islands, in a private boat.  Candelario-Santana initially presented a

12   false identification, providing a Florida driver's license.   Federal agents performed

13   biometric tests and determined that the identification was false.  Another CBP Agent, Louis

14   Penn, recognized Candelario-Santana as a fugitive sought by authorities in Puerto Rico.

15   Agent Don Severance then placed Candelario-Santana under arrest.

16   Following Candelario-Santana's arrest, federal and commonwealth law enforcement

17   officers held a press conference describing the events.  The news was widely reported

18   throughout Puerto Rico at the time.  One of Puerto Rico's main television news stations,

19   WAPA TV, produced a television news announcement, available online, which included

20   footage of the press conference held by law enforcement officials.  In the video, U.S.

21   Attorney for the District of Puerto Rico, Rosa Emilia Rodríguez-Vélez, is shown describing

22   the arrest and charges against Candelario-Santana, including his status as an armed career

Criminal No. 09-427 (JAF)                                                                              -12-

1   criminal.[26]  Roberto Escobar, Director of the Immigration and Customs Enforcement (ICE)

2   in Puerto Rico, is also shown discussing the arrest.  The circumstances of Defendant's arrest

3   were also reported by the Associated Press[27] and Puerto Rico's leading newspapers,

4   including El Nuevo Día and El Vocero.[28]

5        In a 52-count third superseding indictment returned in October 2012, defendants [1]

6   Alexis Candelario-Santana, [2] Carmelo Rondón-Feliciano, and [4] Wilfredo Candelario-

7   Santana are charged as members of a criminal organization "whose members engaged in

8   narcotics distribution and acts of violence, including murder and attempted murder."

9   (Docket No. 579 at 1-2.)  The overt acts in furtherance of this conspiracy include twenty-

10  one (21) murders and twenty-one (21) attempted murders.  (Id.; Docket No. 590 at 3.)

11  Defendants [1] Alexis Candelario-Santana and [5] David Oquendo-Rivas are specifically

12  charged with having committed violent crimes in aid of racketeering activity for nine (9)

13  murders and twenty-one (21) attempted murders.  (Id.)  Nine of the murders charged in the

14  indictment occurred on October 17, 2009, the day of La Tómbola massacre. (Id. at 6-7.)

15

16

17

---

[26] En la Cárcel Federal Alexis Candelario, WAPA TV, Primera Plana, December 16, 2009 (available at http://www.wapa.tv/noticias/primeraplana/en-manos-de-la-policia-alexis-candelario_20091216090248.html)   (last visited January 03, 2012).

[27] En la Cárcel Federal Alexis Candelario, Maritza Cañizares, Associated Press, December 16, 2009 (available at http://xposedmagazine.wordpress.com/tag/alexis-palo-de-goma/) (second article on page) (last visited January 03, 2012).

[28] Alexis Candelario Podria Ser Extraditado en Varios Dias, Osman Perez Mendez, EL NUEVO DIA, December 16, 2009 (available at http://www.elnuevodia.com/alexiscandelariopodriaserextraditadoenvariosdias-648995.html (last visited January 03, 2012); see also En La Isla Presunto Autor de Masacre de la Tombola, Limarys Suarez Torres and Ricardo Torres Chico, EL NUEVO DIA, December 16, 2009 (available at http://www.elnuevodia.com/enlaislapresuntoautordemasacredelatombola-649295.html) (last visited January 03, 2012); see also Arrestan a Alexis Candelario-Santana, Miguel Puig, EL VOCERO, December 16, 2009, at 22.

1                                            **III.**

2                                   **Expert Reports**

3          The court heard testimony from the following four experts in this case.  Each of the

4    experts was qualified as an expert without objection.

5    **A.     Dr. Margarida**

6          Dr. María Margarida, Psy.D., was the first expert to testify, on December 6, 2012.[29]

7    She was called by the Defendant.  Dr. Margarida is a full-time Professor in the Neurology

8    section of the University of Puerto Rico School of Medicine.[30]   In 1986, she received a

9    Psy.D. degree in clinical psychology from the Massachusetts School of Professional

10   Psychology.  She also received a M. Ed. From Harvard University in 1980.  In 1986-1987,

11   she was a post-doctoral fellow in neuropsychology at Harvard Medical School.  Her current

12   professional activities today are wide-ranging, including teaching, research, consultation,

13   clinical practice, and private practice.   Dr. Margarida does not specialize in mental

14   retardation.[31]

15         Dr. Margarida spent a total of twenty-seven hours with Candelario-Santana during

16   seven separate sessions.[32]   She performed a battery of tests using several different

17   instruments.  Each of those instruments is listed in her report ("Marg. Rep.").[33] The most

18   important tests were the "EIWA-III," a version of the Wechsler Adult Intelligence Scale III

---

[29] A transcript of Dr. Margarida's testimony is available at Docket No. 697 (Dec. 6 TR).

[30] Dr. Margarida's curriculum vitae was admitted into evidence as Defense Exhibit 1.  Dr. Margarida also described her qualifications and background to the court during her testimony on December 6.  (Docket No. 697 at 6.)

[31] See Dr. Greenspan's "Declaration," Def. Exh. 10 at 1.   On cross-examination, the government also established that mental retardation has been a fairly small part of Dr. Margarida's career. (Dec. 6. Tr. at 83-89.)

[32] A more complete version of the relevant chronology regarding Defendant's Atkins defense is set forth in a separate order, see Docket No. 627.  As we explained in that order, Defendant has had more than a year since we granted his first motion to appoint a psychological expert in the case.  Id.

[33] A full copy of Dr. Margarida's report, as well as sealed copies of the raw data that formed a basis for the report, were entered into evidence as Defense Exhibits 2-8. In this opinion, we refer to "Def. Exh. 2" and "Marg. Rep." interchangeably.

1    that has been normed for Puerto Rico,[34] and the Vineland II Adaptive Behavior Scales

2    ("Vineland" or "VABS-II" test), which she administered to two relatives of Candelario-

3    Santana.[35] She testified that Candelario-Santana was fully cooperative with the tests and that

4    she found no evidence of malingering.[36]

5          On the EIWA-III comprehensive intelligence test, Candelario-Santana obtained a full

6    score of 75.  (Marg. Rep. at 16.)  His verbal score was an 80 and his performance score was

7    a 72.  Broken down even further, Candelario-Santana's score was an 84 on verbal

8    comprehension, 79 on perceptual organization, 77 on working memory, and 59 on

9    processing speed.  These results are listed in a table at page 16 of Dr. Margarida's report.[37]

10         Dr. Margarida testified that the EIWA-III was the only comprehensive intelligence

11    test that she performed.  Nonetheless, the table of results on page 16 of her report also lists

12    scores scaled for the WAIS III intelligence test.  Dr. Margarida explained that even though

13    she did not actually perform the WAIS III, she saw it fit to include scores scaled to that test,

14    because of her belief that the EIWA-III overestimates scores.  (Docket No. 697 at 31.)

15    Dr. Margarida also applied the "Flynn effect" to her results, and provided two columns of

16    "Flynn adjusted scores."[38]  (Marg. Rep. at 16.)

17         Dr. Margarida's report also refers to the "second prong" of adaptive behavior.

18    (Marg. Rep. at 19.)  To assess Candelario-Santana's adaptive behaviors, she relied heavily

19    on two administrations of the Vineland II Adaptive Behavior Scales, which were

20    administered in a "semi-structured interview format with two of Mr. Candelario-Santana's

---

[34] Dr. Margarida referred to this test the EIWA-III during her testimony.  (Docket No. 697 at 28.)
[35] A full list of the tests Dr. Margarida performed, including the NEUROPSI, can be found in her report.
[36] The government disagreed with this, citing Dr. Grodzinski's finding of malingering on the Rey 15.  (Dec. 6 Tr. at 95-96.)
[37] Def. Exh. 2 at 16.
[38] As we discuss in our analysis section, we disregard the Flynn-adjusted scores and the WAIS III scores.

Criminal No. 09-427 (JAF)                                                                -15-

1    sisters, and score[] his performance as he functioned at 17 years, 6 months age." (Marg.

2    Rep. at 21.)   To do this, Dr. Margarida flew to Worcester, Massachusetts, where eleven of

3    Candelario-Santana's twelve siblings are now living.  (Dec. 6. TR at 41-42.)  She spoke to

4    Candelario-Santana's siblings about their memories of Candelario-Santana when he was age

5    seventeen and one-half years old.  Dr. Margarida also performed informal adaptive probes

6    of Candelario-Santana, as well as academic probes, including the Woodcock Muñoz III

7    Achievement Test, Spanish Version.  (Marg. Rep. at 25-28.)  In Dr. Margarida's words, "the

8    information gathered in the standardized assessment was validated by cross referring the

9    informant's responses, with data gathered from informal adaptive probes with Alexis,

10   interviews with collateral sources described earlier, and information from standardized

11   achievement testing using the Woodcock Muñoz Spanish Achievement Battery III."  (Id. at

12   21.)

13          Regarding the third prong of mental retardation, Dr. Margarida again relied heavily

14   on her interviews with Candelario-Santana's sisters in Massachusetts, including the two

15   administrations of the Vineland test.  (Marg. Rep. at 30.)  She also referred to her academic

16   probes of Candelario-Santana, available records, and interviews with Candelario-Santana

17   and his relatives, which she said indicated the onset of mental retardation before the age of

18   eighteen.  (Id.)

19   **B.    Dr. Herrera**

20          Dr. Jorge Herrera Pino ("Dr. Herrera") was the second expert to testify, on

21   December 7.[39]  Dr. Herrera was called by the government.  Among many other professional

22   roles, Dr. Herrera is the founder and director of the Miami Neurobehavioral Institute, where

---

[39] A transcript of Dr. Herrera's testimony is available at Docket No. 700 (Dec. 6 TR).

1    he oversees a team of eleven licensed neuropsychologists.  Recently he managed a five-year

2    contract from the state of Florida, in which he and his team were responsible for evaluating

3    5,000 individuals for developmental disability diagnoses.  Dr. Herrera estimates that seventy

4    to seventy-five percent of those individuals were evaluated for mental retardation

5    specifically.  At the beginning of his career, Dr. Herrera was involved in a large-scale effort

6    to rectify incorrect diagnoses of Hispanic children as mentally retarded by the state of

7    Michigan.

8            A large portion of Dr. Herrera's career has also involved, up to the present day,

9    international consultation with institutions throughout Spain and Latin America.  He sees

10   patients one day a week in addition to his extensive teaching, supervision, consulting, and

11   management responsibilities, which he does for hospitals, universities, and private

12   institutions.  He is an Associate Professor and a founding member of the college of medicine

13   at Florida International University.[40]   His involvement in the field of neuropsychology

14   stretches some "forty plus years."[41]   He has also testified for both the government and

15   defense as an expert in Atkins hearings, including approximately ten times for the defense in

16   habeas proceedings.[42]      Dr. Herrera has a Ph.D. in Educational and Clinical

17   Neuropsychology from Wayne State University, a Doctor of Medicine from Universidad de

18   Alcalá, Spain, and was a post-doctoral fellow for two years in pediatric and clinical

19   neuropsychology, also at the Universidad de Alcalá, Spain.[43]

---

[40] Dec. 7 Tr. at 13.

[41] Dec. 7 Tr. at 13.

[42] Id. at 14.

[43] Copies of Dr. Herrera's curriculum vitae were admitted into evidence as Government's Exhibit 5. Dr. Herrera is not a licensed medical doctor.

1      Dr. Herrera met with Candelario-Santana for approximately two hours at the

2  Metropolitan Detention Center, where he performed a neuropsychological diagnostic

3  interview.  He prepared a report of his analysis, available as Defense Exhibit 13.  In his

4  report, Dr. Herrera also analyzed the findings of a 2008 psychological exam done by

5  Dr. Torres (discussed above), and conducted interviews with four individuals who had

6  known Candelario-Santana well for an extended period of time, including in adulthood.

7  Each interview lasted approximately one-and-a-half hours.  Dr. Herrera also reviewed the

8  tests performed by Dr. Margarida and Dr. Grodzinski.  (Dr. Grodzinski's background and

9  findings are discussed below.)  Dr. Herrera also performed an "additional eclectic battery of

10 neuropsychological instruments" to complement the test results performed by

11 Dr. Grodzinski. As we discuss further below, Dr. Herrera determined with a high degree of

12 confidence that Candelario-Santana was not mentally retarded.

13 **C.    Dr. Grodzinski**

14     Dr. Jaime Grodzinski Schwartz ("Dr. Grodzinski") was the second government

15 expert to testify, also on December 7.[44]  Dr. Grodzinski received a Psy.D. and M. Sc. in

16 clinical psychology, with an emphasis in neuropsychology, from Carlos Albizu University

17 in Miami, Florida.  He has also received graduate degrees and licensures in clinical

18 psychology from institutions in Peru and Israel.  Presently, Dr. Grodzinski serves as a

19 neuropsychologist examiner for the Veterans Hospital in San Juan, Puerto Rico, and

20 performs clinical and forensic psychological services for several other government entities.

---

[44] A transcript of Dr. Grodzinski's testimony is available at Docket No. 700 (Dec. 7 TR).

Criminal No. 09-427 (JAF)                                                                -18-

1   Dr. Grodzinski is also an adjunct professor at Carlos Albizu University, and maintains a

2   private practice.[45]

3        Dr. Grodzinski evaluated Candelario-Santana on three separate occasions,

4   November 13, 19, and 21, for a total of ten hours.  The evaluation included a clinical

5   interview, an inquiry into Candelario-Santana's medical and psychological history, and

6   neuropsychological testing.  A complete list of the eighteen tests administered by

7   Dr. Grodzinski is available in his report.  While "the main source of information was

8   Candelario-Santana himself," Dr. Grodzinski also gathered information from the following

9   sources: The indictment; Candelario-Santana' siblings; the report and raw data by

10  Dr. Margarida; the reports of Drs. Torres[46] and Greenspan; Candelario-Santana's school

11  records, prison records, and vaccinations records; interviews with four individuals who

12  knew Candelario-Santana well; and transcript of phone calls made by Candelario-Santana.

13       Based on all of this information, Dr. Grodzinski concluded that Candelario-Santana

14  was not mentally retarded.  Dr. Grodzinski also concluded that Candelario-Santana's

15  available records and test results were consistent with post-concussion syndrome and his

16  "psychosocial deprivation" that interrupted his formal education at seventh grade.

17  **D.    Dr. Greenspan**

18       Dr. Stephen Greenspan, the final expert, testified on December 21. (Dec. 21

19  TR.) Dr. Greenspan received a Ph.D. in developmental psychology from the University of

20  Rochester, and was a postdoctoral fellow in mental retardation and developmental

21  disabilities at UCLA.  He is currently a Clinical Professor of Psychiatry at the University of

---

[45] A more complete list of Dr. Grodzinski's education and professional experiences is set forth in his curriculum vitae, available as Government's Exhibit 8.

[46] Dr. Grodzinski refers to Dr. Lespier Torres as "Dr. Lespier," her first last name.  This is the same report and doctor we refer to as Dr. Torres, see Government's Exhibit 14.

Criminal No. 09-427 (JAF)                                                                -19-

1   Colorado Health Sciences Center, and Emeritus Professor of Educational Psychology at the

2   University of Connecticut.  He has a long history of involvement in the mental retardation

3   field, including in the APA and AAIDD.  His work has been cited in the relevant manuals of

4   the AAIDD, and he has testified in several court cases involving mental retardation,

5   including several <u>Atkins</u> determinations in federal courts.  Dr. Greenspan's curriculum vitae

6   is available as Defendant's Exhibit 10.

7        Dr. Greenspan did not directly examine or interview Candelario-Santana.  Instead,

8   Dr. Greenspan provided a "Declaration."  In his "Declaration," Dr. Greenspan describes his

9   involvement in the case:

10       Although Dr. Margarida is a highly qualified neuropsychologist, she does not
11       specialize in developmental disorders such as mental retardation. Therefore,
12       Mr. Ruhnke engaged my services as a recognized authority on mental
13       retardation, and asked me to examine Dr. Maragrida's [sic] methods and
14       findings, and opine as to whether or not she is on firm ground in her
15       conclusions.
16
17   Def. Exh. 10 at 1.  Dr. Greenspan says he has performed similar services in other U.S. court

18   cases, also without actually meeting or interviewing the defendants or any witnesses.  In his

19   "findings", Dr. Greenspan states his professional opinion that Dr. Margarida "used

20   appropriate methods and information for assessing" the three prongs of mental retardation,

21   and that she "appears justified in her conclusion that Mr. Candelario-Santana" meets the

22   three prongs.  Dr. Greenspan briefly discusses the reasons for this professional opinion, and

23   cautions against adopting any stereotype of mentally-retarded people.  He also warns against

24   using isolated competencies or accomplishments as evidence of mental retardation.  It is not

25   clear from Dr. Greenspan's "Declaration" what information he considered about

26   Candelario-Santana aside from Dr. Margarida's tests.

1        On December 18, days before his testimony, Dr. Greenspan produced a

2   "Supplemental Declaration." (Def. Exh. 10A.)  At the hearing and in subsequent briefings,

3   the defense made almost no reference to this "Supplemental Declaration."  We have

4   reviewed the Supplemental Declaration, and found it to be speculative, inconsistent, and

5   unhelpful.  The unhelpfulness of Dr. Greenspan's Supplemental Declaration is consistent

6   with his otherwise limited, biased and unprofessional involvement in this case.  The

7   Supplemental Declaration reviews the reports of Drs. Grodzinski and Herrera and adds

8   additional thoughts about their reports.  Our determination that Dr. Greenspan is completely

9   lacking in credibility precludes us from giving any weight to the assertions in his

10   Supplemental Declaration.

11        Under Rules of Evidence 702[47] and 703[48], this court has a duty to "ensure that any

12   and all scientific testimony or evidence admitted . . . is reliable."  Daubert v. Merrell Dow

13   Pharmaceuticals, Inc. 509 U.S. 579, 589 (1993).  We enjoy wide latitude in determining

14   how to assess an expert's reliability, and we are not limited to the specific factors outlined in

15   Daubert or any other case. See Kumho Tire Co., Ltd. v. Michael, 526 U.S. 137, 138 (1999);

16   United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995) ("A district court's decision to admit

17   or exclude expert testimony is entitled to great deference."); United States v. Brien, 59 F.3d

18   274 (1st Cir. 1995) ("[T]rial judges have traditionally been afforded wide discretion to admit

19   or exclude expert evidence.").

---

[47] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise. Fed. R. Evid. 702; see also Shay, 57 F.3d at 132.

[48] Rule 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed. R. Evid. 703.

1    We found Dr. Greenspan's testimony suffered from extreme deficits to the extent that

2    it was fundamentally unreliable.   We conclude that it cannot be used as evidence in

3    rendering our decision today.

4    First, Dr. Greenspan's testimony contained considerable errors that suggest a certain

5    carelessness and slipshod disregard for the seriousness of our present inquiry.  For example,

6    Dr. Greenspan's declaration, which he signed under penalty of perjury, states unequivocally

7    that he reviewed Dr. Margarida's final report.  (Docket No. 600.)  Yet he admitted to the

8    court that he was actually not sure whether he had read her final report (dated the same day

9    as his declaration) or an earlier, non-final draft. (Dec. 21 TR at 80.)  Also, Dr. Greenspan's

10   declaration states that he has personal knowledge of its contents—including his laudatory

11   endorsement of Dr. Margarida's professional qualifications and reputation.  In fact, Dr.

12   Greenspan told the court that he had no personal knowledge of Dr. Margarida's credentials

13   and only knew of her accomplishments through her CV and some casual internet research.

14   (Dec. 21 TR at 84-5.)  It is alarming that Dr. Greenspan would make such misstatements to

15   the court, and we can only conclude (at best) that he was careless in crafting his statements

16   under oath to this court.  This behavior unto itself is not consistent with the rigorous

17   standards of diligence and honesty this court requires of expert testimony.

18   Second, Dr. Greenspan was combative and evasive throughout his testimony despite

19   being admonished to be more forthcoming with his answers. (Dec. 21 TR at 69, 71, 73, 76,

20   78, 86, 87, 88, 93, 98, 103, 105, 109, 113, 114, 182, 211.)  Dr. Greenspan's evasiveness

21   continued even when he was answering questions about his own testimony on cross-

22   examination.  (Dec. 21 TR at 111-12.)  Dr. Greenspan's testimony before this court

23   contradicted testimony he has given elsewhere on prior occasions and scholarly writings he

Criminal No. 09-427 (JAF)                                                                -22-

1   has published specifically addressing <u>Atkins</u> hearings.  (Dec. 21 TR at 120-122.)   On a

2   prior occasion, Dr. Greenspan said that those diagnosed with mild mental retardation cannot

3   read.   But before this court he said his previous statement was incorrect and that he should

4   have said that the mentally retarded cannot read "well."  (Dec. 21 TR at 89-91.)  He referred

5   to this discrepancy as "a little thing." (Dec. 21 TR at 89.) Dr. Greenspan also testified in

6   another case that the mental "age" of one diagnosed with mild mental retardation would

7   never be higher than between the age equivalent of eight and eleven.  (Dec. 21 TR at 90-91.)

8   Before this court he testified that it would be twelve.   (Dec. 21 TR at 90-92.)   In his

9   declaration, Dr. Greenspan wholesale endorsed Dr. Margarida's methods and findings.

10  (Docket No. 600.)   But in his testimony he found certain aspects of Dr. Margarida's

11  methods, including her use of the Vineland Adaptive Behavior Scales, "inappropriate."

12  (Dec. 21 TR at 177.)

13          Finally, Dr. Greenspan seemed unwilling or unable to explain evidence that tended to

14  refute his conclusions and offered little explanation during his testimony as to why he

15  thought the government's experts' assessments were incorrect.  (Dec. 21 TR at 111,

16  113.)  He did, however, resort to ad hominem attacks on the governments' experts'

17  professional qualifications as a replacement for scientific evidence and arguments.  (Dec. 21

18  TR at 184.)[49]   Moreover, Dr. Greenspan criticized certain methods employed by the

19  government's experts, including IQ screening tests, that he himself has used in the past.

---

[49] It is worth noting that Dr. Greenspan exhibited contemptuous disregard for the work of the government's experts.
Sadly, this seems entirely consistent with Dr. Greenspan's estimation of his and his colleague's singular importance in
<u>Atkins</u> proceedings:  "Our revised position is that 'clinical judgment is all right when it is used correctly, by us, but is
not all right when it is used incorrectly, by experts other than us.  As we are not able to participate in every <u>Atkins</u> case
in America, it would probably be better if constraints were placed on the use of clinical judgment."  Stephen Greenspan
& Harvey N. Switzky, <u>Lessons from the Atkins Decision for the Next AAMR Manual</u> in WHAT IS MENTAL
RETARDATION?: IDEAS FOR AN EVOLVING DISABILITY IN THE 21ST CENTURY 281, 289 (S. Greenspan & H.N. Switzky
eds., 2006).

1  (Dec. 21 TR at 139.)  In the end, Dr. Greenspan delayed the proceedings unnecessarily and

2  attempted to prevent the government from conducting meaningful cross-examination for the

3  benefit of the court.

4         We do not dispute that Dr. Greenspan can qualify as an expert in this field—certainly

5  his academic credentials and the many plaudits he has received from his professional peers

6  mark him as such.  But that does not mean that his testimony before *this court* was

7  reliable.  To the contrary, Dr. Greenspan's testimony before *this court* failed to meet the

8  high standards of scientific reliability and evidence demanded in his field .  See Kumho Tire

9  Co., Ltd., 526 U.S. at 152 (reliability can be measured by whether the expert has employed

10 in the courtroom "the same level of intellectual rigor that characterizes the practice of an

11 expert in the relevant field"); Milward v. Acuity Speciality Products Group, Inc., 639 F.3d

12 11, 26 (1st Cir. 2011).  Dr. Greenspan was evasive and unhelpful in addressing the court's

13 questions.  He gave no explanation to refute contrary opinions or to support his own

14 opinions when challenged.  He gave testimony that contradicted his own prior statements

15 and gave no explanation for having changed his mind.  Perhaps most fundamental of all, he

16 told the court under oath that he was familiar with Dr. Margarida's final report, when in fact,

17 he did not know whether he had looked at a preliminary draft or the final version.  Whatever

18 Dr. Greenspan's professional credentials, it is clear he did not bring them to bear on his

19 testimony and reports before this court.

20        We note this mismatch between Dr. Greenspan's credentials and his performance

21 here as a warning to other courts who may yet hear his testimony in the future.  Dr.

22 Greenspan serves as an expert in cases of this sort across the country, and such service

23 demands an impeccable professional reputation.  Carelessness and evasiveness have no

1  place in any courtroom, yet Dr. Greenspan has demonstrated those characteristics amply

2  here, and may do so again elsewhere.

3                                              **IV.**

5                                          **Analysis**

7       In this section, we analyze our findings with respect to each of the three prongs of

8  mental retardation: (1) sub-average intellectual functioning; (2) adaptive behaviors; and

9  (3) onset before the age of 18.  Atkins, 506 U.S. at 318.

10  **A.      Prong One: Sub-average Intellectual Functioning**

11       In Atkins, the Court stated that a "national consensus has developed against"

12  executing persons with a "known IQ" of less than 70.  506 U.S. at 316.  The Court also

13  observed that "an IQ score of between 70 and 75 or lower" is "typically considered the

14  cutoff IQ score for the intellectual function prong of the mental retardation definition."  Id.

15  at 309 n.5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B.

16  Sadock and V. Sadock eds. 7th ed. 2000)).  This five-point margin between 70 and 75 is due

17  to the standard error of measurement in administering the test. See Hooks, 689 F.3d at 1168

18  (noting that a "five-point range" applies on either side of the results); see also Atkins, 536

19  U.S. at 308 n.3 (noting that mild mental retardation is a condition "typically used to describe

20  people with an IQ level of 50-55 to approximately 70.")

21       Candelario-Santana was administered a series of tests measuring his cognitive

22  functioning—both by his own expert and by experts acting on behalf of the government.

23  The court was presented with an IQ score from one comprehensive IQ assessment and a

1   variety of other cognitive assessment tests administered over a period of several months,

2   between February and October of 2012.  On the full-scale IQ test Canelario-Santana scored

3   a 75, which exceeds the range typically considered to be mentally retarded.  On some

4   sections of the comprehensive IQ test, however, Candelario-Santana scored significantly

5   below a 75, which could be indicative of mental retardation.  The testimony of Drs. Herrera

6   and Grodzinski, however, convinces us that this is not the case.

7   **1.      Candelario-Santana's IQ Score**

8           Dr. Margarida, an expert for the defense, administered the "Escala de Inteligencia de

9   Wechsler  para  Adultos—Tercera  Edicion"  ("EIWA-III")  to  Candelario-Santana  on

10  March 15, 2012.[50]  (Def. Exhibit 2 at 16.)  The EIWA–III is recognized as a model tool for

11  intelligence testing among Spanish-speakers.  See  Nicholas S. Thaler & Sharon Jones-

12  Forrester, IQ Testing and the Hispanic Client in GUIDE TO PSYCHOLOGICAL ASSESSMENT

13  WITH HISPANICS, 88 (Lorraine T. Benuto, ed., 2012).  The EIWA-III is a Spanish-language

14  adaptation of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), and it

15  includes the subtests and constructs that are the foundation of WAIS-III testing.  Id.

16  However, unlike the WAIS-III, the EIWA-III was adapted and standardized specifically to

17  Puerto Rico.  The third edition was developed in cooperation with the Ponce School of

18  Medicine in Puerto Rico to ensure the language and items were culturally appropriate for

19  Puerto Ricans speaking Spanish.  See Brigida Hernandez, Elizabeth Horin & et alia,

---

[50] While Dr. Margarida included scaled scores from the WAIS-III in her report, she did not administer this test at any time to Candelario-Santana.  (Dec. 6 TR at 31.)  We decline to consider the scaled WAIS-III scores included in her report.

1    Psychological Testing and Multicultural Populations in RACE, CULTURE, AND DISABILITY:

2    REHABILITATION SCIENCE AND PRACTICE (Fabricio E. Balcazar, Yolanda Suarez-Balcazar,

3    et alia eds., 2010).

4            The EIWA–III was the current version of the test at the time Dr. Margarida assessed

5    Candelario-Santana.  (Dec. 7 TR at 29.)  The test administered by Dr. Margarida consisted

6    of a global scale and several subscales or subtests, grouped into two general categories,

7    "verbal" and "performance".  (Dec. 6 TR at 30)  After administering the EIWA-III,

8    Dr. Margarida found Candelario-Santana to have a Full Scale IQ of 75.  In addition,

9    Dr. Margarida found Candelario-Santana to have a Verbal IQ of 80 and a Performance IQ of

10   72.  (Def. Exh. 3 at 1.)

11           The government experts credited Dr. Margarida's raw scores and her administration

12   of the EIWA-III test.  (Dec. 7 TR at 23-24.)  We see no reason to disagree with this expert

13   consensus.  Furthermore, since the EIWA-III is itself recognized as a mainstream IQ test

14   devised specifically for Puerto Ricans, we see no reason to doubt its suitability in these

15   circumstances.

16   **2.      Criticism of IQ Score by Drs. Herrera and Grodzinski**

17           Although we credit Dr. Margarida's administration of the test and the raw data it

18   generated, we do not necessarily credit all of Dr. Margarida's interpretations of that data.

19   The government's experts testified that, contrary to Dr. Margarida's conclusions, the Flynn

20   effect should not be applied here and that Candelario-Santana's low score on the processing

21   speed subtest of the EIWA-III was better explained by several traumatic brain injuries he

1   sustained, rather than an overall sub-average intellectual functioning.  We agree with the

2   government's experts on both points.

3          The Flynn Effect is a phenomenon named for James R. Flynn, who discovered that

4   the population's mean IQ score rises over time, by about a third of a point each year.

5   According to Flynn, if an individual's test score is measured against a mean of a population

6   sample from prior years, then that individual's score will be inflated in varying degrees

7   (depending on how long ago the sample was first employed) and will not provide an

8   accurate picture of his IQ. See, e.g., Walton v. Johnson, 440 F.3d 160, 177 n.22 (4th Cir.

9   2006) (en banc) ("The premise of the 'Flynn Effect' is that IQ scores increase over time and

10  that IQ tests that are not renormed to take into account rising IQ levels will overstate a

11  testtaker's IQ score."); James. R. Flynn, Tethering the Elephant: Capital Cases, IQ, and the

12  Flynn Effect, 12 PSYCHOL. PUB. POL'Y & L. 170, 172 (2006) ("Naturally, judges want to

13  know whether defendants were actually two standard deviations below their peers at the

14  time they were tested and not how they rank against a group selected at some random date

15  in the past." (emphasis added)). See generally James R. Flynn, The Mean IQ of Americans:

16  Massive Gains 1932 to 1978, 95 PSYCHOL. BULL. 29 (1984). Flynn posited that a downward

17  adjustment to scores is necessary when a test without current norms is used. See Flynn,

18  Tethering the Elephant, supra, at 174–75.

19         However, the Flynn Effect remains highly controversial and many courts have

20  declined to accept its application.  See Thomas v. Allen, 607 F.3d 749, 757 (11th Cir. 2010)

21  ("[T]he Flynn Effect is a statistically-proven phenomenon, although no medical association

1    recognizes its validity."); Maldonado v. Thaler, 625 F.3d 229 (5th Cir. 2010) ("Neither this

2    court nor the [Texas Criminal Court of Appeals] has recognized the Flynn Effect as

3    scientifically valid."); Williams v. Mitchell, 2012 WL 4505774, 34-36 (N.D. Ohio 2012)

4    (holding that a state court's failure to adjust an IQ score to take in account the Flynn Effect

5    was not contrary to clearly established federal law for purposes of 28 U.S.C. § 2254(d)(1);

6    "[C]ourts have held that 'there is no scientific consensus' on the validity of the Flynn

7    Effect."); see also Leigh D. Hagan, Eric Y Drogin and Thomas J. Guilmette, IQ Scores

8    Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases, JOURNAL OF

9    PSYCHOEDUCATIONAL ASSESSMENT (2010); George C. Denkoski and Kathryn M.

10   Denkowski, WAIS-III IQs of Criminal Defendants with Mental Retardation Claims Should

11   Not Be Reduced for the 'Flynn Effect', AMERICAN JOURNAL OF FORENSIC PSYCHOLOGY

12   (2007); Alan S. Kaufman, In What Way Are Apples and Oranges Alike? A Critique of

13   Flynn's Interpretation of the Flynn Effect, JOURNAL OF PSYCHOEDUCATIONAL ASSESSMENT

14   (2010);    Michael Shayer and Denise Ginsburg, Thirty Years On—A Large Anti-Flynn

15   Effect?, BRITISH JOURNAL OF EDUCATIONAL PSYCHOLOGY (2009);

16        As the government's experts demonstrated, the EIWA-III test administered to

17   Candelario-Santana was not an old test in need of being "renormed."  Recently revised in

18   2008, the EIWA-III was (and is) a test for contemporary Puerto Ricans and scaled

19   specifically to that population.  (Dec. 7 Tr at 26-31.)  Furthermore, the government's experts

20   could not point to a single instance in their professional experience where they applied, or

21   could recall a colleague's application of, the Flynn Effect.  (Dec. 7 TR at 31.)  Moreover,

1    defense's own experts differed about how to apply the Flynn Effect properly and how many

2    points a proper Flynn Effect adjustment would give to Candelario's IQ score.  (Dec. 21 TR

3    at 87.)  Under such circumstances, the Flynn Effect has no relevance to our inquiry and we

4    agree with the government's experts that it should not apply here.  See Hooks, 689 F.3d at

5    1170 (concluding that neither Atkins nor any other U.S. Supreme Court decision mandates

6    the application of the controversial Flynn Effect).

7          In her report, Dr. Margarida included a scoring sheet that listed Candelario-Santana's

8    raw and scaled scores from each of the eleven subtests that comprise the EIWA-III. (Def.

9    Exh. 2 at 15.)  Raw scores are the actual scores achieved on each subtest.  See United States

10    v. Smith, 790 F.Supp.2d. 482, 491 (E.D.L.A. 2010).  Scaled scores are raw scores converted

11    into a standardized score, the final score on the test for that category.  Id.

12          The scaled scores Candelario-Santana achieved on the administration of the EIWA-

13    III subtests are grouped into four general categories:  "Verbal Comprehension," "Perceptual

14    Organization," "Working Memory," and "Processing Speed."  The scores Candelario-

15    Santana received in these four categories were remarkably consistent, save for one

16    obviously outlying score measuring Candelario-Santana's processing speed. (Dec. 7 TR at

17    34.) Without processing speed, the scaled scores from the three general categories listed in

18    Dr. Margarida's report are clustered around a median score of 80.

19          Based on the scores Dr. Margarida obtained from her administration of the EIWA-III,

20    Candelario-Santana scored a 59 on processing speed. (Def. Exh. 2 at 15.) That score is

21    significantly lower than his scores for each of the other three categories.  Because a single

1   outlying score is uncommon, Drs. Herrera and Grodzinski conducted additional tests on

2   Candelario-Santana to determine if any clinical reasons, including mental retardation, might

3   explain this outlying score.

4          Drs. Herrera and Grodzinski administered a battery of tests—eighteen separate tests,

5   in fact—aimed at further examining Candelario-Santana's deficient processing speed.  (Def.

6   Exh. 11.)  In the course of their tests, Drs. Herrera and Grodzinski determined that, in

7   addition to processing speed impairment, Candelario-Santana had poor hand-eye

8   coordination and memory impairment.  (Dec. 7 TR at 36-37.)  For example, Candelario-

9   Santana scored very poorly on the Grooved Pegboard Test, which is strongly indicative of

10  underlying motor and eye-hand coordination difficulties.  (Def. Exh. 13 at 12.)

11         One of the tests administered by Dr. Grodzinski was the Test of Nonverbal

12  Intelligence ("TONI-IV").  The TONI-IV is a general assessment of intelligence and

13  provides evaluative data of non-verbal learning process, abstract reasoning, and problem

14  solving.  (Def, Exh. 11 at 6.)  The TONI-IV helps evaluate subjects with questionable or

15  limited language ability.  (Dec. 7 TR at 55.)  Dr. Grodzinski administered the TONI-IV as a

16  tool that could corroborate the hypothesis that Candelario-Santana suffered from impaired

17  motor skills and sub-average processing speed.  (Dec. 7 TR at 54.)  The test was not

18  administered as a tool for determining a comprehensive measurement of Candelario-

19  Santana's intelligence.  Id.  At the hearing, defense counsel raised questions about the

20  manner in which Dr. Grodzinski scored his administration of the TONI-IV.  According to

21  the TONI-IV diagnostic manual, testing should stop when a subject incorrectly answers

1   three successive questions.  (Dec. 7 TR at 167.)  But, when Candelario-Santana incorrectly

2   answered three questions in a row, Dr. Grodzinski had him continue the test.

3          Dr. Grodzinski explained why he did not follow the specific directions of the

4   diagnostic manual in this particular case:  he had suspicions that Candelario-Santana was

5   malingering.  Malingering is "intentional production of false or grossly exaggerated physical

6   or psychological symptoms, motivated by external incentives such as avoiding work,

7   obtaining financial compensation, evading criminal prosecution, or obtaining drugs."  See

8   AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF

9   MENTAL DISORDERS: DSM-IV 683 (4th ed. 1994).  At the hearing, Dr. Grodzinski testified

10  that Candelario-Santana exhibited a "failure attitude" or "frustration attitude" throughout

11  testing, indicating that Candelario-Santana would frequently indicate that a task was too

12  hard for him and that he could not do it.  (Dec. 7 TR at 164-65.)  But Dr. Grodzinski also

13  found that, with encouragement, Candelario-Santana often could complete the requested

14  tasks, and often complete them quite well.  Dr. Grodzinski also noticed fluctuations in

15  Candelario-Santana's performance on similar tasks, even some that were familiar to

16  him.  Where Dr. Grodzinski expected to see a "practice effect" [the influence of prior test-

17  taking, which generally results in higher scores during a second administration] Candelario-

18  Santana would actually produce results much lower than expected the second time

19  around.  (Dec. 7 TR at 166.)  Candelario-Santana would read a question very slowly, even

20  though it was a question he had read before.  Sometimes, he would read new information

21  very quickly.  This behavior can be indicative of malingering.  See U.S. v. Smith, 790

1   F.Supp.2d 482, 497 (E.D.L.A. 2011)  (describing typical malingering tactics - saying "I

2   don't know" or "I can't" after answering only a few questions).  Even if the individual is not

3   malingering, this behavior still indicates to a clinician that extra encouragement and more

4   testing may produce different results—the testing subject might need encouragement in

5   order to succeed, or might benefit from multiple attempts at similar tasks, rather than

6   accepting an initial failing result.

7          We acknowledge that Dr. Grodzinski was exercising his professional judgment in

8   continuing the test despite the diagnostic manual's contrary instructions. Since we are not

9   considering Candelario-Santana's specific score on the test, we do not need to deal with the

10  question of whether or not that specific score is accurate based on the test's diagnostic

11  manual and administrative instructions. Rather, for our purposes, we only note that the test

12  was performed as a means of further analyzing the cause of Candelario-Santana's

13  disproportionately low score on the processing subpart of the EIWA-III test.

14         Drs. Herrera and Grodzinski also interviewed Defendant and gained additional

15  information allowing them to understand Candelario-Santana's impairments more

16  fully.  Specifically, they learned that Candelario-Santana suffered head trauma of some kind

17  during the course of his amateur boxing career and during a serious motorcycle accident in

18  which Candelario-Santana was not wearing a helmet.  Also, there was no history of mental

19  retardation in Candelario-Santana's family.  Based on these facts, set alongside Candelario-

20  Santana's scores in the other categories of the EIWA-III and the additional testing they

21  performed, Drs. Herrera and Grodzinski concluded that Candelario-Santana likely suffered

1    from a cognitive impairment that limited his ability to "put the motor act into

2    effect." (Dec. 7 TR at 37.)  Or, in other words, an impairment that clinicians might

3    associate with brain trauma, but that in no way limits Candelario-Santana's "ability to think,

4    to discern, to think rationally, act with purpose." (Id.)

5          In all of this, we remember that, as noted by Dr. Margarida, evaluating a person's

6    mental capacities is both an art and a science.  (Dec. 6 TR at 96.)  While all of the tests

7    administered by the respective experts are valuable assessment tools, they are just

8    that: tools.  Dr. Herrera made the same point in his testimony, when he stated: "[T]ests

9    don't make a diagnosis, just as much as x-rays don't make a diagnosis." (Dec. 7 TR at 34-

10   5.)  A final diagnosis is only "as good as the thinking process of the . . . health care

11   professional that has to make the determination."  Id.  We have considered the different

12   professional determinations that Drs. Margarida, Herrera, and Grodzinski detailed before

13   this court, recognizing that each professional assessment reflects both the art and the science

14   of psychological evaluation.  Given all of the testimony we have heard, we conclude that the

15   best explanation of the data before the court is that Candelario-Santana does not exhibit sub-

16   average intellectual functioning.

17   **B.       Prong Two: Adaptive Functioning**

18         In Atkins, the Court did not provide a firm definition of adaptive behavior

19   limitations.  Instead, the Court again referred to clinical definitions, which it said require

20   "significant limitations in adaptive skills such as communication, self-care and self-direction

21   that manifest before age 18." Id. at 318.  In a footnote, the Court cited the APA and

Criminal No. 09-427 (JAF)                                                                      -34-

1    AAMR[51] definitions.  Id. at 308 n.3.  As one district court has observed, the two

2    classifications "essentially measure the same skills."[52]  United States v. Davis, 611

3    F.Supp.2d 472, 490 (D.Md. 2009).

4        In its third footnote in Atkins, the Court described the key features of adaptive

5    behavior limitations as defined by the AAMR and APA.  According to the AAMR

6    definition, a person meets prong two if he has "related limitations in two or more of the

7    following adaptive skill areas: communication, self-care, home living, social skills,

8    community use, self-direction, health and safety, functional academics, leisure, and work."

9    Atkins, 536 U.S. at 308 n.3 (citing MENTAL RETARDATION: DEFINITION, CLASSIFICATION,

10   AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)). The APA definition is "similar": according to

11   the DSM-IV-TR, a person meets prong two if he has "significant limitations in adaptive

12   functioning in at least two of the following skill areas: communication, self-care, home

13   living, social/interpersonal skills, use of community resources, self-direction, functional

14   academic skills, work, leisure, health, and safety." Id. (citing DSM-IV 41 (4th ed. 2000)).

15       The most recent version of the AAIDD Manual provides a similar definition of

16   adaptive behavior, which is divided into three categories: conceptual, social, and practical.

17   AAIDD, INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF

18   SUPPORTS (11th ed. 2010) (hereinafter the "AAIDD Manual") at 43.  Conceptual skills

19   include receptive and language skills; reading and writing; and money, time, and number

---

[51] As noted above, the AAMR has since switched its name to the AAIDD.  The AAIDD published a new edition of its manual in 2010.  See AAIDD, INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (11th ed. 2010) (the "AAIDD Manual") at 43.

[52] The district court in Davis, 611 F.Supp.2d at 475 n.1, referred to the 2002 "AAMR Manual," as well as the supplemental AAMR "User's Guide," published in 2007 (citing AAMR, MENTAL RETARDATION: DEFINITION. CLASSIFICATION, AND SYSTEMS OF SUPPORT 8 (10th ed. 2002); MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT (2007)).  We see no great difference between the definitions of adaptive behaviors provided by the Court in Atkins and the later Manuals.

Criminal No. 09-427 (JAF)                                                          -35-

1    concepts.  Id. at 44.  Social skills include interpersonal skills, social responsibility, self-

2    esteem, gullibility, naiveté, follows rules/obeys laws, avoids being victimized, and social

3    problem solving. Id.  The practical category involves activities of daily living (personal

4    care), occupational skills, use of money, safety, health care, travel/transportation,

5    schedules/routines, and use of the telephone.  Id. at 44.  We find this definition essentially

6    similar to the ones referenced by the Court in Atkins, which we take as our primary

7    reference point and authority.  In any case, we have considered both sets of standards—the

8    ones referenced by the Court in Atkins, as well as the more recent definition in the AAIDD

9    Manual—and we find that under either definition, Candelario-Santana has failed to show

10   that he suffers from significant adaptive behavior limitations.[53]

11        Many courts have noted, correctly, that "[a]daptive behavior is a broader category,

12   and more amorphous, than intellectual functioning." Davis, 611 F.Supp.2d at 491; see also

13   Smith, 790 F. Supp. 2d at 505.  Because of the relative subjectivity of the adaptive behavior

14   analysis, the importance of clinical judgment becomes greater under prong two than under

15   prong one.  When assessing adaptive behaviors, therefore, courts must make their own

16   independent determinations of the clinicians' judgment and credibility.  See Davis, 611

17   F.Supp.2d at 491 (noting importance of assessing information that goes to "the relative

18   credibility of the experts" in the case); Smith, 790 F. Supp. 2d at 505 ("the Court must rely

19   on its assessment of the relative competence and credibility of the individual experts").  This

20   function has long been performed by district courts when weighing the testimony of dueling

21   experts.  Bruce v. Weekly World News, 310 F.3d 25 (1st Cir. 2002) ("Accordingly, the

---

[53] Dr. Margarida cites the 2010 AAIDD Manual repeatedly in her report.

1   district court, qua factfinder, was entitled to make the crucial credibility determination as

2   between the competing expert witnesses.").

3            In the same vein, we relied here on our own assessment of the experts in this case.

4   Several factors that we discuss below convinced us that Drs. Herrera and Grodzinski

5   exercised better and more informed clinical judgment than Drs. Margarida and Greenspan.

6   Partly, that was because of the more reliable and comprehensive information that went into

7   Dr. Herrera's analysis.   We were also unimpressed by Dr. Margarida's unsatisfactory

8   explanations for why she ignored much relevant evidence.   In Part III.D., above, we

9   discussed our determination that Dr. Greenspan was severely lacking in credibility.

10           Another important factor in our analysis was the relative disparity in each of the

11  psychologists' backgrounds in mental retardation.   In the words of Dr. Greenspan,

12  Dr. Margarida does not specialize in developmental disorders, such as mental retardation.

13  (Def. Exh. 10 at 1.)  Comparatively, Dr. Herrera has an extensive background in evaluating

14  children and adults for mental retardation.  Indeed, one of the early formative experiences in

15  his career responded to the State of Michigan's incorrect diagnoses of mental retardation in

16  Hispanic children.   Since then, he has led teams that are responsible for evaluating

17  thousands of patients for mental retardation.  Dr. Grodzinski also has extensive clinical and

18  forensic experience diagnosing mental retardation for legal purposes in Puerto Rico.  Thus,

19  to the extent we had to resolve disputes between the two experts, we were comfortable

20  relying on the long and distinguished experience of Drs. Herrera and Grodzinski.

21           The government has filed a brief, (Docket No. 729), arguing that this court should

22  adopt a list of six factors that the Texas Court of Criminal Appeals uses to evaluate adaptive

23  behavior under prong two of Atkins.  See Ex Parte Briseno, 135 S.W.3d 1, 8-9 (Tex. Crim.

1    App. 2004).  We agree that some of these six factors are logical considerations in evaluating

2    a defendant's adaptive behavior limitations.  For example, the first and third factors ask

3    whether the people who knew him best believed him to be mentally retarded, and whether

4    his conduct revealed someone who led or was led by others.  Id. at 8.  These two

5    considerations are consistent with the clinical definitions cited in Atkins.  Although Dr.

6    Herrera did not refer to or consider Briseno, some of the same considerations informed his

7    analysis, for example Defendant's qualities as a leader and the way he was perceived by his

8    peers.  However, some of the other four Briseno factors track the Atkins criteria less closely,

9    and in any case, Briseno has not guided our analysis here.  Instead, we have relied

10   principally on the Supreme Court's language in Atkins, as well as our own independent

11   assessment of expert testimony.  In this regard, we found Drs. Herrera and Grodzinski to be

12   very helpful and credible.  The defense, on the other hand, failed to present a credible and

13   persuasive account of Defendant's adaptive behavior limitations.

14        The defense repeatedly stressed the notion that "[i]ndividuals with an [intellectual

15   disability] typically demonstrate both strengths and limitations in adaptive behavior."

16   AAIDD Manual at 47.  In the process of diagnosing mental retardation, the AAIDD Manual

17   does caution that "significant limitations in conceptual, social or practical adaptive skills is

18   [sic] not outweighed by the potential strengths in some adaptive skills."  Id.  This concept is

19   related to Dr. Greenspan's warnings against adopting an incorrect stereotype of mentally

20   retarded people or inferring too much from apparent successes.  As we explained in our

21   introduction, Part I.B, we reject the notion that we are bound by clinical standards

1    prescribing what evidence we may and may not consider of Defendant's adaptive behaviors.

2    See Hooks, 689 F.3d at 1168 (noting that a "clinical standard is not a constitutional

3    command").

4            But even if we did confine our analysis to the relevant clinical standards, we would

5    find that Defendant's account lacks credibility.  It may be true as a general matter that one

6    should not infer too much from specific examples of a person's apparent successes.  But the

7    defense experts' repeated failures to probe the circumstances that produced Candelario-

8    Santana's many apparent successes gave us pause.  For example, Dr. Margarida referred to

9    Defendant as a "very limited historian," but apparently took on faith his assertion that he

10   had help in achieving his GED.  Her failure to investigate the circumstances surrounding his

11   high school equivalency degree, or his repeated moves to and from various locations in the

12   mainland, undermined her assertion that such successes cannot be considered.  In the end,

13   we were convinced that the defense presented a selective and overly narrow view of the

14   evidence.  The analysis of Drs. Herrera and Grodzinski struck us as far more persuasive, fair

15   and comprehensive than the one offered by the defense. In the two sections below, we first

16   discuss the report by Dr. Margarida, and then turn to the analysis of Drs. Herrera and

17   Grodzinski.[54]

18   **1.      <u>Dr. Margarida's Assessment</u>**

---

[54] In Part IV of this opinion, we compare the shortage of evidence presented here to other cases in which defendants have been found mentally retarded.

1      We have several criticisms of Dr. Margarida's assessment of Candelario-Santana's

2  adaptive behavior.   Our chief criticism is her heavy reliance on the poorly conceived

3  Vineland tests that she administered.   The subjects of the test were two of Candelario-

4  Santana's siblings, Erica Betancourt and Mildred Rivera Santana, who provided information

5  about Candelario-Santana's behaviors when he was seventeen and one-half years old.

6      The Vineland test appears to be the primary foundation for Dr. Margarida's finding

7  that Candelario-Santana's adaptive behaviors were indicative of mental retardation.   She

8  devotes almost twice as much room in her report to the Vineland tests than she does for her

9  academic probes of Candelario-Santana's current adaptive behavior functioning.   She also

10 begins her report with her findings of Candelario-Santana at age seventeen, which he says

11 are corroborated with current limited observations.

12     Dr. Margarida's heavy reliance on the Vineland tests is not sufficient to support her

13 determination that Defendant has significant adaptive behavior limitations.   Her report

14 provides no assessment of his present-day adaptive behaviors to ground a finding of mental

15 retardation under the second prong.   The educational results, conversations with relatives

16 who knew him when he was a child, and the sparse records available are much less

17 probative of his present day adaptive behaviors than other indications she could have, and

18 should have considered, but did not.   The focus of prong two should be on present day

19 adaptive behaviors, not the distant memories of how an individual performed trivial daily

20 tasks more than twenty years ago.

21     On page twenty of her report, addressing adaptive behaviors, Dr. Margarida attempts

22 to justify her approach.  There she notes: "**Retrospective diagnosis** is a common issue in

23 Atkins related cases were [sic] a determination of intellectual and adaptive functioning prior

1    to the age of 18 is needed."  (Marg. Rep. at 20) (emphasis in original).   For this proposition,

2    she cites her own Appendix, which does include two paragraphs describing the situations in

3    which retrospective diagnoses may be appropriate.  (Id. at 34.)

4          The Appendix notes that the Vineland-II Adaptive Behavior Scales (VABS II) is one

5    of two instruments that experts consider the "gold standard" for assessing adaptive behavior.

6    (Id.)   The Appendix then goes on to state that experts "strongly recommend that these

7    instruments be used retrospectively to assess the individual's adaptive behavior prior to or

8    as near as possible to the age of 18 in order to meet the third criteria for a diagnosis of

9    mental retardation (Olley & Cox in press)." (emphasis added).

10         That last sentence is key to understanding our disagreement with Dr. Margarida.  As

11    her own Appendix acknowledges, retrospective diagnoses are appropriate to determine

12    whether an individual "meet[s] the third criteria for a diagnosis of mental retardation." (Id.)

13    In other words, retrospective diagnosis may be necessary to determine whether a forty-two

14    year old individual suffered from mental retardation before the age of eighteen.  Of course,

15    that only makes sense, in the context of the third criterion.  The third prong of the mental

16    retardation definition clearly states that to be mentally retarded, an individual's condition

17    must have an onset before the age of eighteen.

18         We are also aware of case law and professional literature approving of the use of

19    retrospective diagnosis to evaluate prong two.  See Davis, 611 F. Supp. 2d at 491 (citing

20    AAMR User's Guide); AAIDD 2010 Manual at 46.  The literature also recommends using a

21    standardized assessment tool such as a Vineland II in this context.  DSM-IV-TR at 42.  Such

Criminal No. 09-427 (JAF)                                                                          -41-

1    tools can be useful especially when evaluating someone who is incarcerated.[55]  But we think

2    that in this context, the Vineland test that Dr. Margarida performed was too unreliable, and

3    lacked sufficient corroborating evidence, to ground a finding of mental retardation under

4    prong two.  We say this for several reasons.

5        First, we have serious concerns regarding Dr. Margarida's selection of these two

6    sisters as the Vineland subjects.  As the government made clear during its cross-examination

7    of Dr. Margarida, one of these individuals, Erica Betancourt, was a very young child, only

8    nine years of age, when Defendant was seventeen years old.[56]  And both she and the other

9    sister interviewed, Mildred, spoke only to memories of the Defendant formed at least twenty-

10   four years earlier. We attach little reliability to these memories because of the large gap in

11   time between then and now.  Moreover, the defense provided very little information that

12   would bolster the credibility or reliability of these two sisters' memories.

13       Even according to the criteria from the DSM-IV-TR and AAIDD Manual, which Dr.

14   Margarida cited, we do not think these two women were the best subjects she could have

15   chosen.  For example, the AAIDD Manual provides that the information should be gathered

16   from "persons who know the individual well."  Id. at 47.  Generally, "individuals who act as

17   respondents should be very familiar with the person and have known him/her for some time

18   and have had the opportunity to observe the person function across community settings and

19   times."   AAIDD Manual at 47.   The guidance from the DSM-IV-TR is similar.   It

---

[55] Dr. Margarida alluded to some of the difficulties of evaluating incarcerated people in her report.  These challenges include the fact that individuals with mental retardation may overestimate their own abilities and lack awareness of their own limitations, referred to by Dr. Margarida as the "cloak of confidence."  (Def. Exh. 2 at 20.)  Another limitation is that interviews of prison personnel may not be useful, because adaptive behavior limitations may be harder to identify in highly structured, predictable environments such as prison.  (Id.)

[56] In its cross-examination of Dr. Margarida, the government pointed out that one of Defendant's sisters was only nine years old at the time Defendant's behaviors were observed at age seventeen and one-half.  This chronology is confirmed in Dr. Margarida's report, which notes that Erica Betancourt Santana was 34 years old at when she spoke with Dr. Margarida.  Candelario-Santana is today 41 years old.  Def. Ex. 2 at 9.

Criminal No. 09-427 (JAF)                                                                    -42-

1   recommends gathering "evidence for deficits in adaptive functioning from one or more

2   reliable independent sources (e.g., teacher evaluation and educational, developmental, and

3   medical history)." Id. at 42.

4           Defendant has given us no reason to believe the recollections of these two sisters are

5   either reliable or independent.  Moreover, there is no indication that these two sisters even

6   knew Defendant well from the time he was seventeen to forty-one years old.  In fact, Dr.

7   Margarida's report states that she was "careful that [the sisters] only considered his

8   performance prior to age 18 and not as he may have developed later in life." (Marg. Rep. at

9   23.) This chronological gap is significant for at least three reasons.  First, it ignores the time

10  during which Candelario-Santana is alleged to have shown considerable adaptive skills as

11  the leader of a gang.  Second, it leaves out any consideration of whether Defendant has

12  adaptive behavior limitations currently, which is the proper focus of prong two.  Third, the

13  passage of twenty-four years' time between the sisters' recollection and now naturally

14  makes their memories less reliable, as stated above.

15          There are still more flaws in Dr. Margarida's report.  The report provides little reason

16  to believe that these two sisters had an adequate basis to observe Defendant even before the

17  age of eighteen.  Erica was a nine-year old at the time, and the only information about

18  Mildred is that she "is one of the closest siblings to Alexis and one of the informants that

19  was able to provide adaptive functioning information." (Marg. Rep. at 9.)  The descriptions

20  of Defendant's behavior, set forth in a section called "Discussion of Informant's Specific

21  Responses On the VABS-II," provide almost no context to bolster their reliability.  (Marg.

22  Rep. at 24-27.)   Instead, the section reads as a three-page series of one-sentence

23  declarations, with few, if any, supporting details.  Dr. Herrera testified that these two

1  subjects were poorly chosen respondents for a Vineland test, because they were only

2  eighteen years and nine years old at the time, and could not "look at him as a child when

3  they themselves were adults."    (Dec. 7 TR at 73.)  Because adults are often better able to

4  assess a child's adaptive behavior, the ideal respondents in a Vineland would be parents or

5  other adults who know the child well.  Even Dr. Greenspan admitted in his testimony that

6  Erica was not a proper subject for the Vineland.

7          The government's experts both testified that Dr. Margarida's reliance on her

8  Vineland test was a serious flaw in her analysis.  We agree**.**  Dr. Herrera testified that with

9  this particular defendant, he would not have made a retrospective use of the Vineland test at

10  all.  Dr. Herrera also described the retrospective use of the Vineland as "controversial."  Dr.

11  Grodzinski also wrote that this technique was one of "several flaws" in Dr. Margarida's

12  report.[57]

13          The testimony of Dr. Herrera on this point was particularly instructive:

14          It does not make any sense to go back if there is no determination of disorder
15          or impairments in adaptive behaviors.  And now I mean the issue between, for
16          instance, adult onset diabetes and childhood onset diabetes is crucial.  The
17          prognosis is totally different.   The intervention needs to be much more
18          aggressive.   But if there's no diabetes now, then there's no sense asking
19          questions about the onset of the diabetes in childhood.
20
21  (Dec. 7 TR at 57.)

22          Even if it were properly administered with reliable subjects, the Vineland would be

23  only one part of a person's overall adaptive behavior profile.  As Dr. John Gregory Olley[58]

24  has acknowledged, "the process of assessing adaptive behavior, particularly in a retroactive

25  sense, 'is a matter of drawing information from many sources, all of which are imperfect.'"

---

[57] Def. Exh. 11 at 8.
[58] Dr. Margarida cites Olley in her report.

1    Davis, 611 F.Supp.2d at 492 (quoting J. Gregory Olley, The Assessment of Adaptive

2    Behavior in Adult Forensic Cases: Part 2, PSYCHOLOGY IN MENTAL RETARDATION AND

3    DEVELOPMENT   DISABILITIES   (American   Psychological   Association/Division   33,

4    Washington, D.C.) (Fall 2006)).  Given the imperfect and amorphous nature of evaluating

5    adaptive behaviors, courts have adhered to the "relative consensus that the best way to

6    retroactively assess Candelario-Santana's adaptive functioning is to review the broadest set

7    of data possible, and to look for consistency and convergence over time."  Davis, 611

8    F.Supp.2d at 492 (reviewing literature on best practices for assessing adaptive behavior).

9        On this score, Dr. Margarida clearly failed to carry her burden.  There are several key

10   indications of Candelario-Santana's adaptive behaviors that she did not address at all.

11   Dr. Margarida either did not consider, or dismissed out of hand, suggestions that any of the

12   following might be indicative of Candelario-Santana's adaptive behaviors: Candelario-

13   Santana's work history, both licit and illicit; his repeated moves to and from Brooklyn,

14   Detroit, and Puerto Rico; his successful completion of a GED while incarcerated; his ability

15   to fix cars and change filters and brake pads; or the facts that he admitted to being a "chief"

16   of a large gang, had pled guilty to several murders, and was found to possess "average

17   intellectual resources" by a state psychologist in 2008.  Dr. Margarida simply ignored the

18   indictment's   allegations   that   Candelario-Santana   was   head   of   a   "large   criminal

19   organization" that netted several thousand dollars a day and committed at least twenty

20   murders to advance its goals.  Perhaps most importantly, one wonders why Dr. Margarida

21   chose to perform the Vineland test on two of Candelario-Santana's sisters, yet declined to

22   perform the test, or even conduct an in-depth interview with, anyone who knew Candelario-

23   Santana well during the last twenty-four years.

1    In these respects, we found the government's cross-examination of Dr. Margarida to

2    be very effective.  The government elicited several explanations from Dr. Margarida about

3    different pieces of evidence that she did not consider or did not reference in her report.  We

4    found many of Dr. Margarida's explanations unsatisfactory, unconvincing or contradictory.

5    The effect of these varying admissions was to detract from Dr. Margarida's credibility and

6    the validity of her report.

7    First, the government asked Dr. Margarida if she had not considered Defendant's

8    illicit employment as a drug dealer and manager of a drug point.  In response, she stated:

9        A. No, that's considered. It's just that it's impossible to ascertain.

10       Q. Really? Did you ask him?

11       A. I did not.

12   Id. at 112.

13   Her explanation for this omission was as follows: "I don't think that I need that

14   information to get to a conclusion."   Id. at 113.  The government then asked whether she

15   would find it relevant to a person's adaptive functioning if they were able to run a

16   successful drug operation for ten years that was purchasing drugs by the kilo.  This time,

17   Dr. Margarida provided yet another explanation, stating that she was "not an expert in

18   identifying the cognitive functions needed to do that."  Id.   Pressed further, Dr. Margarida

19   then stated that while she did know some of the tasks involved, there was an absence of

20   research showing "exactly what intellectual skills, if any, are needed to run a drug point."

21   Id. at 116.

22   Dr. Margarida then explained: "Whether he ran the point after 18 is not what I

23   needed to consider to make the diagnosis." Id. at 117.  Logically, then, the government

1   asked Dr. Margarida if she asked Defendant's sisters whether Candelario-Santana began

2   dealing drugs before the age of 18.  Id. at 118.  Dr. Margarida admitted that she did not ask.

3   Id.

4           The cumulative effect of all of these admissions was very damaging to the reliability

5   and credibility of Dr. Margarida's analysis in the court's eyes.  Moreover, it seems clear to

6   us that a person's work history running a drug point successfully for ten years would be

7   relevant to their adaptive functioning.  For example, Dr. Margarida cited to the 2010

8   AAIDD Manual. We think that being the "jefe" of a gang for sixteen years would indicate

9   mastery of adaptive skills found in this definition.  These include conceptual skills, such as

10  money, time and number concepts; social skills, including gullibility, naiveté, avoids being

11  victimized; and practical skills, such as occupational skills, use of money, safety, health

12  care, travel/transportation, schedules/routines, and use of the telephone.  AAIDD Manual at

13  44. Using the criterion from Atkins, we think it clear that such activities would have some

14  bearing on a person's "communication, self-care and self-direction."  Atkins, 536 U.S. at

15  318.

16          Moreover, we reject Dr. Margarida's assertion that she had "no way of analyzing

17  things that are allegations and that I have no access to." Her admission that she did not even

18  ask Defendant or his sisters about his past as a drug dealer, or consider the allegations in the

19  indictment, contradict this explanation.  The government also pointed out that Defendant

20  has two siblings who live in Puerto Rico that she could have talked to.  (Docket No. 697 at

21  126.)  Dr. Margarida did not speak with either one of them.  (Id.)  No explanation was

22  provided for this omission, except for Mr. Ruhnke's suggestion on re-direct that it would

23  have been inappropriate for her to speak with his brother, who is a codefendant in the case.

1        Another highly relevant source that Dr. Margarida failed to consider, but could have,

2    was the 2008 report by Dr. Torres.  On cross-examination, Dr. Margarida admitted that she

3    did not consider this report because it was not provided to her.  (Dec. 6 TR at 122-124.)

4    We find this omission highly significant for at least two reasons.  First, the report further

5    undermines Dr. Margarida's assertion that Defendant's gang leadership were simply

6    "allegations that [she] ha[d] no access to": in the evaluation by Dr. Torres, Defendant

7    admits to being the "jefe" of a gang.  (Gov. Exh. 14.)  Even more importantly, though, Dr.

8    Torres' report notes that Defendant possessed "average mental resources to work and

9    produce."  In fact, the report lists his intellectual resources as one of Candelario-Santana's

10   protective factors.  The government and Dr. Margarida had a brief colloquy about why she

11   would not have been provided with this evaluation, since the government claims to have

12   produced it to defense counsel two years ago.  (Dec. 6 TR at 123-124.)  Whatever the

13   reason, Dr. Margarida's failure to consider the evaluation certainly adds to the sense that

14   she did not consult—nor did she properly consider—a full panoply of relevant evidence.

15       To be clear, we reject Dr. Margarida's assertions that only Defendant's behaviors

16   before the age of eighteen should count towards her adaptive behavior determination.  We

17   also reject her assertion that only his legitimate work history should be considered.  But

18   even if we did agree with these two assumptions by Dr. Margarida, we find that her

19   analysis would still miss the mark.  On cross-examination, the government challenged her

20   on this point, by discussing Defendant's work history and his successful moves to and from

21   at least four different locations on the mainland United States before he was eighteen years

22   old. (Docket No. 697 at 106-111.)

1    The government pointed out that Candelario-Santana was able to move to and from

2    Florida, Brooklyn, Massachusetts, and Michigan, successfully landing on his feet each new

3    location, despite Candelario-Santana's very limited English skills and lack of familiarity

4    with these cities when he arrived.  Id. at 106-8.  In New York, Candelario-Santana even

5    worked successfully for one year in a full-time job.  He chose to return to Puerto Rico not

6    because he had been fired or could not handle life in New York, but simply because he

7    wanted a change.  Defendant was also able to buy a truck and start his own business

8    delivering merchandise, which he did for a year.

9    Dr. Margarida was unwilling to acknowledge that any of these successes might be

10   evidence of Defendant's adaptive behaviors.  Id.  The defense repeatedly argued that it

11   would be unfair to infer too much from these apparent successes, because not enough was

12   known about what kinds of help Defendant had to achieve these things.  But again, we are

13   unwilling to accept such an explanation, absent some sign that Dr. Margarida tried to find

14   out what could have caused the successes.  It was incumbent on the defense to at least make

15   a good faith effort to consider the Defendant as a whole, rather than just rehearsing

16   boilerplate from clinical manuals.  Drs. Herrera and Grodzinski both disagreed with Dr.

17   Margarida's judgment in these respects, and so do we.  We turn to the analysis of the

18   government psychologists now.

19   **2.      Reports by Drs. Herrera and Grodzinski**

20   For several reasons, we found the analysis of Drs. Herrera and Grodzinski much

21   more persuasive than that of Drs. Margarida and Greenspan.  To begin with, Dr. Herrera

22   personally met with four individuals who had long relationships with Candelario-Santana

23   and knew him well over a long period of time.  Dr. Herrera met with each person for an

Criminal No. 09-427 (JAF)                                                                          -49-

1   hour-and-a-half; the redacted descriptions of his interview are available in his report.[59]   In

2   some cases, these individuals had known Candelario-Santana from his childhood until 2009,

3   when the massacre at La Tómbola occurred.   Some had grown up and spent their whole

4   lives in the same neighborhood where Candelario-Santana is from.   We have read the un-

5   redacted reports of the information Dr. Herrera gained from these individuals.

6         We find the information provided by these individuals very informative, credible,

7   and probative of Candelario-Santana's adaptive behaviors.   We also believe that the picture

8   these individuals paint of Defendant is far more complete and reliable than the one given by

9   Dr. Margarida and Defendant's two sisters.   First, these individuals that Dr. Herrera spoke

10  with described Candelario-Santana as they knew him throughout their lifetimes, including

11  up to the time that Defendant allegedly committed the massacres at La Tómbola.   These

12  individuals were not speaking of Defendant only as he existed at age seventeen.   Second, the

13  descriptions provided by these individuals were based on their fresh memories of Defendant

14  as he behaved in 2009.   Naturally, then, these memories are more reliable than the ones

15  offered by Defendant's sisters, told to Dr. Margarida twenty-four years after the fact.   Third,

16  these individuals were all adults when they formed their impressions of Defendant; none of

17  the four individuals were offering only memories that they had formed as small children, as

18  Erica did.   Fourth, these individuals did not limit themselves to describing Defendant's legal

19  behaviors.   Their observations and experiences describe living in a neighborhood where

20  Candelario-Santana   directed   a   large   and   violent   drug   organization.   We   find   these

---

[59] Def. Exh. 13 at 4-8. The identifying information of these individuals has been kept confidential because of concerns for their safety.   In two separate orders, we have explained our rationale for keeping this information confidential. (Docket Nos. 701; 722.)

1    observations much more revealing than discussions in Dr. Margarida's report about how

2    well Defendant could cook and wash his clothes as a seventeen-year old boy.

3          In his testimony, Dr. Herrera summarized the feedback he received from these

4    individuals about Candelario-Santana:

> 5    [A]gain, the description across the board for four people independently
> 6    without being prompted or asked specific questions, at first it was that this
> 7    gentleman runs a very successful, prosperous business, or at least did run for a
> 8    substantial part of his adult life; and that even though he may have gone to
> 9    prison and come back, he was still considered to be the boss and asserted
> 10   himself to be the boss.  So that would be the general understanding of adaptive
> 11   functioning.

13   (Dec. 7 TR at 68.)  Dr. Herrera went on to testify that some of these individuals described

14   Candelario-Santana as "brilliant," not at all gullible, and possessing "very good

15   mathematical skills for counting money and making sure the weights were correct and all of

16   that."  (Id. at 69-70.)  Dr. Herrera further testified that when asked whether they believed

17   Candelario-Santana was mentally retarded, these individuals were incredulous.  At least

18   three had strong reactions indicating they thought Dr. Herrera would have to be kidding to

19   ask such a question.  One referred to Candelario-Santana as "nobody's fool."

20         Based in part on these conversations, Dr. Herrera concluded that Candelario-Santana

21   was a leader, not a follower.  In his interviews with the individuals who knew Candelario-

22   Santana well, Dr. Herrera asked whether Candelario-Santana was someone who is gullible,

23   easily led, or easily fooled.  These traits are some of the indicators of adaptive behavior

24   deficits.  As Dr. Herrera testified, "The responses were dramatically no, no way, okay? If

25   this is a follower rather than a leader? No way.  He perceives himself as the boss, the

Criminal No. 09-427 (JAF)                                                                        -51-

1    leader."  Upon questioning, Dr. Herrera then added that Candelario-Santana not only was

2    perceived as the boss, but was "feared as such in the business."[60]

3         Dr. Herrera indicated that he was "somewhat taken aback" by these "unrehearsed,

4    spontaneous manifestations" that he heard so consistently.  In the face of such strong

5    evidence of Candelario-Santana's adaptive behaviors, Dr. Herrera found it unnecessary to

6    administer the Vineland on any of these individuals.  Dr. Herrera testified that while he

7    brought the test with him to these meetings, after receiving such strong evidence of

8    Candelario-Santana's adaptive behaviors, he folded up the test, seeing "no need to explore

9    further."

10        Dr. Herrera also stated that Candelario-Santana's frequent moves to and from various

11   locations in the mainland provided further evidence of Candelario-Santana's successful

12   adaptive behaviors.  Again, we agree.   Asked whether he believed Candelario-Santana

13   suffered from adaptive behavior limitations under prong two of the <u>Atkins</u> analysis,

14   Dr. Herrera responded "Categorically No."  He further indicated that he was 100 percent

15   certain that Candelario-Santana was not mentally retarded. (<u>Id.</u> at 76.)  The question whether

16   Candelario-Santana had onset before the age of eighteen—the third prong of the

17   definition—became "moot" after this determination.  (<u>Id.</u>)

18        Dr. Grodzinski, after meeting with and examining Defendant, as well as reviewing

19   the relevant records and reports, concluded that Candelario-Santana did not meet prong two.

20   Dr. Grodzinski stated during his testimony that he believed in this result "completely

21   strongly" with "a hundred percent" confidence.  (Dec. 7 TR at 187-191.)  He came to this

---

[60] Dec. 7 Tr. at 68-69.

1   conclusion on the basis of his observations, records review, statements made by Defendant,

2   clinical impressions, past interviews, and Defendant's life history.  (Id.)

3        Dr. Herrera noted that he "never saw anything here that addressed impairment other

4   than low educational achievement."[61]   Apart from the Vineland tests Dr. Margarida

5   administered to Defendant's sisters, she also relied on her academic assessments of

6   Defendant.  We agree with Drs. Herrera and Grodzinski that Candelario-Santana's poor

7   academic and educational performance is just as easily explained by other factors.  These

8   doctors found that Candelario-Santana's poor performance on academic and educational

9   tests was likely attributed to Defendant's decision to drop out of school in the seventh grade;

10  to family and economic pressures that interfered with his studies; to his hyperactivity and

11  restlessness; or to his poor attendance and unruly behavior.

12       Dr. Grodzinski summed up many of these pressures when he explained that

13  Defendant's educational achievement suffered as a result of his growing up in a

14  "psychosocially deprived environment." (Dec. 7 TR at 175.) Dr. Herrera testified that he

15  believed Candelario-Santana "started with a syndrome of hyperactivity and attention

16  deficit." (Dec. 7 TR at 76.)  He also noted that Candelario-Santana was a self-described

17  restless, hyperactive child.  Id.  Ample evidence suggests that each of these factors inhibited

18  Defendant's academic growth.  We find each of these to be more plausible explanations for

19  Candelario-Santana Santana's low educational scores than Defendant's claim of mental

20  retardation.

21       Moreover, the academic test results that Dr. Margarida reported are contradicted by

22  several pieces of other evidence.  First, Dr. Grodzinski testified that Candelario-Santana's

_____

[61] Dec. 7 TR at 59.

1   performance on the 2008 MMPI-2 required basic reading skills of a sixth or seventh grade

2   level.[62]    The Aphasia Screening Test also indicated that Defendant's reading, writing,

3   spelling and math skills were okay.[63]  The GED that Defendant obtained while incarcerated

4   also suggests that he was capable of high-school level academic achievement.  Therefore, it

5   is simply not credible to think that Dr. Margarida's test results were an accurate reading of

6   Defendant's abilities.  The clear indications of malingering that Dr. Grodzinski found, for

7   example on the Rey 15 and Beck Anxiety Inventory tests, suggest that Candelario-Santana

8   may have been malingering on other tests as well.

9        Drs. Herrera and Grodzinski both concluded that prong two was not a close call.

10  Dr. Grodzinski said he was 100 percent confident in that judgment, based on his clinical

11  observations, available records, Dr. Herrera's interviews, and Defendant's history.  (Dec. 7

12  TR at 187-190.)  We agree with the judgment of Drs. Herrera and Grodzinski.  Although

13  Drs. Herrera and Grodzinski did not mention Defendant's arrest as a fugitive in St. Thomas,

14  we think this fact would provide even further indication of Candelario-Santana's many

15  adaptive behavior strengths.  We emphasize that even without considering the evidence of

16  Candelario-Santana's arrest, there was more than enough evidence to conclude that

17  Defendant does not meet prong two.

18       As the APA states, "[m]ental Retardation would not be diagnosed in an individual

19  with an IQ lower than 70 if there are no significant deficits or impairments in adaptive

20  functioning."  DSM-IV at 42.  We have seen no credible evidence of any significant

21  adaptive limitations in Candelario-Santana that would suggest mental retardation.

22  Candelario-Santana has simply failed to carry his burden of demonstrating by a

---

[62] Dec. 7 Tr. at 184.

[63] Id.

Criminal No. 09-427 (JAF)                                                                    -54-

1   preponderance of the evidence that he suffers from significant limitations under this prong.

2   On this basis alone, then, we would have enough reason to find Candelario-Santana not

3   mentally retarded.

4   **C.      Prong Three: Onset Before the Age of 18**

5           Drs. Herrera and Grodzinski both testified that because Candelario-Santana does not

6   show signs of being mentally retarded presently, this third prong becomes moot.  We agree.

7   Moreover, even if we were to closely inquire into this third prong, we think the evidence of

8   Candelario-Santana's mental retardation during childhood is very thin.  As we stated above,

9   the twenty-four year passage of time weakens the reliability of the testimony of Candelario-

10  Santana's sisters.  Candelario-Santana's poor academic performance is just as easily

11  explained by his troubled family life and unruly behavior as it is by any mental deficiencies.

12  But because of our above findings that Candelario-Santana is not mentally retarded

13  presently, any deeper analysis under this prong is unnecessary.

14                                            **V.**

15                                       **Conclusion**

16          Our independent analysis under the relevant three prongs has convinced us that

17  Candelario-Santana is not mentally retarded.  Having explained those reasons, we also want

18  to note the differences between the facts presented here and many of the other cases cited by

19  Defendant as model Atkins determinations.  In Point Seven of his Omnibus Motion, (Docket

20  No. 564 at 140-141), Defendant points the court to several "exhaustive opinions describing

21  the analysis and the extensive nature of expert testimony and social-history investigation

22  these cases require." Id. (citing Smith, 790 F. Supp. 2d 482; United States v. Lewis, 2010

23  WL 5418901 (N.D. Ohio, December 23, 2010); Hardy, 762 F. Supp. 2d 849 (E.D.L.A.

Criminal No. 09-427 (JAF)                                                                -55-

1   2010); Davis, 611 F. Supp. 2d 472; Sablan, 461 F. Supp. 2d 1239 (D.Colo. 2006); Allen v.

2   Wilson, 2012 WL 2577492 (S.D. Ind. July 3, 2012)).

3          We have reviewed each of these cases, all of which found that the defendant met the

4   Atkins criteria of mental retardation.[64]  But even a brief discussion of the facts in several of

5   these cases makes clear that each of the defendants showed many more signs of mental

6   retardation than Candelario-Santana.

7          For example, in Smith, 790 F. Supp. 2d at 491, "[bo]th psychologists found Smith to

8   have a Full Scale IQ of 67" after administering the WAIS III.  These scores were before

9   applying the Flynn adjustment. Id.  Contrast that with the one examination here that yielded

10  a Full Scale IQ of 75.  With respect to adaptive behavior, the court found the defendant in

11  Smith had a "simple lack of ability to compete at the levels he sought" in school, the Job

12  Corps, the U.S. Navy, and in his work history.   Id. at 524.   The court also found the

13  defendant to be a follower rather than a leader, noting his lack of participation in clubs,

14  extracurricular activities or athletics.  Id.  Here the situation could hardly be more different:

15  Candelario-Santana seems to have done quite well in the pursuits he chose, including

16  boxing, his licit work experience, ability to purchase and operate a vehicle, successful

17  pursuit of a GED in prison, and many other examples.  Candelario-Santana was consistently

18  described by people who knew him as a leader, not a follower.  Moreover, the alleged crime

19  committed by the defendant in Smith was an armed bank robbery resulting in death, not a

20  sophisticated, longstanding criminal conspiracy.

---

[64] In Sablan, 461 F. Supp. 2d 1239, the court ruled that the Atkins determination would be determined pre-trial, with the defendant bearing the burden of proof by a preponderance.  See page 2 of this opinion.  The defense also cited one unpublished case without any Westlaw or Lexis-Nexis citation, which we have not reviewed.

1     The same disparities are apparent when comparing <u>Davis</u>, 611 F. Supp. 2d at 489 to

2 the present case.  In <u>Davis</u>, the defendant had obtained "consistently low scores on IQ tests"

3 over a seventeen-year period.  Detailed school records also showed the defendant had a

4 word recognition grade level of 2.5 at age 12, indicating "severe and pervasive intellectual

5 and academic deficits." <u>Id.</u> at 489-490.  Candelario-Santana can point to no such track

6 record here, either in school records or past IQ tests.

7     Further, the adaptive behavior determination of the two defense experts in <u>Davis</u> was

8 much more comprehensive than the one offered by Dr. Margarida.  <u>Id.</u> at 495-497.  In

9 <u>Davis</u>, to assess the defendant's adaptive behaviors, defense psychologists spoke with the

10 defendant's parents, niece, daughter, older half-brother, former girlfriend who lived with

11 him, four former teachers or tutors, and a former co-worker. <u>Id.</u> at 496.  The portrait that

12 emerged, based on observations of the defendant at various stages of his life, including

13 adulthood, indicated significant deficits in at least seven of ten DSM-IV-TR criteria.   <u>Id.</u>

14 Comparatively, the information presented by the defense here is several orders of magnitude

15 less probative, in terms of the reliability of the witnesses, their knowledge of defendant and

16 relationship to him, the time period surveyed, and the level of detail.

17     A similar comparison can be drawn between this case and <u>U.S. v. Lewis</u>, 2010 WL

18 5418901 (N.D. Ohio, December 23, 2010).  In <u>Lewis</u>, the defense presented a much more

19 detailed and reliable portrait of defendant than the one we have here.  In <u>Lewis</u>, the

20 defendant was only twenty-five years old, making it much easier for the court to rely on

21 observations of Defendant when he was seventeen years old.  In fact, Dr. Greenspan

22 testified to that effect in the case, noting that the use of the retrospective diagnosis had an

23 advantage, because so little time had passed since the evaluation of Defendant at age

1    seventeen.  Id. at *21.  It seems only logical that the use of a retrospective diagnosis here

2    would be much less reliable, given that twenty-four years, rather than eight, have passed

3    since the cutoff age.  Moreover, the defense in Smith cited testimony from many witnesses

4    who knew the defendant well in the time leading up to the crime.  These included the

5    defendant's mother, aunt, sister, and the defendant's teacher in his juvenile detention

6    program.    Again, the picture of defendant the defense presented here is much less

7    comprehensive, and based on a selective and narrow view of the evidence.

8          Finally, we have reviewed Allen v. Wilson, 2012 WL 2577492 (S.D. Ind. July 3,

9    2012) and find it fundamentally different than the case we are presented with here.  In Allen,

10   the defendant had obtained two IQ scores of 68 and 70 as a child, and was recommended to

11   "be placed in a special education class for the mentally retarded." Id. at *3.  Here, the first

12   IQ test (of a 75) was registered after Candelario-Santana had been charged in this case,

13   when he was forty-one years old.  There is no indication that any of his teachers believed he

14   suffered from mental retardation.

15         In sum, the defense has simply failed to meet its burden of demonstrating that

16   Candelario-Santana is mentally retarded.    For the foregoing reasons, we find that

17   Candelario-Santana does not meet the definition of mental retardation under Atkins.  This

18   case will proceed as a death-penalty eligible prosecution.  Candelario-Santana's motion

19   (Docket No. 564) will be denied.

20         Candelario-Santana's motion, (Docket No. 564), is hereby **DENIED**.   The agreed-

21   upon schedule remains the same, with jury questionnaires to be filled out beginning on

22   January 8, 2013.

23         **IT IS SO ORDERED.**

Criminal No. 09-427 (JAF)                                                    -58-

1          San Juan, Puerto Rico, this 8th day of January, 2013.

2                                    s/José Antonio Fusté
3                                    JOSE ANTONIO FUSTE
4                                    United States District Judge