# United States Court of Appeals
## For the First Circuit

No. 19-1191

UNITED STATES OF AMERICA,

Appellee,

v.

ALEXIS CANDELARIO-SANTANA, a/k/a "Congo",

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

David Ruhnke, with whom Ruhnke & Barrett, Francisco Rebollo-Casalduc, Francisco Rebollo-Casalduc Law Office, Kendys Pimentel-Soto, and Kendys Pimentel-Soto Law Offices, LLC, were on brief, for appellant.
Scott H. Anderson, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and David C. Bornstein, Assistant United States Attorney, were on brief, for appellee.

October 8, 2020

**HOWARD**, <u>**Chief Judge**</u>.  On October 19, 2012, the appellant, Alexis Candelario-Santana ("Candelario") was charged in a 52-count superseding indictment in connection with the October 17, 2009 shooting at La Tómbola, a mini-market and bar in Toa Baja, Puerto Rico.  Relevant to this appeal, Candelario was charged with nine counts of committing a violent crime (here, murder) in aid of racketeering, in violation of 18 U.S.C. § 1959, and nine counts of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(j).  In advance of trial, the government filed a notice of its intent to seek the death penalty on sixteen of these counts.

In 2013, a jury found Candelario guilty on all charges but failed to reach a unanimous decision on the question of punishment.  The district court, consistent with its representations to the jury during trial, imposed an incarcerative sentence for the term of Candelario's natural life without the possibility of release.  Candelario timely appealed his conviction, arguing that the district court's decision to close the courtroom during the testimony of a single witness violated his Sixth Amendment right to a public trial.  <u>See</u> <u>United States</u> v. <u>Candelario-Santana</u>, 834 F.3d 8, 23 (1st Cir. 2016).  We concluded that this courtroom closing constituted structural error and vacated his conviction.  <u>Id.</u> at 24.  On remand, now before a different district court judge, the government again notified the

court of its intention to seek the death penalty on sixteen of the charges levied against Candelario.

In response, Candelario moved to strike the government's notice of intent to seek the death penalty on double jeopardy grounds. The district court denied the motion and Candelario timely appealed.

We now reverse and remand for further proceedings.

**I. BACKGROUND**

Because the facts underlying Candelario's original conviction were set forth in some detail in our opinion in his initial appeal, see Candelario-Santana, 843 F.3d at 15-16, we recite them only briefly. We focus our attention on the original jury's verdict following the penalty phase of Candelario's trial.

**A. The Facts**

In 1993, Candelario became the head of a drug-trafficking organization known as the Palo de Goma drug point, which operated primarily in the Sabana Seca barrio of Toa Baja, Puerto Rico. During this time, Candelario, along with various co-conspirators, trafficked in heroin, cocaine, and marijuana, and used violence to maintain exclusive control of the organization's "territory." In 2003, Candelario pled guilty in a Puerto Rico court to twelve counts of second-degree murder and was sentenced to imprisonment. Nonetheless, he continued to be involved in the

drug organization from prison.   Candelario was released from custody in February 2009.

On October 17, 2009, several gunmen entered the La Tómbola mini-market and bar in Sabana Seca during its opening night party.   They opened fire on the crowd gathered there.   Several witnesses identified Candelario as one of the shooters.   One of the witnesses stated that she heard Candelario shout, "Nobody is getting out of here alive," while firing on the crowd.   The shooting left nine people dead, including an unborn child, and nineteen others injured.

Shortly thereafter, Candelario was indicted along with several others in federal court in connection with the shooting. The indictment included eighteen murder-related charges that carried the possibility of a death sentence.   On July 8, 2012, the government notified the district court that it intended to seek the death penalty against Candelario on sixteen of the eighteen murder charges.   The government did not seek the death penalty for the two charges related to the death of an unborn child.   After a sixteen-day trial, the jury convicted Candelario on all counts, including the sixteen capital counts.

## B. The Original Penalty Phase

The trial then moved to the penalty phase.   During this phase, the district court instructed the jury orally that "[t]he selection between two serious choices, the death penalty or

lifetime imprisonment without the possibility of release is yours

and yours alone to make."  After instructing the jury with respect

to the relevant aggravating and mitigating factors, the burdens of

proof, and the proper order of deliberations, the district court

stated:

> [i]f you determine beyond a reasonable doubt
> that the aggravating factor or factors found
> to exist sufficiently outweigh any mitigating
> fact or factors found to exist to justify a
> sentence of life for a given capital offense,
> you will enter your determination as to
> whether death is justified in the
> corresponding section of the verdict form
> . . . If you unanimously determine that the
> aggravating factor or factors do not exist, do
> not sufficiently outweigh any fact or factors
> that exist to justify a sentence of death, you
> will enter your determination as to whether
> the defendant be sentenced to life
> imprisonment without possibility of release in
> the pertinent section of the verdict form.
>
> However, if you are unable to come to [an]
> agreement of [a] unanimous nature on the issue
> of punishment, after following the instruction
> [regarding the duty to deliberate] . . . I
> will impose a sentence of life imprisonment
> without the possibility of release.  There is
> a space in your verdict form addressing this
> outcome.

In reference to the duty to deliberate, the district

court instructed the members of the jury that they had a "duty to

consult with one another and to deliberate with a view to reaching

[an] agreement if you [the members of the jury] can do so without

doing violence to your individual judgment."  It reminded the

members of the jury that "[e]ach of you must decide the case for

yourself, but [that] you should do so only after consideration of the evidence with your fellow jurors." The members of the jury, the court noted, had an obligation to "examine the questions submitted to you openly and frankly, with proper regard to the opinion of others and with a willingness to examine your own views." Beyond this instruction, however, the district court did not give the jury further oral instructions regarding their duty to reach a unanimous verdict. The district court gave the jury substantively identical written instructions.

The jury was then sent to deliberate, and it was required by statute to return a special verdict. See 18 U.S.C. § 3593(d). In particular, it was required to state both (1) whether it found beyond a reasonable doubt that Candelario was death eligible; and, (2) its finding on each statutory and non-statutory aggravating factor that the government had argued existed in this case. The jury was also required to indicate how many of its members found each of the mitigating factors by a preponderance of the evidence. The verdict form finally asked the jury to state with respect to each of the capital counts whether it "determine[d], by unanimous vote, that a sentence of death shall be imposed"; "determine[d], by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed"; or determined that "[a]fter due deliberation, [the members of the jury] are unable to come to unanimous agreement on the issues of punishment. We [the

jury] understand that the Court will impose a sentence of life imprisonment without the possibility of release."

After approximately one day of deliberation, the jury informed the district court that it had "concluded deliberations." The jury unanimously found that Candelario was death eligible and that the government had proven six statutory aggravating factors and three non-statutory aggravating factors beyond a reasonable doubt. With respect to the mitigating factors, at least one member of the jury found and considered ten of the twelve mitigating factors presented by Candelario, and two additional ones that had not been raised by counsel. With respect to each of the capital counts, however, the jury stated that it was unable to come to a unanimous agreement on the issue of punishment and "under[stood] that the Court will impose a sentence of life imprisonment without the possibility of release."

Upon receiving the verdict form, the district court announced the jury's decision and asked each member of the jury if "this [is] your verdict." Each juror answered in the affirmative, and the district court discharged the jury. The district court did not give the jury an Allen charge or expressly inform counsel that the jury was not unanimous before announcing the verdict. See generally, Allen v. United States, 164 U.S. 492 (1896).

**C. Appeal and Remand**

At a hearing held on August 23, 2013, the district court sentenced Candelario to a sentence of life imprisonment and a (purely hypothetical) period of five years of supervised release.

Candelario timely appealed his conviction, arguing only that the district court's decision to hear testimony from one witness in a closed session violated his Sixth Amendment right to a public trial. Candelario-Santana, 834 F.3d at 21. We agreed with Candelario, holding that the district court had failed to make any finding that closing the courtroom was necessary to protect an "overriding interest" in the witness's personal safety. Id. at 23-24. This failure constituted structural error and entitled Candelario to a new trial. Id.

On remand, the government again notified the court of its intention to seek the death penalty. Candelario moved to strike the notice of intent on double jeopardy grounds. Relying on the Supreme Court's decision in Sattazahn v. Pennsylvania, 537 U.S. 101 (2003), the district court denied Candelario's motion, holding that the original trial jury did not acquit Candelario of capital murder. In doing so, the court stated that the original penalty-phase jury was deadlocked on the question of death and as a consequence, the government was not barred from seeking the death penalty on retrial.

We now reverse.

## II. JURISDICTION

Though not raised by the parties, we "have an independent obligation to determine whether subject-matter jurisdiction exists," especially in cases in which no final judgment has been rendered. Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006). Therefore, we begin by briefly addressing whether we have the power to reach the merits of Candelario's claim.

In most circumstances, "[f]inality of judgment has been required as a predicate for federal appellate jurisdiction." Abney v. United States, 431 U.S. 651, 656 (1977). However, this requirement gives way, and interlocutory appeal is permitted, in the small class of cases in which a decision by the district court "finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Id. at 658-59 (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).

This case falls into that class. The protection Candelario invokes "is a guarantee against being twice put to trial" and would be defeated if he was forced to wait until a final judgment had been reached to seek review. Id. at 660 (emphasis added); see also United States v. Keene, 287 F.3d 229, 232 (1st Cir. 2002).

- 9 -

## III. STANDARD OF REVIEW

Ordinarily, a motion to dismiss on double jeopardy grounds rests on a pure question of law that we review de novo. See Keene, 287 F.3d at 233 (citing United States v. Morris, 99 F.3d 476, 478 (1st Cir. 1996)).  However, this seemingly simple principle is complicated where, as here, the district court's decision with respect to the motion depends on whether the original penalty-phase jury was in fact deadlocked on the issue of the death penalty and on whether the district court properly discharged the jury after confirming its verdict.  Id.

In denying Candelario's motion to strike, the district court treated the original court's decision to discharge the jury and hold a separate sentencing proceeding as a declaration of a mistrial.  See Mistrial, Black's Law Dictionary at 1200 (11th ed. 2019) (defining "mistrial" as "[a] trial that ends inconclusively because the jury cannot agree on a verdict").  Now on appeal, Candelario argues that this conclusion was erroneous.  The original jury, he argues, unanimously rejected the death penalty and the original court simply effectuated the jury's verdict by imposing a life sentence.  In evaluating this argument, the district court relied entirely on the record of the original penalty-phase proceedings and did not engage in further fact-finding. Consequently, at least this part of Candelario's argument presents a question of law that we review de novo.  See Keene, 287 F.3d at

233 (citing, <u>inter alia</u>, <u>United States</u> v. <u>Pierro</u>, 32 F.3d 611, 617 (1st Cir. 1994)).

However, Candelario has not clearly argued either initially on appeal or before the district court that the original court's decision to accept the jury's verdict was erroneous.  To the extent we reach that question, we will evaluate – favorably to the government – the original court's actions for plain error. <u>See, e.g.</u>, <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 731–32 (1993); <u>United States</u> v. <u>Davis</u>, 923 F.3d 228, 236–37 (1st Cir. 2019) (applying plain error review to unpreserved claims of error during sentencing).

## IV. ANALYSIS

The only question before us on appeal is whether the jury's failure to reach a unanimous verdict "on the issues of punishment" during the penalty phase of the initial trial triggers the protection against double jeopardy during a potential subsequent penalty phase.  Candelario has not argued (nor can he do so convincingly) that double jeopardy bars the government from retrying him for the charged offenses following remand.  <u>See, e.g.</u>, <u>Bravo-Fernandez</u> v. <u>United States</u>, 137 S. Ct. 352, 363 (2016) ("When a conviction is overturned on appeal, the general rule is that the Double Jeopardy Clause does not bar reprosecution." (internal quotations and citations omitted)); <u>cf.</u> <u>Tibbs</u> v. <u>Florida</u>, 457 U.S. 31, 40–41 (1982) ("[T]he Double Jeopardy Clause [only] precludes

retrial once the reviewing court has found the evidence legally insufficient to support conviction." (internal quotations and citations omitted)).

Candelario insists that the jury's decision here amounted, in substance, to an acquittal of the death penalty because the jury agreed to a sentence of life imprisonment. Implicit in his argument is the idea that, by instructing the jury repeatedly as to the consequences of deadlock (namely, that it would result in an imposition of a life sentence), the district court reduced the jury's choice to a binary one -- i.e., to either death or life in prison -- and that any decision by the jury other than a unanimous verdict for death acquitted Candelario of the death penalty.

The government responds by arguing that the jury explicitly failed to reach a unanimous conclusion with respect to punishment and therefore, that the jury's decision cannot fairly be read to acquit Candelario of the death penalty. Double jeopardy therefore does not prevent the government from seeking the death penalty upon retrial.

In making this argument, the government, like the district court, relies heavily on the Supreme Court's decision in Sattazahn v. Pennsylvania, 537 U.S. 101 (2003). There, the Supreme Court held that, when the penalty-phase jury is unable to "reach[ ] a decision on death or life" and is discharged "without making any

findings regarding aggravating or mitigating circumstances," the defendant has not been "acquitted" of capital murder.  Sattazahn, 537 U.S. at 112–13.  Thus, "[the Sattazahn defendant's] 'jeopardy' never terminated with respect to either" capital murder or the lesser-included offense of first-degree murder, and the government could seek the death penalty on retrial.  Id. at 113.  However, the Court in Sattazahn noted that the jury there was discharged only after the defendant moved for a mistrial under Pennsylvania law, so there was no question that a mistrial was proper; the Pennsylvania trial court granted the defendant's motion, discharged the jury as hung, and entered a sentence of life imprisonment.  Id. at 104–05.

In applying Sattazahn, the district court in this case found that the jury was "clear and deliberate in expressing its deadlock," and therefore, that its original verdict could not properly constitute an "acquittal."  Consequently, the district court held that the government was entitled to seek the death penalty a second time.

We do not disagree with the district court's conclusion that, if the jury truly was "clear and deliberate in expressing its deadlock" with respect to the death penalty, double jeopardy would not bar the government from seeking the death penalty upon retrial. We are not convinced, however, that the record so clearly supports the government's position that the jury was hopelessly

deadlocked on the question of death.  We therefore cannot say that the district court properly concluded that the original penalty-phase jury was deadlocked.  Nor can we say that, even if the jury was deadlocked, the original trial judge's decision to declare a mistrial was "reasonably necessary" under the circumstances. United States v. Toribio-Lugo, 376 F.3d 33, 39 (1st Cir. 2004) (quoting Keene, 287 F.3d at 234).  Consequently, the government is now barred from seeking the death penalty a second time.

**A. The FDPA**

We begin our analysis of Candelario's claim by determining whether double jeopardy applies at all.  The Double Jeopardy Clause of the Fifth Amendment "protects against a second prosecution for the same offense after [an] acquittal . . . [or] conviction.  And, it protects against multiple punishments for the same offense."  Brown v. Ohio, 432 U.S. 161, 165 (1977) (citing North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).  However, double jeopardy ordinarily does not attach to sentencing proceedings, even in circumstances where a judge (or, in some states, a jury) is required to make factual findings to determine whether a defendant is subject to an enhanced sentence.  See, e.g., Monge v. California, 524 U.S. 721, 728 (1998); Bullington v. Missouri, 451 U.S. 430, 438 (1981).  In the context of sentencing, the Supreme Court has reasoned, "the determinations at issue do not place a defendant in jeopardy for an 'offense,'" but rather

serve as "a stiffened penalty for the latest crime." <u>Monge</u>, 524 U.S. at 728 (internal quotations and citations omitted).

The exception is the death penalty context.  In that circumstance, the Supreme Court has made clear that capital defendants are entitled to have a jury, not a judge, determine both whether they are death eligible and whether to impose the death penalty.  <u>See</u> <u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584, 589 (2002) ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." (citing <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000))); <u>Hurst</u> v. <u>Florida</u>, 136 S. Ct. 616, 622 (2016) ("<u>Ring</u> required a jury to find every fact necessary to render [the defendant] eligible for the death penalty.").

Congress has incorporated this requirement into the Federal Death Penalty Act ("FDPA") by requiring a penalty-phase hearing after a defendant has been convicted of a capital offense before the same jury that convicted him.  18 U.S.C. §§ 3591(a), 3593(b).  During this hearing, a jury is required to find: (1) that the defendant is death eligible; (2) the existence of any aggravating factor "beyond a reasonable doubt;" and, (3) any mitigating factor "by a preponderance of the information."  18 U.S.C. § 3593(c).  After hearing the evidence, the jury is required to return a special verdict detailing its findings and recommending

"by unanimous vote . . . whether the defendant shall be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence."  18 U.S.C. § 3593(e).  The district court is then bound to sentence the defendant according to the jury's verdict.

If there is no recommendation, the right to determine the sentence returns to the trial judge, who has the discretion to impose an incarcerative sentence for a term of years, up to a term of the defendant's natural life, according to the factors set forth in 18 U.S.C. § 3553(a); the judge cannot, however, impose a sentence of death.  See Jones v. United States, 527 U.S. 373, 380-81 (1999) (interpreting 18 U.S.C. § 3594); United States v. Tsarnaev, 968 F.3d 24, 90 (2020) ("And if [the jury] cannot make a unanimous recommendation, the judge steps in and can impose either a life sentence without possibility of release or any lesser sentence allowed by law." (emphasis added)); see also id. at 41 n.12 (same).

Because this kind of proceeding is "comparable to a trial," double jeopardy applies.  Arizona v. Rumsey, 467 U.S. 203, 209 (1984) (citing Bullington, 451 U.S. at 438); see also Sampson v. United States (Sampson II), 724 F.3d 150, 160 (1st Cir. 2013) ("After all, the Double Jeopardy Clause . . . applies to sentencing hearings in capital cases." (internal citation omitted)).  What is more, it applies in the same way, and to the same extent, as it

would in any other criminal proceeding.  If a penalty-phase jury imposes a sentence of death, the government, on retrial, may seek death a second time; if the jury imposes a sentence of life imprisonment, the government is barred by the Double Jeopardy Clause from seeking death on retrial.  See Sampson II, 724 F.3d at 160-61.

Finally, if the jury fails to reach a unanimous verdict, our inquiry focuses on whether this failure constituted an "'acquittal' based on findings sufficient to establish a legal entitlement to the life sentence."  Sattazahn, 537 U.S. at 108; see also Sampson v. United States (Sampson III), 832 F.3d 37, 44-45 (1st Cir. 2016).  In essence, this inquiry is identical to the one we conduct when a district court declares a mistrial because of jury deadlock.  We will therefore turn our attention to that circumstance.

**B. Double Jeopardy After Mistrial**

"When a mistrial is declared before the jury returns its verdict, jeopardy may or may not persist" to bar reprosecution. Toribio-Lugo, 376 F.3d at 38 (citing, inter alia, Arizona v. Washington, 434 U.S. 497, 505 (1978)).  Certainly, double jeopardy does not bar reprosecution in cases where the defendant either requests or explicitly consents to the declaration of a mistrial. See United States v. Dinitz, 424 U.S. 600, 607-08 (1976) (explaining that "[d]ifferent considerations obtain, however, when

a mistrial is declared at the defendant's request" and holding that, in such circumstances, double jeopardy does not bar reprosecution (citing, inter alia, United States v. Jorn, 400 U.S. 470, 484 (1971) and United States v. Tateo, 377 U.S. 463, 467 (1964))).

Double jeopardy also does not bar reprosecution if "a mistrial was occasioned by manifest necessity." Toribio-Lugo, 376 F.3d at 38 (citing United States v. Perez, 22 U.S. (9 Wheat.) 579, 579-80 (1824)); see also United States v. Garske, 939 F.3d 321, 328-29 (1st Cir. 2019), cert denied 140 S. Ct. 1121 (2020) ("The general rule is that a judge's decision to discharge an empaneled jury and declare a mistrial prior to verdict does not bar retrial when, taking all the circumstances into consideration, there is a manifest necessity for that act, or the ends of public justice would otherwise be defeated." (internal citations and quotations omitted)); Keene, 287 F.3d at 233 ("[A]n appropriately declared mistrial does not insult principles of double jeopardy (and therefore, does not bar retrial)"); Washington, 434 U.S. at 506 ("[W]e require a 'high degree' [of necessity] before concluding that a mistrial is appropriate.").

Because the decision to declare a mistrial is within the sound discretion of the district court, our review is "inevitably reduce[d] to whether the district judge's declaration of a mistrial was reasonably necessary under all the circumstances." Toribio-

Lugo, 376 F.3d at 39 (citing Keene, 287 F.3d at 234).  In doing
so, we consider whether the district court explored other options,
gave counsel the opportunity to object, and acted "after sufficient
reflection."  Id.  In the vast majority of cases, the district
court's decision to declare a mistrial when the jury is "genuinely
deadlocked" is manifestly necessary, and the defendant may be
retried without insulting principles of double jeopardy.
Washington, 434 U.S. at 509; Keene, 287 F.3d at 233.

     The key to this principle, of course, is that the jury
must be genuinely deadlocked.  There is no requirement that a trial
court "consider any particular means of breaking the impasse"
before declaring a mistrial because of a hung jury.  Blueford v.
Arkansas, 566 U.S. 599, 609 (2012).  The Supreme Court has frowned
upon establishing a mechanical rule that requires a district court
to take specific steps or make specific findings before concluding
that a jury is deadlocked and unlikely to reach a verdict.  Renico
v. Lett, 559 U.S. 766, 775-76 (2010); see also Washington, 434
U.S. at 516-17 (holding that a trial judge's failure to make an
explicit finding of manifest necessity does not render the
declaration of a mistrial constitutionally defective when the
basis for that determination is adequately disclosed by the
record).

     This does not mean, however, that a district court can
discharge a jury any time the court believes (reasonably or

otherwise) that jurors disagree with one another; nor does it insulate the district court's decision to discharge the jury from appellate review.    Though we defer to the district court's judgment, its decision to discharge the jury must be an exercise of "sound discretion," meaning it must take <u>some</u> step to ensure that the jury truly is unable to reach a verdict before discharging it.  <u>Renico</u>, 559 U.S. at 775; <u>see also</u> <u>Illinois</u> v. <u>Somerville</u>, 410 U.S. 458, 470-71 (1973) ("The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one.").   Double jeopardy bars retrial on a particular charge when "the jury was dismissed without returning any express verdict on that charge and without [defendant's] consent [despite having] a full opportunity to return a verdict and [in the absence of any] extraordinary circumstances . . . which prevented it from doing so." <u>Green</u> v. <u>United States</u>, 355 U.S. 184, 191 (1957).

This principle applies with the same force to the penalty phase of a capital trial as it does to any other criminal proceeding in which a jury is called upon to make a determination of guilt.  <u>See generally</u>, <u>Sattazahn</u>, 537 U.S. 101.

**C. The Penalty-Phase Verdict**

Here, the record as a whole does not make clear that the jury was genuinely deadlocked on the question of death, thus making

the "declaration of a mistrial . . . reasonably necessary under all the circumstances." Toribio-Lugo, 376 F.3d at 39 (citing Keene, 287 F.3d at 234). Rather, the record can be read to support the conclusion that, at least with respect to the death penalty, the jury had reached a unanimous verdict. Moreover, even if the jury was not unanimous when the verdict was read, there were no "extraordinary circumstances" that would have prevented the jury from reaching a unanimous verdict after further deliberation. Green, 355 U.S. at 190-91.

### 1. The Verdict Was Ambiguous

During the penalty phase, the district court instructed the jury only once before it began deliberations that "[t]he selection between two very serious choices: (1) the death penalty; or (2) lifetime imprisonment without the possibility of release, is yours and yours alone to make." Though the verdict form included a so-called "third option" if the jury was not unanimous, the district court's comments (and the verdict form itself) also made clear to the jury that, if it could not reach a unanimous decision on the appropriate punishment, Candelario would be sentenced to life imprisonment. These instructions are not erroneous; the district court is permitted, though not required, to instruct the jury as to the consequences of its decision. See Jones, 527 U.S. at 383; Tsarnaev, 968 F.3d at 92-93.

However, these instructions, when read with the jury's responses on the verdict form, render the verdict ambiguous and raise the possibility that the jury intended to acquit Candelario of the death penalty. Unlike the jury in Sattazahn, the jury here returned specific findings with respect to Candelario's eligibility for the death penalty and the aggravating and mitigating factors presented by counsel. Only after doing so did the jury turn to the question of punishment and state, with respect to each capital count, that it did not "determine, by unanimous vote, that a sentence of death shall be imposed."

It is possible to read the verdict form, as both parties propose, to indicate that the jury approached the question of punishment as a binary choice between life and death. The government argues that, by choosing the third option, the jury indicated that it was deadlocked as to whether to impose the death penalty. Candelario, in turn, argues that, because the jury instructions presented the choice as a binary one, we should read the verdict form as reflecting the jury's unanimous intent to impose a sentence of life imprisonment; any verdict other than a unanimous death sentence, Candelario argues, amounts to a clear verdict for a sentence of life imprisonment.

But, it is also reasonable to read the verdict form as suggesting that the jury approached the question of punishment sequentially: it is reasonable to conclude that the jury first

considered and unanimously rejected a sentence of death before even considering a sentence of life imprisonment.[1]  And, in this circumstance, it is possible to read the verdict form as stating that the jury was divided between a sentence of life imprisonment and some lesser sentence.  See 18 U.S.C. § 3594 (allowing a court to impose a sentence below life imprisonment if authorized by law if a penalty-phase jury does not return a recommendation); see also 18 U.S.C. § 924(j)(1) (allowing for a sentence of imprisonment

---

[1] This ambiguity is particularly salient because first-degree murder is a lesser-included offense of capital murder and because the district court gave no clear instruction to the jury as to the order of its deliberations with respect to the ultimate penalty.

The states are divided on the question of how the trial court should instruct a jury in these circumstances.  Several states use some variation of what has been called an "acquittal-first" charge, which requires the jury to acquit the defendant of a greater-included offense before considering the lesser-included charge.  See State v. Davis, 266 S.W.3d 896, 905 (Tenn. 2008) (collecting cases).  The others use a "reasonable efforts" instruction, which "allows the jury to consider lesser-included offenses if it cannot reach a verdict on the greater offense after having made reasonable efforts to do so."  Id. at 906 (collecting cases).  The difference between these two approaches is most consequential in the double jeopardy context because a defendant convicted of a lesser-included offense in an "acquittal-first" jurisdiction is protected from retrial on the greater offense.  A defendant in a "reasonable efforts" jurisdiction is not.

Other circuits have not required district courts to instruct the jury in any particular way with respect to lesser-included offenses, though they have required courts to give effect to the defendant's preference, if he expresses one.  See, e.g., United States v. Tsanas, 572 F.2d 340, 346 (2d Cir. 1978); United States v. Jackson, 726 F.2d 1466, 1469 (9th Cir. 1984).  Candelario made no request with respect to any lesser-included offense instruction here, and none was given.  Consequently, we have no guidance as to how the jury approached these deliberations.

"for any term of years or for life"); but see 18 U.S.C. § 1959(a)(1) (suggesting that the sentence for murder in aid of racketeering be "death or life imprisonment").

All three interpretations are supported by the plain text of the verdict form, read along with the jury instructions. Even after examining the full record, we cannot say with reasonable certainty which of the three interpretations that we have outlined was intended by the jury. Cf. Tsarnaev, 968 F.3d at 122 (Torruella, J., concurring in part, joining in part, and concurring in judgment) (noting the necessity of a reasonable "degree of certainty" in the outcome of the capital sentencing process). This is especially true because of the context in which the verdict was rendered. As the Supreme Court has acknowledged, capital sentencing is a moral enterprise in which the jury is called upon to make "difficult and uniquely human judgments." McCleskey v. Kemp, 481 U.S. 279, 311, 319 (1987); see also Tsarnaev, 968 F.3d at 120 (Torruella, J., concurring in part, joining in part, and concurring in judgment) (noting that "the decision of whether to recommend a death sentence is mostly a question of mercy." (internal quotations omitted)). Consequently, trying to determine on appeal the reactions of a jury to evidence presented during the penalty phase of a capital trial, in the absence of a clear verdict, "is a dangerously speculative enterprise." Satterwhite

v. Texas, 486 U.S. 249, 262 (1988) (Marshall, J., concurring); see also Caldwell v. Mississippi, 472 U.S. 320, 380 (1985).

Moreover, the original trial court took no steps to clarify the jury's verdict; when polling the jury, the court asked each member only if "this [is] your verdict." (emphasis added). Even if this failure to clarify the verdict would not rise to the level of reversible error in an ordinary case, capital proceedings are different and carry with them a "greater need for reliability." Satterwhite, 486 U.S. at 263 (Marshall, J., concurring) (citing, inter alia, California v. Ramos, 463 U.S. 992, 998-99 (1983)); see also Kyles v. Whitley, 514 U.S. 419, 411 (1995) ("Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." (quoting Burger v. Kemp, 483 U.S. 776, 785 (1987)); Tsarnaev, 968 F.3d at 61 (suggesting that the district court's obligation to protect the defendant's rights is heightened in a capital case because of the stakes involved). Cf. United States v. Poole, 545 F.3d 916, 918 (10th Cir. 2008) ("When a jury returns a verdict that is plainly ambiguous or uncertain on its face, the district court has a duty to resolve that doubt.").

Even in non-capital cases, ambiguous verdicts (much like ambiguous criminal statutes) must be construed in favor of the defendant. See Blum, George, L., et. al., 75B Am. Jur. 2d, Trial § 1472 (2020); see also, e.g., Franklin v. Klopotoski, 2013 WL

5468251 at *5 (E.D. Penn. Aug. 7, 2013) (applying this rule);
Alvarez-Guerrero v. Uttecht, 2016 WL 7241568 at *8 (W.D. Wash.
Nov. 8, 2016) (same); cf. Albernaz v. United States, 450 U.S. 333,
342 (1981) ("[The] policy of lenity means that the Court will not
interpret a federal criminal statute so as to increase the penalty
it places on an individual when such an interpretation can be based
on no more than a guess . . . ." (quoting Bifulco v. U.S., 447
U.S. 381, 387 (1980)).  Surely, that consideration is heightened
in a capital case.  See Bucklew v. Percythe, 139 S. Ct. 1112, 1146
(2019) (Sotomayor, J., dissenting) ("[T]he equities in a death
penalty case will almost always favor the prisoner . . . ."
(citing, inter alia, Nken v. Holder, 556 U.S. 418, 434 (2009)).
Applying this principle, we are required to interpret the ambiguity
inherent in the original jury's verdict in favor of Candelario; we
are, in other words, required to read the verdict as unanimously
rejecting the death penalty.

This is sufficient for us to conclude that the first
life sentence "was an 'acquittal' based on findings sufficient to
establish legal entitlement to a life sentence." Sattazahn, 537
U.S. at 108.  Double jeopardy therefore bars the government from
seeking the death penalty on retrial.

## 2. The Mistrial Declaration

Even if we accept the government's reading of the verdict
and conclude that the jury was, in fact, not unanimous on the

question of death, we must still reverse.  Because it is not
evident from the record that further deliberation would have been
futile, the original trial court's declaration of a mistrial was
not manifestly necessary under the circumstances.

       The jury gave the district court no indication that it
was unable to reach a unanimous verdict before the verdict was
delivered; the jury's note to the court says only that it "[has]
concluded deliberations."  After reviewing the verdict form, the
district court did not consult with counsel, remind the jury of
its obligation to reach a unanimous verdict or give an Allen
charge; or even ask the jurors whether they genuinely believed
they had reached an impasse.  Instead, the district court merely
asked the individual members of the jury whether "this [is] your
verdict."  (emphasis added).

       Though we do not require the district court to take any
specific step before announcing the jury's verdict, we do require
something more than what the district court did here.  See, e.g.,
Blueford, 566 U.S. at 609; Renico, 559 U.S. at 775-76.  At the
very least, we require the district court to consider other options
to ensure that the jury is genuinely deadlocked before discharging
it.  See Toribio-Lugo, 376 F.3d at 38-39; Garske, 939 F.3d at 334-
35.  Indeed, this obligation is heightened when, as here, the
stakes are life and death, and where both parties have a compelling
interest in a unanimous verdict.  Jones, 527 U.S. at 382 (noting

that, while the defendant always has a strong interest in a unanimous verdict resolving the charges against him, "in a capital sentencing proceeding, the Government has a strong interest in having the jury express the conscience of the community over the ultimate question of life or death" (internal quotations omitted)).

The district court also did not give defense counsel a meaningful opportunity to object before discharging the jury. The record suggests that the parties were not aware of the fact that the jury was not unanimous before the verdict was announced and confirmed. The district court only addressed counsel after reading and confirming the verdict in open court to ask if there was "[a]nything else" before discharging the jury. Given the circumstances, we cannot say that this was sufficient to protect Candelario's right to object to the declaration of a mistrial.[2]

---

[2] It is difficult to imagine a defendant in Candelario's shoes actually objecting to the district court's decision to discharge the jury. When the verdict was announced, Candelario was assured that he would not be sentenced to death. Had the jury been sent back for further deliberation, it is possible that the jury could have changed its mind and imposed the death penalty. Blueford v. Arkansas, 566 U.S. 599, 607-08 (2012).

To be sure, a contemporaneous objection is required to preserve an issue for appeal. Strict mechanical application of the rule, however, would require a capital defendant to make what amounts to an impossible choice -- either to object to the mistrial and have the jury sent back, potentially to return a verdict of death, or to forfeit this objection and accept a life sentence. Cf. Sattazahn v. Pennsylvania, 537 U.S. 101, 126 (Ginsburg, J., dissenting) (expressing concern that the Court's holding "confronts defendants with a perilous choice . . . [A] defendant

Taken together, then, the circumstances do not clearly show that the jury was hopelessly deadlocked and that the district court's decision to discharge the jury without a verdict was manifestly necessary. Just as we cannot be sure that the jury intended to unanimously reject the death penalty by selecting the third option on the verdict form, we also cannot be sure that the jury would not have reached a clear, unanimous verdict if it had been given more time and further instruction.

We do know, however, that the original trial judge did not give the jury that opportunity and took no steps to safeguard either party's interest in a unanimous verdict once the jury began deliberating. Nor did the trial court give Candelario a reasonable opportunity to comment on the most appropriate path forward after being informed that the jury was not unanimous. When these circumstances are taken together, when the stakes are so high, we cannot require a capital defendant to bear the consequences of the resulting error or ambiguity. See Downum v. United States, 372 U.S. 734, 738 (1963) (noting that, in cases where a mistrial is

---

in Sattazahn's position must relinquish either her right to file a potentially meritorious appeal, or her state-granted entitlement to avoid the death penalty" (citing Green v. United States, 355 U.S. 184, 193-94 (1957) ("The law should not, and in our judgment does not, place the defendant in such an incredible dilemma."))).

Nevertheless, because Candelario did not object, we still review the district court's decision to discharge the jury only for plain error.

declared, courts must "resolve any doubt in favor of the liberty
of the citizen").

It also is clear that the error in discharging the jury
without clarifying the verdict "affected [Candelario's]
substantial rights" and "seriously affect[s] the fairness,
integrity or public reputation of judicial proceedings" because of
the stakes involved. Puckett v. United States, 556 U.S. 129, 135
(2009) (quoting Olano, 507 U.S. at 736) (second alteration in
original). "The awesome severity of a sentence of death makes it
qualitatively different from all other sanctions. . . . For this
reason, the Court has emphasized the greater need for reliability
in capital cases, and has required that capital proceedings be
policed at all stages by an especially vigilant concern for
procedural fairness and for the accuracy of factfinding."
Satterwhite, 486 U.S. at 262-63 (Marshall, J., concurring)
(citing, inter alia, Ramos, 463 U.S. at 998-99).

Thus, even if we accepted the government's position that
the original penalty-phase jury failed to agree unanimously on the
question of death, we cannot affirm. The district court order
that resulted in the present appeal was predicated on the
assumption that the initial penalty-phase jury was properly
discharged. Because this assumption is incorrect, the district
court's decision must be reversed.

**V. CONCLUSION**

For the foregoing reasons, we **reverse** the decision of the district court and **remand** with instructions to strike the government's notice of intent to seek the death penalty in this case.