**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

**Plaintiff,**

**v.**                                          **Criminal No.** 09-427 (FAB)

ALEXIS CANDELARIO-SANTANA [1],

**Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

Five motions are before the Court.  First, defendant Alexis Candelario-Santana ("Candelario") moves to dismiss counts 2 through 19 of the third-superseding indictment.  (Docket No. 1699.)  Second, Candelario moves to preclude the United States from eliciting hearsay statements from putative trial witness Amarylis Fonseca-Matías ("Fonseca").  (Docket No. 1696.)  Third, Candelario requests that the Court bar the admission of crime scene photographs.  (Docket No. 1693.)  Fourth, the United States moves to preclude expert eyewitness testimony.  (Docket No. 1718.)  Fifth, Candelario moves to compel the United States to provide a specific notice of its case-in-chief.  (Docket No. 1705.)  For the reasons set forth below, Candelario's motion to dismiss, motion to preclude hearsay statements, and motion for a specific notice of evidence are **DENIED.**  (Docket

Nos. 1696, 1699 and 1705.)  His motion to bar the admission of crime scene photographs is **DENIED WITHOUT PREJUDICE.**  (Docket No. 1693.)  Lastly, the United States motion to exclude expert eyewitness testimony is **GRANTED.**  (Docket No. 1718.)

## I.  Background

On October 19, 2012, the grand jury returned a 52-count third-superseding indictment against Candelario, Carmelo Rondón-Feliciano ("Rondón"), Wilfredo Candelario-Santana, and David Oquendo-Rivas ("Oquendo").  (Docket No. 579.)[1]  This indictment alleges that Candelario participated in an illicit enterprise in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(d) (count one); participated in an illicit enterprise in violation of the Violent Crime in Aid of Racketeering Activity ("VICAR") Act, 18 U.S.C. § 1959(a)(1) (counts 2 through 10, and counts 29 through 49); knowingly carried and used a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(j)(1) (counts 11 through 19); committed a drug-related murder in violation of 21 U.S.C. § 848(e)(1)(A) (counts 20 through 28); conspired to

---

[1] Rodón and Wilfredo Candelario-Santana pled guilty to count one of the third-superseding indictment on November 7, 2012 and January 14, 2013, respectively.  (Docket Nos. 636 and 763.)  Rondón received a sentence of 262 months imprisonment, to be served consecutively with the sentences imposed in Criminal Case Nos. 06-336 (GAG) and 08-290 (GAG).  (Docket No. 1074 at p. 2.) Wilfredo Candelario-Santana received a sentence of 151 months imprisonment, minus time served (56 months) in Criminal Case No. 8009300-01 (United States District Court for the Eastern District of Michigan).  (Docket No. 1148 at p. 2.)

possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846 (count 50); and possessed a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (counts 51 and 52).  Id.

Candelario and Oquendo pled not guilty.  (Docket Nos. 615 and 617.)  After an eleven-day trial, the jury found the defendants guilty on all counts of the third-superseding indictment.  (Docket No. 985.)  On August 30, 2013, Candelario received two life sentences, to be served consecutively to each other.  (Docket No. 1145.)  The First Circuit Court of Appeals subsequently vacated Candelario's conviction, however, holding that the district court committed structural error by violating his Sixth Amendment right to a public trial.  United States v. Candelario-Santana, 834 F.3d 8, 24 (1st Cir. 2016).[2] Candelario's second trial is set to commence on June 20, 2023. (Docket No. 1686.)

## II.  Candelario's Motion to Dismiss

Candelario seeks dismissal of counts 2 through 19 because, he argues, "murder in violation of Article 105 of the 2004 Puerto Rico Penal Code is not categorically a crime of violence."  (Docket No. 1699 at p. 1.)  An indictment is sufficient "if it contains the elements of the offense charged,

---

[2] Candelario is no longer eligible for the death-penalty.  See United States v. Candelario-Santana, 977 F.3d 146 (1st Cir. 2020).

fairly informs the defendant of the charges against which he must defend, and enables him [or her] to enter a plea without fear of double jeopardy." United States v. Ford, 839 F.3d 94, 104 (1st Cir. 2016) (internal quotation marks and citation omitted). "[I]t is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words [contain] all the elements of the offense without any uncertainty or ambiguity." United States v. Brown, 295 F.3d 152, 154 (1st Cir. 2002) (internal quotation marks and citation omitted); see United States v. Rodríguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019) ("Unlike a civil complaint that need allege facts that plausibly narrate a claim for relief, a criminal indictment need only apprise the defendant of the charged offense.") (internal quotation marks and citation omitted).

To adjudicate a motion to dismiss, courts "must take the allegations in the indictment as true," cognizant that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted). Notably, the indictment need not provide a preview of the evidence to be adduced at trial. See United States v. Stepanets, 879 F.3d 367,

372 (1st Cir. 2018) (noting that the "government need not recite all of its evidence in the indictment").

### A.   The Violent Crime in Aid of Racketeering Activity Act

Congress enacted VICAR in 1984 "as the violent crime corollary to the RICO statute." United States v. Savage, 970 F.3d 217, 273 (3rd Cir. 2020) (quotation omitted).  To secure a VICAR conviction, the United States must prove that:

> (1) an enterprise existed; (2) the enterprise affected interstate commerce; (3) the enterprise was engaged in racketeering activity; (4) the defendant was a member of the enterprise, (5) the defendant committed the alleged crime of violence, and (6) the defendant committed the crime ["for a promise or agreement to pay, anything of pecuniary value," or] in furtherance of his membership in the enterprise.

United States v. Brandao, 448 F. Supp. 2d 311, 327 (D. Mass. 2006); see 18 U.S.C. § 1959(a).[3]  The VICAR counts cite Article 105 of the Puerto Rico Penal Code ("Article 105"), Laws P.R. Ann. tit. 33 § 4733, as the predicate "crime of violence." Docket No. 579 at pp. 12-22, 44-63; see United States v. Millán-

---

[3] The VICAR counts pertain to allegations that "several shooters attacked" "La Tómbola" market and bar on October 17 2009, "killing nine and injuring more than a dozen people." United States v. Candelario-Santana, 834 F.3d 8, 16 (1st Cir. 2016); see Docket No. 579 (third-superseding indictment).  Counts 2 through 10 aver that Candelario and Oquendo murdered Joan Manuel Class Guzmán, Pedro Semprit-Santana, José Ángel Hernández-Martínez, John Henry García-Martínez, Elisa Del Carmen Ocasio, Samuel Ruiz-Martínez, Rafael Ángel Ramos-Rivera, Tina Marie Rodríguez-Otero, and an unborn child, respectively. (Docket No. 579 at pp. 12-22.)  Counts 29 through 49 allege that Candelario and Oquendo attempted to murder Carmen María García Santiago, a minor referred to as "O.F.M.," Wilfredo Semprit-Santana, Amarylis Fonseca-Matis, Victim #2, Victim #3, Victim #4, Victim #5, Victim #6, Victim #7, Victim #8, Victim #9, Victim #11, Victim #12, Victim #13, Victim #14, Victim #15, Victim #16, Victim #17, Victim #18, and Victim #19, respectively. Id. at pp. 44-63.

Machuca, 991 F.3d. 7, 21 (1st Cir. 2021) (noting that Article 105 "serve[d] as a predicate offense for a murder in aid of racketeering conviction"); United States v. Ramos, Case No. 12-200, 2017 U.S. Dist. LEXIS 229475, at *10 (D.P.R. May 19, 2019) (Smith, J.) ("The predicate offense for the VICAR charge was aiding and abetting the murder of Christian Toledo Sánchez ("Pekeke") under Puerto Rico law").[4]   Pursuant to Article 105, "murder is to kill another human being with intent."  Laws P.R. Ann. tit. 33 § 4733.

**B.   The Use of a Firearm During and in Relation to a Crime of Violence**

Congress enacted 18 U.S.C. § 924 to ensure "long prison sentences for anyone who uses a firearm in connection with certain other federal crimes." United States v. Davis, 139 S. Ct. 2319, 2323 (2019).  In relevant part, this statute prohibits any person from using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c).  A section 924(c) violation "causing the death of a person through the use of a firearm" shall, "if the killing is a murder . . . be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j); see United States v. García-Ortiz, 657 F.3d 25, 28

---

[4] Count ten is the exception. The predicate crime of violence for this VICAR allegation is a purported violation of the Protection of Unborn Children Act, 18 U.S.C. § 1841.  (Docket No. 579 at p. 22.)

(1st Cir. 2011) ("The only meaningful difference" between sections 924(c) and 924(j) is that the latter "requires proof of one additional fact: the death"); United States v. Cruz-Ramos, 987 F.3d 27, 45 (1st Cir. 2021) ("[Roughly] speaking, § 924(j) makes it a crime to kill anyone when doing acts that infract § 924(c) . . ."). A "crime of violence" is any felony offense that "has an element the use, attempted use, or threatened use of physical force against the person or property of another." United Stats v. Farmer, 988 F.3d 55, 62 (1st Cir. 2021) (quoting 924(c)(3)(A)). This definition is referred to as the "force clause."[5]

Counts 11 through 18 charge Candelario with using a firearm during and in relation to a crime of violence, causing the death of Joan Manuel Class-Guzmán, Pedro Semprit-Santana, José Ángel Hernández-Martínez, John Henry García-Martínez, Elisa Del Carmen Ocasio, Samuel Ruiz-Martínez, Rafael Ángel Ramos-Rivera, and Tina Marie Rodríguez-Otero, respectively

---

[5] Section 924(c) contains a "residual clause," defining a "crime of violence" as any felony offense "[involving] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3). The Supreme Court invalidated this clause, however, holding that "§ 924(c)(3)(B) is unconstitutionally vague." Davis, 139 S. Ct. at 2336. Consequently, the Court relies exclusively on the force clause in adjudicating Candelario's motion to dismiss. See United States v. Torres-Correa, 23 4th 129, 133 n.4 (1st Cir. 2022) ("Davis did not affect the continued viability of the § 924(c)(3)(A) definition."); United States v. Tsarnaev, 968 F.3d 24, 99 (2020) ("With Davis on the books, that leaves only one potential path for treating predicates as crime-of-violence offenses: the elements clause.").

(hereinafter, "section 924(j) counts").  Docket No. 579 at pp. 23-30; see 18 U.S.C. § 924(j).  The predicate crimes of violence for the section 924(j) counts are the VICAR allegations set forth in counts 2 through 9.  Id.[6]  Essentially, the VICAR statute serves a dual purpose in the third-superseding indictment.  First, the VICAR allegations in counts 2 through 10 and counts 29 through 49 subject Candelario to criminal liability irrespective of the section 924(j) counts (hereinafter "singular VICAR counts").  Second, VICAR counts 2 through 9 are the predicate crimes of violence for the section 924(j) allegations in counts 11 through 18 (hereinafter "predicate VICAR counts").  The following table illustrates this duality.

**[Continue to Next Page]**

---

[6] Candelario misconstrues the section 924(j) allegation in count 19.  (Docket No. 1699 at p. 4.)  The VICAR predicate for this count is based on the Protection of Unborn Children Act, 18 U.S.C. § 1841, not Article 105 of the Puerto Rico Penal Code.  (Docket No. 579 at pp. 22 and 31.)

VICAR: Counts 2 through 10, Counts 29 through 49

Section 924(j): Counts 11 through 18

**Singular VICAR Counts**

Candelario allegedly committed crimes of violence for the "purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).

Section 924(j)

Candelario allegedly carried and used a firearm during and in relation to a crime of violence, causing the death of eight people. 18 U.S.C. § 924(j)

Counts 2 through 9





Article 105

Murder in violation of Article 105 of the Puerto Rico Penal Code is the VICAR "crime of violence." Laws P.R. Ann. tit. 33 § 4733

**Predicate VICAR Counts**

The predicate "crime of violence" for the section 924(j) counts are the VICAR allegations in counts 2 through 9. See 18 U.S.C. § 1959(a).



Article 105

Murder in violation of Article 105 of the Puerto Rico Penal Code is the VICAR "crime of violence." Laws P.R. Ann. tit. 33 § 4733

Candelario attacks the validity of the third-superseding indictment by asserting that Article 105 "does not qualify as a 'crime of violence.'" (Docket No. 1699 at p. 5.) Without a viable predicate offense, he argues, the VICAR and section 924(j) counts are doomed. Id. This argument is unavailing for two reasons. First, Candelario presumes that the singular VICAR counts are subject to the categorical approach. Id. They are not, and Candelario does not argue otherwise. Second, he posits that murder under Puerto Rico law (i.e. Article 105) is not a crime of violence. (Docket No. 1699.) He argues, therefore, that the VICAR counts predicated on Puerto Rico murder cannot sustain the section 924(j) counts. (Docket No. 1699.) The Court disagrees with Candelario. The modality of Article 105 alleged in the third-superseding indictment (i.e., premeditated murder) constitutes a crime of violence upon which the section 924(j) counts are properly predicated.

**C.   The Singular VICAR Counts**

Both VICAR and section 924(j) require that the United States prove that the defendant committed a predicate "crime of violence." See 18 U.S.C. § 1959(a); 18 U.S.C. § 924(c). Different analyses govern, however, whether a particular offense is a valid predicate for purposes of VICAR and section 924(j).

### 1.   The Categorical Approach

Commonsense dictates that murder is a crime of violence.  Indeed, "[murder] is one of the worst violent crimes.  And humanity has considered it so ever since Cain slew Abel." Battle v. United States, Case No. 21-5457, 2023 U.S. Dist. LEXIS 6157, at *8 (6th Cir. 2023) (Thapar, J., concurring).  To determine if an offense qualifies as a crime of violence, courts frequently employ the "categorical approach."  This analysis is convoluted and, in many instances, requires courts to suspend logic.  In fact, Justice Samuel Alito pointedly observed that judges must "delve into pointless abstract questions" to apply this approach.  Mathis v. United States, 579 U.S. 500, 543-44 (2016) (Alito, J., dissenting); United States v. Rivera-Carrasquillo, 933 F.3d 33, 55-56 (1st Cir. 2019) ("Properly applying force clause precedent is no picnic (an understatement if ever there was one), seeing how the 'crime of violence' definition is 'complex and unclear.'") (citation omitted); López-Aguilar v. Barr, 948 F.3d 1143, 1149 (9th Cir. 2020) ("The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results.") (Graber, J., concurring).

The Supreme Court first adopted the categorical approach in United States v. Taylor, 495 U.S. 575 (1990).  The

<u>Taylor</u> court assessed whether a violation of the Missouri burglary statute constituted a "crime of violence" for purposes of the Armed Career Criminal Act, 18 U.S.C. § 924(e).   <u>Id.</u> at 579.   This question required the Court "to address a more general issue – whether the sentencing court in applying § 924(e) must look only to the statutory definitions of the prior offenses, or whether the court may consider other evidence concerning the defendant's prior crimes."   <u>Id.</u> at 600.

        Pursuant to the categorical approach, courts "[look] only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." <u>Id.</u>; <u>Thompson v. United States</u>, 64 F.4th 412, 419 (1st Cir. 2023) ("In applying the categorical approach, rather than looking at the actual facts of the defendant's prior offense, the court must presume that the conviction rested upon nothing more than the least of the acts criminalized by the statute of conviction, and then determine whether those acts satisfy the sentencing enhancement's requirements.") (quoting <u>Moncrieffe v. Holder</u>, 569 U.S. 184, 190-91 (2013)) (internal quotation marks omitted).   Elements are the "constituent parts of a crime's legal definition – the things the prosecution must prove to sustain a conviction." <u>United States v. Taylor</u>, 848 F.3d 476, 491-92 (1st Cir. 2017) (quoting <u>Mathis</u>, 136 S. Ct. at 2248)).

Courts then compare the elements of the predicate offense (i.e.
Article 105) with the elements of the generic federal offense
(i.e. "crime of violence" as defined in the force clause).  See
United States v. Castro-Vázquez, 802 F.3d 28, 35 (1st Cir. 2015)
(citation omitted).

        The categorical approach "runs into a potential
obstacle" when "the conviction is for a crime set forth in a
statute that is 'divisible.'"  United States v. Serrano-Mercado,
784 F.3d 838, 843 (1st Cir. 2015.)  A divisible statute "sets
out one or more elements of the offense in the alternative – for
example, stating that burglary involves entry into a building or
an automobile."  King v. United States, 965 F.3d 60, 65 (1st
Cir. 2020) (quoting Descamps v. United States, 570 U.S. 254, 257
(2013)).  In contrast, an indivisible statute "contains a single
set of elements that may 'enumerate various factual means of
commission.'"   Id. (quoting Mathis, 136 S. Ct. at 2249).
Comparing the elements of an indivisible statute with the
generic or statutory offense is not problematic.  Identifying
the elements of an indivisible statute, however, is a Gordian
knot.  To cut through this obstacle, courts utilize the modified
categorical approach.  This approach allows courts to "consult a
limited category of documents known as 'Shepard Documents' –
including the indictment and the jury instructions – to figure

out which version of the crime the defendant was charged with committing." Taylor, 848 F.3d at 492 (citation omitted). "Modified categorical approach" is a "somewhat misleading" term: This "framework is still categorical in the sense that the elements of the offense of conviction are compared with the elements of the statutory offense and only if they align may the offense count as a [crime of violence]." United States v. Faust, 853 F.3d 39, 51 (1st Cir. 2017).

Both the categorical and modified categorical approaches conclude with an element-by-element comparison between the predicate and statutory or generic offense. For instance, a predicate offense is a "crime of violence" pursuant to § 924(c)(1) only if the elements necessarily involve the "use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(1); United States v. Price, 777 F.3d 700, 704 (4th Cir. 2015) (noting that a state offense is a "categorical match" to a federal crime only if "the elements comprising the statute of conviction [are] the same as, or narrower than, those of the generic offense.").

**2.    The Categorical Approach is Inapplicable to the Singular VICAR Counts**

The VICAR statute provides that, *inter alia*, murder, kidnaping, assault with a deadly weapon, and "[crimes] of violence against any individual in violation of the laws of any State or the United States" constitute predicate offenses for illicit racketeering activity.  18 U.S.C. § 1959(a). Candelario argues that counts 2 through 10 "should be dismissed" because Article 105 is "not categorically a 'crime of violence.'" (Docket No. 1699 at p. 18.)  He cites no precedent for this proposition, assuming that the categorical approach is applicable.  The weight of authority demonstrates, however, that the singular VICAR counts are subject to an alternative analysis.

The Fourth Circuit Court of Appeals' decision in United States v. Keene is illustrative.  955 F.3d 391 (4th Cir. 2020).  In Keene, the contested VICAR count rested on the "Virginia prohibition against brandishing a firearm."  Id. at 392.  "Because the VICAR statute requires the commission of enumerated federal as well as separate state or federal crimes," the defendant urged the Court to apply the categorical approach. Id.  According to the defendant, this approach would "determine whether Virginia brandishing is a 'categorical match' to the

enumerated federal offense of assault with a dangerous weapon."
Id.  The district court applied the categorical approach, held
that the Virginia brandishing statute "was broader than the
enumerated federal offense of assault," and dismissed this VICAR
count.  Id. at 393.

The Keene court reversed this decision, holding
that the VICAR statute is "not subject to analysis under the
categorical approach."  Id.  The statutory text contains no
indication that "Congress intended an element-by-element
comparison of the enumerated federal offense with the specified
state offense."  Id.  For example, the specific language of
VICAR provides:  "Whoever . . . assaults with a dangerous weapon
. . . in violation of the laws of any State or the United States
. . . shall be punished."  Id. at 397.  This text is devoid of
phrases associated with the categorical approach (i.e.
"elements").  Id.  Because the "jury, not the judge, will
determine whether the defendant committed the offense charged in
the indictment," Sixth Amendment concerns underlying the
categorical approach are nonexistent.  Id. at 398.  At bottom,
the VICAR statute requires proof that the defendant violated
**"both"** the "enumerated federal offense as well as the state law
offense, regardless whether the two offenses are a categorical
'match.'"  Id. at 398-99 (emphasis added).

The parties do not cite, and the Court is unaware of, binding precedent from the First Circuit Court of Appeals. Every court confronted with this issue has, however, espoused the analysis set forth by the Fourth Circuit Court of Appeals. See United States v. Elmore, Case No. 13-764, 2022 U.S. Dist. LEXIS 154596, at * 33 (N.D. Cal. Aug. 27, 2022) (holding that a VICAR offense "must qualify under state or federal law **and** must qualify as 'murder' as the VICAR statute uses that term") (emphasis in original); United States v. Jones, Case No. 13-205, 2022 U.S. Dist. LEXIS 230229, at *18 (E.D. La. Dec. 22, 2022) ("This Court joins the numerous district courts that have adopted the Fourth Circuit's decision in Keene in holding that the categorical approach should not be used to determine whether a defendant's state court crime constitutes a predicate crime under the VICAR statute."); United States v. Ray, Case No. 20-110, 2022 U.S. Dist. LEXIS 212735, at *51-53 (S.D.N.Y. Nov. 23, 2022) (holding that the categorical approach does not apply to singular VICAR counts); cf Johnson v. United States, 64 F.4th 715 (6th Cir. 2023) (adopting the rationale set forth in Keene, holding that "the categorical approach does not apply to a RICO prosecution because it is not consistent with the text of § 1961(1)(A)").

The dispositive inquiry for the singular VICAR counts is whether the third superseding-indictment sufficiently alleges that: (1) Candelario committed a state offense, and (2) whether Candelario violated Article 105 of the Puerto Rico Penal Code and generic murder. Counts 2 through 10 aver that Candelario "caused the death of [eight persons] intentionally and with premeditation, in violation of Puerto Rico Penal Code Article 105 (2004)." (Docket No. 579 at pp. 12-21.) Accordingly, the third superseding-indictment satisfies the first Keene requirement. See United States v. Mills, 378 F. Supp. 3d 563, 576 (E.D. Mich. 2019) ("Although [the defendant] demands that an indictment alleging a violation of VICAR must also allege the elements required to prove the underlying state-law offense, this is not necessary.") (citing United States v. Fernández, 388 F.3d 1199, 1219-1220 (9th Cir. 2009)).

The singular VICAR counts also charge Candelario with committing generic murder. This offense is accomplished by "causing the death of another person either intentionally, during the commission of a dangerous felony, or through conduct evincing reckless and depraved indifference to serious dangers posed to human life." United States v. Vederoff, 914 F.3d 1238, 1246 (9th Cir. 2019) (quoting United States v. Marrero, 743 F.3d 389, 401 (3d Cir. 2014)); see Model Penal Code § 210.2 (defining

murder as, *inter alia*, "purposefully or knowingly" causing the death of another human being).  According to the third-superseding indictment, Candelario caused the death of 9 human beings (including the unborn child) "intentionally and with premeditation."  (Docket No. 579.)  These allegations are sufficient to allege a generic murder offense.

Candelario argues that Article 105 prohibits reckless homicide, suggesting that the VICAR statute mandates a more culpable *mens rea*.  Docket No. 1699 at p. 15; citing Borden v. United States, 141 S. Ct. 1817, 1835 (2021) (holding that "the elements clause's definition of 'violent felony' – an offense requiring the 'use of physical force against the person of another,'" does not criminalize reckless conduct).  He relies on inapposite precedent, however, citing case law pertaining to the Armed Career Criminal Act.  Id.  A VICAR allegation need only charge "murder – however that crime is defined by the underlying state or federal law – and that [Candelario] engaged in the conduct that resulted in murder, however defined, with the purpose or motivation prescribed in the statute."  United States v. Mapp, 170 F.3d 328, 335 (2d Cir. 1999); see Owens v. United States, 236 F. Supp. 2d 122, 138 (D. Mass. 2022) ("The charge at issue, violation of 18 U.S.C. § 1959(a)(1), imposes liability for murder in aid of racketeering.  The statute is not

restricted to first or second degree murder.") (affirmed in
part, reversed in part 483 F.3d 48 (1st Cir. 2007)); United
States v. Slocum, 486 F. Supp. 2d 1104, 1114 n.6 (C.D. Cal.
2007) (noting that "a finding of second-degree murder would also
support a VICAR conviction").  Consequently, Candelario's motion
to dismiss the singular VICAR counts is **DENIED**.

**D.    The Section 924(j) Counts**

Unlike the singular VICAR counts, the section 924(j)
allegations are subject to the categorical approach.  See Cruz-
Rivera, 904 F.3d at 66 ("To assess whether a predicate crime
qualifies as a 'crime of violence,' under the force clause of
§ 924(c), we apply a categorical approach.") (citation omitted).
If "the least culpable conduct" prescribed by Article 105 "has
an element the use, attempted use, or threatened use of physical
force against the person . . . of another," this statute
qualifies as a crime of violence.  United States v. Báez-
Martínez, 950 F.3d 119, 124 (1st Cir. 2020).

As a preliminary matter, VICAR as a predicate crime of
violence for a section 924(j) charge is divisible "on its face"
because each of its "statutory alternatives carry a different
punishment" (i.e. murder, kidnapping, and assault with a deadly
weapon).  Mathis, 579 U.S. at 518; see United States v. Morris,
61 F.4th 311, 320 (2d Cir. 2023) ("Morris's § 924(c) conviction

on Count Two is sustained because, after applying the modified
categorical approach prescribed by the Supreme Court, we
conclude that the predicate crime of violence – VICAR assault
with a dangerous weapon premised on a violation of N.Y. Penal
Law . . . qualifies as a crime of violence that supports a
conviction under § 924(c).”); United States v. Pastore, 36 F.4th
423, 429 (2d Cir. 2022) (holding that the modified categorical
approach is applicable to determine whether a VICAR offense “is
a valid predicate crime of violence under section 924(c)”);
Alvarado-Linares v. United States, 44 F.4th 1334, 1342 (11th
Cir. 2022) (“The parties agree that the VICAR statute is
divisible, and they are right.”); De Jesús v. United States,
Case No. 16-4878, 2019 U.S. Dist. LEXIS 212402, at *4 (S.D.N.Y.
Dec. 10, 2019) (applying the modified categorical approach to
assess whether a VICAR offense is a section 924(c) crime of
violence).  The predicate VICAR counts set forth in the section
924(j) allegations are, in turn, premised on Article 105.
Accordingly, the section 924(j) counts are viable only if
Article 105 is a crime of violence.

        Candelario contends that Article 105 is indivisible,
urging the Court to apply the categorical approach.  (Docket
No. 1699 at p. 7.)  This statute is, however, divisible.  See
Ramírez-Rivera v. United States, Case No. 17-1206, 2021 U.S.

Dist. LEXIS 258910, at *19 (D.P.R. Sept. 30, 2021) (Arias-
Marxuach, J.) (holding that Articles 105 and 106, "as [they
pertain] to first degree murder," are divisible statutes).
Candelario's analysis is flawed from its inception, citing a
Puerto Rico Supreme Court case for the proposition that Article
105 is "only 'one' offense."  Docket No. 1699 at p. 7 (citing
Pueblo v. Roche, 195 D.P.R. 791 (2016)).  The First Circuit
Court of Appeals has held, however, that the categorical
approach "[begins] with the text of the statute."  King, 965
F.3d at 68 (citing Mathis, 136 S. Ct. at 2256-57)).

        Article 105 prohibits the killing of "another human
being with intent."  Laws P.R. Ann. tit. 33 § 4733.  Article 106
provides that first degree murder is:

    (a) Any murder committed by means of poison, stalking,
    or torture, or with premeditation.

    (b) Any murder committed as a natural consequence of
    the attempt or consummation of aggravated arson,
    sexual assault, robbery, aggravated burglary,
    kidnapping, child abduction, serious damage or
    destruction, poisoning of bodies of water for public
    use, mayhem, escape, intentional abuse or abandonment
    of a minor.

    (c) The murder of a law enforcement officer, school
    police, municipal guard or police officer, marshal,
    prosecutor, solicitor for minors' affairs, special
    family solicitors for child abuse, judge or custody
    officer in the performance of his duty, committed
    while carrying out, attempting or concealing a felony.

Laws P.R. Ann. tit. 33 § 4734.  Second degree murder is "[any] other intentional killing of a human being."  Id.

First and second degree murders are punishable by a ninety-nine year term of imprisonment, and "penalty of imprisonment between fifteen (15) years and one day and twenty-five (25) years," respectively.  See Laws P.R. Ann. tit. 33 §§ 4644(a)-(b), 4735.  Because Article 106 enumerates alternative versions of first-degree murder, Article 105 is divisible. Indeed, the discrete punishments for first and second degree murder confirm that Article 105 is divisible.  See Mathis, 136 S. Ct. at 2256 ("[If] statutory alternatives carry different punishments, then . . . they must be elements.") (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

The Fourth Circuit Court of Appeals' decision in United States v. Jackson is informative.  32 F.4th 278 (2022). The Jackson court held that the federal murder statute, 18 U.S.C. § 1111 ("section 1111"), qualified as a crime of violence for purposes of section 924(c)(3)(a).  Id. at 285-86.  Like Article 106, section 1111(a) sets forth alternative versions of murder.  18 U.S.C. § 1111(a).  This statute prohibits:

> Every murder [1] perpetuated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or [2] committed in the preparation of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage,

> sabotage, aggravated sexual abuse or sexual abuse,
> child abuse, burglary, or robbery; or [3] as part of a
> pattern or practice of assault or torture against a
> child or children; or [4] perpetrated from a
> premeditated design unlawfully and maliciously to
> effect the death of any human being other than him who
> is killed, is murder in the first degree.

18 U.S.C. § 1111(a). Each version of first degree murder
"requires the Government to prove a unique element that the jury
must find unanimously; the first [version] requires proof of
premeditation, and the second requires proof of the
accomplishment (or attempted accomplishment of a listed felony."
Jackson, 32 F.4th at 285. Similarly, the alternative versions
of first degree murder in Article 106 require the United States
to prove distinct elements. For example, felony murder in
Article 106 does not require the United States to prove that the
victim is a member of a protected class. The provision
prohibiting the murder of a police officer does, however,
further demonstrating that the Puerto Rico murder statute is
divisible. Consequently, the modified categorical approach is
applicable.

Candelario asserts that Pueblo v. Roche, 195 D.P.R.
791 (2006), is controlling, compelling this Court to conclude
that Article 105 is indivisible. (Docket No. 1699 at pp. 6-7.)
According to Candelario, the Roche court "held that Article 105
of the 2004 Penal Code of Puerto Rico . . . is only 'one'

offense but is divided into degrees." Id. (citing 195 D.P.R. at 796). The United States notes, however, that while Roche held that murder is one offense with no statute of limitation, it emphasized that it is separated by degrees. Docket No. 1714 at p. 11; see Roche, 195 D.P.R. at 809. Consequently, Roche is inapposite.[7]

Because Article 105 is a divisible statute, this Court must "consult approved Shepard documents in order to" identify which first-degree murder offense is charged in the third-superseding indictment. Faust, 853 F.3d at 59; see Descamps v. United States, 570 U.S. 254, 263 (2013) (noting that the Shepard documents include the indictment). Candelario allegedly violated Article 105 "intentionally" and "with premeditation." See Docket No. 579 at p. 14. The intentional murder of a human being is categorically a crime of violence, falling within the ambit of the force clause. See Ramírez-Rivera, 2021 U.S. Dist. LEXIS 258910, at *24-25 ("[The] record and commonsense guide the Court's interpretation that first degree murder is a crime of violence and that the predicate offense of [the defendant's]

---

[7] Both parties cite this decision, failing to file a certified English translation on the electronic docket. (Docket Nos. 1699 and 1714.) Pursuant to the Jones Act, all "pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." 48 U.S.C. § 864. This Court cannot "consider any untranslated documents placed before [it]." United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir. 2014). Accordingly, the United States **SHALL** file a certified English translation of Pueblo v. Roche, 195 D.P.R. 791 (2016), **no later than June 11, 2023.**

§ 924(c) charge – murder in aid of racketeering – is a crime of violence under the elements clause of § 924(c)(3)(A).") (citing cases); United States v. Mathis, 932 F.3d 242, 265 (4th Cir. 2019) ("[We] conclude that the crime of first-degree murder under Virginia law qualifies categorically as a crime of violence under the force clause, and we affirm the capital defendants' Section 924(c) convictions that are based on the commission of this Virginia offense."); cf United States v. Solís-Vásquez, 10 F.4th 59, 65 (1st Cir. 2021) ("Second degree murder under Massachusetts law is a crime of violence.") (citing Báez-Martínez, 950 F.3d at 126-128 (holding "that second degree murder qualifies as a violent felony under the ACCA")).

Candelario relies heavily on United States v. Borden, a recent Supreme Court decision holding that "[offenses] with a *mens rea* of recklessness do not qualify as violent felonies under ACCA." Docket No. 1699 at pp. 10-12; 141 S. Ct. at 1834. Candelario is not, however, charged with committing a reckless crime of violence. Premeditated murder entails a more egregious state of mind. See Laws P.R. Ann. tit. 33 § 4642(bb) (premeditation refers to the "deliberation occurring prior to the resolve to perpetuate the act after having considered it for some time"). Accordingly, Borden does not support Candelario's argument. See Alvarado-Linares, 44 F.4th at 1344 (11th Cir.

2022) ("Borden does not help [the defendant].  Unlike the kinds of recklessness crimes discussed in Borden, Georgia malice murder must be committed with 'malice aforethought'' – either express or implied.").

Because VICAR premised on Article 105 is categorically a crime of violence, the section 924(j) counts survive Candelario's motion to dismiss.  Consequently, his request to dismiss counts 11 through 18 is **DENIED.**

**III. Candelario's Motion to Bar Hearsay Statements**

Candelario moves to preclude the United States from eliciting purported hearsay statements from putative trial witness Amarylis Fonseca-Matías.  (Docket No. 1696.)  Hearsay is an out-of-court statement offered "in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  This evidence is inadmissible unless a federal statute, the Federal Rules of Evidence, or rules prescribed by the Supreme Court provide otherwise.  Fed. R. Evid. 802.

**A.    The Voice Identification**

Fonseca is the wife of Wilfredo ("Rufo") Semprit-Santana, the owner of La Tómbola.  (Docket No. 896 at p. 4.) Candelario is Semprit-Santana's cousin and former employer.  Id. at 15.  Rufo and Fonseca celebrated the grand opening of La Tómbola on October 17, 2009, hosting approximately 30 people

inside the establishment.  Id. at p. 8.  She heard an eruption
of gunfire at 11:30 p.m.  Id.  Fonseca "hadn't even taken a step
when" a bullet hit her neck.  Id. at p. 9.  "[T]he shooting
continued for minutes."  Id. at p. 9.  A man then yelled,
"[nobody's] getting out of here alive, puñeta, God dammnit."
Id. at p. 10.  At trial, Fonseca identified this person as
Candelario based on the sound of his voice.  Id.

Despite sustaining a gunshot wound to the neck,
Fonseca remained conscious, observed dead bodies on the floor,
and noted the scent of blood.  Id. at p. 10.  A person then
"passed between [her] legs, [shooting her] at point blank" seven
times in the arm, cheek, and mouth.  Id. at p. 11.
Subsequently, Rufo and an acquaintance transported Fonseca to a
hospital.  Id. at p. 13.

The first trial occurred in 2013, nearly four years
after the deadly attack.  Fonseca did not identify Candelario's
voice until the evening before her testimony, however, providing
fodder for cross-examination.  Id. at pp. 23-24.  Defense
counsel confirmed that Fonseca initially informed the FBI that
the voice belonged to a male, but that she "wasn't sure who."
Id. at p. 41.  Fonseca explained, however, that "[it] was not a
matter of not being able to identify the voice, because I did
identify the voice.  The thing is I didn't dare say."  Id.

During direct examination, Fonseca testified: "[At] first I told [the FBI] that I thought it had been him, but that I wasn't sure, because I'm really afraid for my life and my daughters' lives." Id. at p. 18. On redirect-examination, Fonseca claimed that she identified Candelario's voice to her sisters, mother, and husband once she "[was] able to speak again." Id. at p. 42. This identification occurred "as soon as [Fonseca] got out of the hospital and [her family] started talking about everything that had happened." Id. at p. 43.

Candelario presented a theory of mistaken identification. At closing argument, defense counsel claimed that "Alexis was not there that night . . . He did not participate in it. He did not plan it. He did not carry it out. He simply wasn't there." (Docket No. 1207.) He also portrayed Fonseca as an unreliable witness. Id. at p. 61. Indeed, defense counsel argued explicitly that Fonseca "[was] lying when she said she identified Alexis's voice at La Tómbola." Id. at p. 117.

**B.  Fonseca's Pretrial Voice Identification is Admissible**

Pursuant to Federal Rule of Evidence 801(d)(1)(C) ("Rule 801(d)(1)(C)"), a statement is not hearsay if "the declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . identifies a person as

someone the declarant perceived earlier." Fed. R. Evid. 802(d)(1)(C). This rule recognizes that "out-of-court identifications [are] generally preferable to courtroom identifications." United States v. Owens, 484 U.S. 554, 562 (1988) (citing Advisory Committee Notes on Rule 801(d)(1)(C)).

Candelario will have the opportunity to cross-examine Fonseca at trial. See United States v. López, 271 F.3d 472, 282 (3d Cir. 2001) ("Any concerns regarding conditions or circumstances [of the pretrial identification] that might bear on reliability are matters going to the weight of the evidence, which can be addressed on cross-examination, and should not affect the admissibility of the statement."). The contested statements pertain to a voice identification. See Cardoso v. Roden, Case No. 09-11058, 2010 Dist. LEXIS 141767, at *6-8 (D. Mass. Aug. 25, 2010) (noting that the witness "told her mother" that she "recognized [the defendant's] voice" shortly after the crime, triggering the hearsay exclusion set forth in the state law counterpart to 801(d)(1)(C)). Accordingly, Fonseca's statements to her sisters, mother, and husband concerning the identification of Candelario's voice are not hearsay.

Candelario sets forth four reasons in support of his motion to bar Fonseca's pretrial voice identification. First, Candelario maintains that Fonseca's statements are not

"identification[s]."   (Docket No. 1712 at p. 7.)   Second, her
"statements to her relatives did not occur after she had an
opportunity to 'perceive' Mr. Candelario following La Tómbola
shooting as required by the rule."   <u>Id.</u>   Third, Rule
801(d)(1)(C) "does not permit the prior statements to
'corroborate' in-court testimony showing that the defendant 'did
it.'"   <u>Id.</u>   Fourth, he claims that "no in-court identification
issue exists in this case and there is no inconsistency between
Fonseca's trial testimony and her out-of-court statement."   <u>Id.</u>
at p. 8.

        Candelario cites no authority for the proposition that
voice identifications fall beyond the purview of Rule
801(d)(1)(C).   The Court has no reason to differentiate voice
from sight identifications.   That the pretrial voice
identifications may corroborate Fonseca's in-court testimony is
immaterial.   Candelario conflates the hearsay exclusion in Rule
801(d)(1)(C) with the exclusion regarding prior consistent
statements in Federal Rule of Evidence 801(d)(1)(B).   <u>See</u> <u>United</u>
<u>States v. Parker</u>, Case No. 18-495, 2020 U.S. LEXIS 114054, at *8
(N.D. Ill. June 29, 2020) ("The exception [in Rule 801(d)(1)(C)]
does not hinge upon whether the declarant's testimony is
consistent or inconsistent with a prior statement, as in the
case with other Rule 801(d)(1) exceptions.").   In fact,

"statements such as 'he's the one' or 'the one who did it is X'
are admissible" pursuant to Rule 801(d)(1)(C).   5 Weinstein's
Fed. Evid. § 801.23 (2023) (citation omitted).

        Lastly, Rule 801(d)(1)(C) sets forth no requirement
that the witness identify the defendant at trial.   Fonseca's
statements are "admissible nonhearsay even if [she] disavows the
earlier identification or fails to identify [Candelario] at
trial."   Id. (citing López, 271 F.3d at 282 (affirming the
admission of a pretrial identification even though the trial
witness "denied making any such statement")); United States v.
Elemy, 656 F.2d 507, 508 (9th Cir. 1981) ("The reasons [for
adopting Rule 801(d)(1)(C)] are fully applicable when the person
who testifies to the statement of identification is not the
person who uttered it, so long as the latter also testifies and
is available for cross-examination."); see United States v.
Cardena, 842 F.3d 959, 990 (7th Cir. 2016) ("All that [Rule
801(d)(1)(C)] requires is that the declarant testifies and is
subject to cross-examination, which Ávila was, and that the
statement is one of identification, which it was.").
Consequently, Candelario's motion to preclude Fonseca's pretrial
identifications to her sister, mother, and husband is **DENIED**.
Because this disposition rests on Rule 801(d)(1)(C), the Court
need not address the parties' Rule 801(d)(1)(B) arguments.   See

United States v. Bracy, Case No. 20-483, 2022 U.S. LEXIS 22795, at *16 (E.D.N.Y. Dec. 19, 2022) ("Having granted the motion on Rule 801(d)(1)(C) grounds, I do not reach the government's argument regarding admissibility under Rule 801(d)(1)(B)").

**IV.  Candelario's Motion to Bar Gruesome Crime-Scene Photographs**

Candelario moves for an order compelling the United States "specify the particular photographs they [it] intends to submit" at trial, and to bar the admission of "gruesome dead bodies photographs." (Docket No. 1693 at p. 4.)  "[This] evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance." United States v. Sampson, 486 F.3d 13, 43 (1st Cir. 2007) (affirming the use of autopsy photographs in a death penalty case).   The   United   States   intends   to   use   the   autopsy photographs to "corroborate the testimony of the cooperating witnesses who will describe who participated in the murders, where the murders took place, and how the victims were killed." (Docket No. 1703 at p. 3.)

While Candelario may be willing to stipulate the cause of the victim's death, "[t]he prosecution ordinarily may not be forced to eliminate gruesome details of a killing . . . or the degree  of  malevolence  exhibited  by  the  defendant  through  a

defense-proffered stipulation." United States v. Tavares, 21 F.3d 1, 3 (1st Cir. 1994) (*en banc*).   The United States may present crime-scene photographs within limits to be determined at trial.   Consequently, the Court **DENIES without prejudice** Candelario's request to preclude these photographs.

## V.   Candelario's Request for a Specific Notice of Evidence

Candelario argues that he cannot "navigate the monumental discovery in this case and guess which particular pieces of evidence the United States will introduce at trial."   (Docket No. 1705 at p. 8.)   This statement is true in every criminal trial.

The United States has no obligation to specify which photographs it intends to admit into evidence at trial.   Pursuant to Federal Rule of Criminal Procedure 12(b)(4) ("Rule 12"), "[at] the government's discretion . . . the government may notify the defendant of its intent to use specified evidence at trial." Fed. R. Crim. P. 12(b)(4)(A). Additionally, "[a]t the defendant's request . . . the defendant may . . . request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16."   Fed. R. Crim. P. 12(b)(4)(B).   Rule 12 is not, however, a means "to force the government to decide precisely which documents provided in discovery it will offer at

trial" or "to prevent it from using any that it does not so designate as a matter of trial tactics."  United States v. El-Silimy, 228 F.R.D. 52, 57 (D. Me. 2005).  The United States' designation of evidence satisfies the Rule 12 requirements.  See Docket Nos. 1796 and 1719.  Accordingly, the Court **DENIES** Candelario's request for a more specified designation of evidence.

## VI.  The United States' Motion to Preclude Expert Eyewitness Testimony

The United States seeks to preclude expert testimony from Brian Cutler ("Cutler"), a purported expert on eyewitness identification.  (Docket No. 1718.)  Candelario maintains that Cutler's testimony will "help the jury weigh the identification's reliability knowing that some circumstances present in this case contradict their commonsense understandings."  (Docket No. 1724 at p. 12.)

### A.  Federal Rule of Evidence 702

Pursuant to Federal Rule of Evidence 702, a witness may testify to scientific, technical, or other specialized knowledge if it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137,

147-49 (holding that Daubert applies to technical and other specialized expert).  In determining the admissibility of this evidence, the Court "must perform a gatekeeping function and decide whether the proposed testimony, including the methodology employed by the witness in arriving at the proffered opinion, rests on a reliable foundation and is relevant to the facts of the case."  Cummings v. Standard Register Co., 265 F.3d 56, 64 (1st Cir. 2001) (internal citations omitted).  Whether an expert meets these criteria is a "case-specific inquiry and . . . a question that the law grants the trial judge broad latitude to determine."  Id. (internal citation omitted).

The Rule 702 analysis is pragmatic, subject to an abuse of discretion standard of review.  See Packgen v. Berry Plastics Corp., 847 F.3d 80, 85-86 (1st Cir. 2017).  In Daubert, the Supreme Court outlined four nonexclusive, non-dispositive factors to assist trial courts in determining whether an expert's methodology is scientifically valid and whether it can be reliably applied to the facts in issue.  509 U.S. at 593-94.  These include:  (1) whether the technique can be or has been tested; (2) whether the technique has been subjected to peer review; (3) the known or potential error rate; and (4) a degree of acceptance within the relevant scientific community.  Id. This inquiry is a "flexible one."  Id. at 594.

**B.   The Eyewitness Identification Expert**

The jury has no use for expert testimony pertaining to conventional wisdom and commonsense.  See United States v. Montás, 41 F.3d 775, 784 (1st Cir. 1994) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value."); United States v. Zajanckauskas, 441 F.3d 32, 39 (1st Cir. 2006) ("Expert testimony does not assist where the trier of fact has no need for an opinion because it can be derived from commonsense, common experience, the trier of fact's own perceptions, or simple logic") (internal citation and quotation omitted); see e.g., United States v. Sebaggala, 256 F.3d 59, 65 (1st Cir. 2001) ("Here, commonsense supports the district court's determination that jurors would understand, without the aid of expert testimony, that an individual whose primary language is other than English might have difficulty comprehending bureaucratic forms.").

The dispositive question before the Court is whether an eyewitness expert will assist the jury in determining whether the eyewitness identifications are reliable.  See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (holding that expert testimony "must be relevant not only in the sense that all evidence must be relevant [. . .] but

also in the incremental sense that the expert's opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue"). Indeed, "trial courts have long hesitated to admit expert evidence purporting to identify flaws in eyewitness identification: for example, courts have said that the jury could decide the credibility issues itself." United States v. Brien, 59 F.3d 274, 277 (1st Cir. 1995).

The First Circuit Court of Appeals has, however, "declined to lay down a general rule" regarding identification expert witnesses. United States v. Jones, 689 F.3d 12, 18 (1st Cir. 2012); see United States v. Stokes, 388 F.3d 21, 26 (1st Cir. 2004) (noting that district courts "should examine each case one by one, taking into account such concerns as the reliability and helpfulness" of the identification expert witness); Brien, 59 F.3d at 276-77 ("[Quite] possibly an expert such as a psychologist familiar with identification problems could give the jury background information about the mechanism of memory, types of errors, error rates, and other information not commonly possessed by the jury – information that may even be at odds with what a judge or jury might expect."); United States v. Shay, 57 F.3d 126, 131 (1st Cir. 1995) (noting that "no constitutional provision, law or rule requires the automatic

exclusion of expert testimony simply because it concerns a credibility question").

To determine whether this type of testimony is admissible, courts consider the importance of the identification, the "nature of the proposed expert testimony," and "alternative means of providing information to the jury" (i.e. jury instructions). Id. at 19 (affirming the exclusion of testimony from an expert stating that "stress can hinder identification . . . [and] that a witness can be highly confident but wrong" in part because the "judge was fully entitled to conclude that this general information could be more readily and efficiently conveyed by instructions rather than through dueling experts"). The effectiveness of cross-examination is also relevant to the Court's analysis. See United States v. Rodríguez-Berríos, 573 F.3d 55, 72 (1st Cir. 2009) (affirming the exclusion of an identification expert in part because factors such as "lighting, lack of attention, and post-event information – are particularly susceptible to exposure through cross-examination without the benefit of expert testimony"); De León-Quiñones v. United States, Case No. 11-1329, 2011 U.S. Dist. LEXIS 95783, at *7-8 (D.P.R. Aug. 25, 2011) ("[The Court] finds no prejudice from Petitioner counsel's failure to call an expert as to the unreliability of eyewitness

testimony.  Counsel extensively cross-examined [the witness] as
to the questionable circumstances of their in court
identification.") (Fusté, J.).

Testimony by Cutler regarding the eyewitness
identifications will not assist the trier of fact, rendering
Cutler's expert opinion inadmissible.  See Shay, 57 F.3d at 132
(noting that expert opinion testimony is unnecessary if "the
untrained layman would be qualified to determine intelligently
and to the best degree, the particular issue without
enlightenment from those having a specialized understanding of
the subject matter involved").  That a victim of a violent
massacre might misidentify the assailants does not require
expert testimony.  See, e.g., United States v. Maryboy, Case
No. 14-119, 2022 U.S. Dist. LEXIS 167250, at *14-16 (D. Utah
Sept. 14, 2022) (precluding expert testimony "that an individual
in a high-stress event could experience physiological and
psychological effects" because "an average juror understands
that [these circumstances] can affect memory, perception, and
recall . . . Expert testimony is unnecessary and would not be
helpful.").

The Court will provide the jury with an instruction
regarding eyewitness testimony, addressing the concerns

associated with this genre of testimony. The model jury
instruction provides that:

> Testimony by a witness as to identity must be received
> with caution and scrutinized with care. The
> government's burden of proof extends to every element
> of each crime charged, including the burden of proving
> beyond a reasonable doubt the identity of an alleged
> perpetrator of an offense. You may consider the
> following in evaluating the accuracy of an eyewitness
> identification: [risks of cross-racial identification]
> [risks of identification under stress] [at best, weak
> correlation between the witness's confidence and
> accuracy of the identification] [the influence of
> suggestive identification practices].

First Circuit Pattern Jury Instructions § 2.22 (2022 ed.).
Cutler's proposed expert testimony is no more helpful than this
instruction. Accordingly, the United States motion to preclude
expert eyewitness testimony is **GRANTED**.[8]

**VII. Conclusion**

For the reasons set forth above, Candelario's motion to
dismiss counts 2 through 19 of the third-superseding indictment
is **DENIED.** (Docket No. 1699.) Candelario's motion to preclude
the United States from eliciting hearsay statements from
putative trial witness Amarylis Fonseca-Matías is **DENIED.**
(Docket No. 1696.) Candelario's motion to bar the admission of
gruesome crime scene photographs is **DENIED WITHOUT PREJUDICE.**
(Docket No. 1693.) Candelario's motion for a specific notice of

---

[8] Expert earwitness testimony by Mr. Cutler has also been precluded. See
Opinion and Order at Docket No. 1715, and the Order at Docket No. 1722.

evidence is **DENIED**.  (Docket No. 1705.)   Lastly, the United States' motion to preclude expert eyewitness testimony is **GRANTED**.  (Docket No. 1718.)

The United States **SHALL** file a certified English translation of <u>Pueblo v. Roche</u>, 195 D.P.R. 791 (2016), **no later than June 11, 2023.**

Trial is set to commence on June 20, 2023 at 9:00 in Courtroom 5 at the José V. Toledo Federal Building and United States Courthouse.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 5, 2023.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE