IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff,**<br><br>v.<br><br>ALEXIS CANDELARIO-SANTANA [1],<br><br>**Defendant.** | **Criminal No.** 09-427 (FAB) |

OPINION AND ORDER

BESOSA, District Judge.

Before the Court are two motions *in limine*. (Docket Nos. 1816 and 1825.) First, the United States moves to preclude testimony from Federal Bureau of Investigation ("FBI") Task Force Officers ("TFO's") Cristóbal Rodríguez and Antonio Núñez-Fox. (Docket No. 1816.) Second, defendant Alexis Candelario-Santana ("Candelario") moves to compel Wilfredo "Rufo" Semprit-Santana ("Semprit") to testify at trial as a defense witness. (Docket No. 1825.) For the reasons set forth below, the United States' motion *in limine* is **GRANTED**. (Docket No. 1816.) Candelario's motion *in limine* is, however, **DENIED**. (Docket No. 1825.)

I.   Background

Amarylis Fonseca-Matías ("Fonseca") is the wife of Wilfredo "Rufo" Semprit-Santana, the owner of La Tómbola market and bar. (Docket No. 896 at p. 4.) Fonseca testified at Candelario's first

Criminal No. 09-427 (FAB)                                                    2

trial in 2013, conveying her recollection of the La Tombóla massacre to the jury.  Id.  According to Fonseca, Candelarlio yelled, "[nobody's] getting out of here alive, puñeta, God dammnit."  Id. at p. 10.

Fonseca identified Candelario's voice to her sisters, mother, and Semprit once she "[was] able to speak again."  Id. at p. 44.  She did not, however, identify Candelario's voice to law enforcement officers until the evening before her testimony.  (Docket No. 896 pp. 23-24.)  This eleventh-hour disclosure provided fodder for cross-examination.  Id.  Defense counsel commenced cross-examination by asking Fonseca:

> [The] first time that you have ever said that the voice that you heard screaming, nobody gets out of here alive, was that of Alexis, first time you ever said that was yesterday afternoon when you were being interviewed by [an Assistant United States Attorney] for your testimony here today; isn't that correct?

Id. at p. 23.  She answered, "Correct."  Id.

Candelario's second trial commenced on June 20, 2023.  (Docket No. 1768.)  The Court denied Candelario's motion to preclude Fonseca's pretrial voice identifications.  United States v. Candelario-Santana, Case No. 09-427, 2023 U.S. Dist. LEXIS 98421, at *26-28 (D.P.R. June 5, 2023) (Besosa, J.).  Fonseca's statements to her sisters, mother, and Semprit are admissible pursuant to the hearsay exception set forth in Federal Rule of

Evidence 801(d)(1)(C).  Id.; see Fed. R. Evid. 801(d)(1)(C) (a statement is not hearsay if "the declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . identifies a person as someone the declarant perceived earlier").

**II.  The United States' Motion to Preclude Testimony from FBI Task Force Officers Cristóbal Rodríguez and Antonio Núñez-Fox**

The United States moves to preclude FBI Task Force Officers Cristóbal Rodríguez and Antonio Núñez-Fox from testifying at trial.  (Docket No. 1816.)  These officers interviewed Fonseca on November 9, 2009 and June 24, 2010, respectively.  (Docket No. 1819, Exs. 2 and 3.)

Candelario intends to elicit testimony from these officers to "set the facts straight."  (Docket No. 1819.)  According to Candelario, Fonseca's testimony at the 2023 trial contradicts the statements she provided to TFO's Rodríguez and Núñez.  Id.  The United States maintains, however, that the officer's putative testimony is irrelevant.  Id.  The Court agrees with the United States.

    **A. Fonseca's 2023 Trial Testimony**

    Fonseca testified on July 5, 2023, the sixth day of Candelario's second trial.  (Docket No. 1808 at pp. 60-126.)  The following excerpts pertain to her pretrial voice identification:

Criminal No. 09-427 (FAB)                                                                 4

    **United States**: Ma'am, I want to talk more in detail about what you've described as the massacre on October 17, 2009. But before going into those facts, I want to ask you, after that massacre, did the FBI approach you for cooperation?

    **Fonseca**: When? You mean after what? After the massacre?

    **United States**: Yes, shortly after.

    **Fonseca**: Yes.

    **United States**: And at first, did you cooperate?

    **Fonseca**: No.

    **United States**: Where was [Candelario] when you first decided not to cooperate?

    **Fonseca**: He was a fugitive.

    **United States**: While [Candelario] was still a fugitive, at the beginning, did you tell the FBI that you heard [Candelario] on the night of the massacre?

    **Fonseca**: Yes.

    **United States**: Did you – did you tell the FBI that you heard him or that you had not heard him, initially, at the beginning, shortly after the massacre?

    **Fonseca: At the beginning I said no.**

    **United States**: Afterwards, did you acknowledge to the FBI hearing [Candelario]?

    **Fonseca**: Yes.

    **United States**: Was this years later?

    **Fonseca**: No.

    . . .

Criminal No. 09-427 (FAB)                                                                 5

>**Fonseca**: Somebody shouted, it was a man's voice that shouted, "Nobody is coming out of here alive."
>
>**United States**: And who's voice was that?
>
>**Fonseca**: [Candelario's voice].
>
>**United States**: And how do you know that?
>
>**Fonseca**: Because I can identify the – his voice. The tone of his voice, I can identify it.
>
>**United States**: And how are you able to identify the tone of his voice?
>
>**Fonseca**: Well, because when he was my neighbor and argued with his wife, which was quite frequent, I could hear him screaming in the house. And that's why I quickly identified his voice.
>
>                              . . .
>
>**United States**: Ma'am, when you get out of the hospital, what did you tell your sister Melissa, your husband Rufo, your mom Margaret and your sister Yanitza?
>
>**Fonseca**: That I heard [Candelario].
>
>**United States**: That you heard [Candelario] say what?
>
>**Fonseca**: That nobody is coming out of here alive.
>
>**United States**: Ma'am, why did you wait to tell this to the FBI?
>
>**Fonseca**: Well, because I was afraid.

(Docket No. 1808 at pp. 60-91) (emphasis added). On cross-examination, defense counsel asked Fonseca the following questions:

**Defense Counsel**: All right.  So if the events took place on October 17, 2009, and the trial was in February of 2013, three years and four months had elapsed between the two events, correct?

**Fonseca**: Yes.

**Defense Counsel**: And in those three years and four months, you had several meetings with law enforcement authorities, right?

**Fonseca**: Yes.

**Defense Counsel**: My colleague, [an Assistant United States Attorney], told you this morning that during those meetings with the FBI, the initial meetings, you did not tell them that you had heard the voice of [Candelario] at La Tombóla on the night of the events. Remember that?

**Fonseca**: Yes.

**Defense Counsel**: And you agreed.  You said, "Yes, at first I didn't say it," right?

**Fonseca**: **Correct.**

**Defense Counsel**: One of those meetings where you didn't say it took place on June 24, 2010.  Remember that?

**Fonseca**: No.

**Defense Counsel**: You remember being interviewed by an agent by the name of Antonio Núñez right?

**Fonseca**:  No.

**Defense Counsel**: Well, but whenever you had this meeting, those were the meetings we were referring you that you had not said that you had heard the voice of [Candelario] yet.

**Fonseca**: If I said I had not heard him, it's because I was not asked, but I want to clarify something. That during my first meeting with the federal authorities, I didn't say anything. I remained silent. But then quickly thereafter, I started to tell the truth, and I always did say that.

**Defense Counsel**: Well, that first meeting with federal authorities that you just referred to took place just three weeks after the La Tombóla events, correct?

**Fonseca**: Approximately.

**Defense Counsel**: And to be exact, that was November 9, 2009, correct?

**Fonseca**: Yes.

**Defense Counsel**: And that's where you didn't tell the FBI that you could identify the voice of Alexis as having heard it that night.

**Fonseca**: Again, I will repeat that after that second interview, I always said that I head his voice that night, and it was him.

**Defense Counsel**: So there were two meetings with the FBI where you didn't say it, isn't that correct?

**Fonseca**: No, No. To me, it was one meeting. After the second one, I always said it.

**Defense Counsel**: Well, can we agree you had a meeting on November 9, 2009, which was less than a month after the events, and then a second one on June 24, 2010, which was about eight months after the events?

**Fonseca**: Yes.

**Defense Counsel**: All right. And those were the two where you didn't say it, or are you telling us that in one of those you did say it?

**Fonseca**: I said that at the November – October – the November 9 meeting, I did not. At first I said no. But then, you know, at the hospital, after I woke up with the tubes, they came to ask me. It was at the hospital when I had just woken up is when I said no. I didn't say anything. But after that, I did say so.

**Defense Counsel**: But that interview in the hospital was not with the FBI; isn't that correct?

**Fonseca**: Well, they identified themselves as the FBI.

**Defense Counsel**: That was with Puerto Rico Police Officers, isn't that correct?

**Fonseca**: No.

**Defense Counsel**: You had four –

**Fonseca**: It was the Feds.

**Defense Counsel**: In between the night of the events and your testimony at trial, you had four interviews with law enforcement, isn't that correct?

. . .

**Defense Counsel**: Ms. Fonseca, isn't it a fact that the first time you ever said to a law enforcement officer that the voice you heard screaming "Nobody gets out of here alive" was that of [Candelario], the first time you said it was the afternoon before you testified at the prior trial on February 2013? Isn't that a fact?

**Fonseca**: That is not correct.

. . .

**Defense Counsel**: All right. I am going to hand you, ma'am, the transcript of your prior testimony and ask the interpreter to translate from lines 9 to 15, the question that was posed to you and the answer you gave under oath back then.

. . .

>**Defense Counsel**: Do you remember now, ma'am, that the first time you ever said it was the day before your testimony back in 2013, February, to be exact?
>
>**Fonseca**: Well, the truth of the matter is I do not remember it that way.
>
>**Defense Counsel**: Question from the transcript . . . "Question: Ms. Fonseca, the first time that you have ever said that the voice that you heard screaming "Nobody gets out of here alive" was that of [Candelario]. The first time you ever said that was yesterday afternoon when you were being interviewed by then Prosecutor Domínguez for your testimony here today; isn't that correct? . . . Answer by you under oath: "Correct."
>
>**Court**: Thank you. Next question.
>
>**Defense Counsel**: And you were able to verify that's what the transcript says of your testimony, correct?
>
>**Fonseca**: Yes.
>
>**Defense Counsel**: So for three years and four months you said nothing about that; isn't that correct?
>
>**Fonseca**: If I didn't say it, it's because I hadn't been interviewed, because at all times I have said I heard him.
>
>**Defense Counsel**: Is your testimony today that you had never been interviewed during those three years and four months?
>
>**United States**: Objection, Your Honor. Misleading.
>
>**Court**: Sustained.

(Docket No. 1801 at pp. 91-105.) Candelario contends that this testimony contradicts the statements Fonseca made to TFO's Rodríguez and Núñez. (Docket No. 1819.)

Criminal No. 09-427 (FAB)                                                10

### B. Federal Rule of Evidence 613

During cross-examination, counsel "is permitted to show discrepancy between two statements, one made at trial and one made previously, by extrinsic evidence if necessary, not to demonstrate which of the two is true but to show that the two do not jibe, (thus calling into question the declarant's credibility)." United States v. Winchenback, 197 F.3d 548, 558 (1st Cir. 1999) (citation omitted). Impeachment by prior inconsistent statement is governed by Rule 613, providing that:

> (a) **Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.
>
> (b) **Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

Fed. R. Evid. 613 (emphasis in original). It is hornbook law that "a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter." United States v. Cruz-Rodríguez, 541 F.3d 19, 30 (1st Cir. 2008) (quotation omitted). This Court possesses "wide" discretion in "determining whether

Criminal No. 09-427 (FAB)                                               11

statements are in fact inconsistent for purposes of Rule 613(b)." Udemba v. Nicoli, 237 F.3d 8, 18 (1st Cir. 2001).

### 1. FBI Task Force Officer Antonio Núñez-Fox

TFO Núñez's report contains no reference to Fonseca's voice identification. (Docket No. 1819, Ex. 3.) This report mainly provides background information regarding the Palo de Goma drug point. Id. La Tombóla is mentioned in a perfunctory manner, setting forth Fonseca's location immediately before the massacre. Handwritten notes on pages six and seven summarize the following information:

> La Tombóla
>
> -Went to Sams Club in the Tundra with Ruffo and Melisa (syster [sic] of Ruffo's wife)
>
> -Jimmy (Gayo) cut Ruffo's hair at his residence
>
> -At 11:00 PM the [sic] got to La Tombóla
>
> -Wilfredo possibly saw Christian go inside La Tombola. Chilla of Amarilis Aunt
>
> -Chindel said that he saw Christian and Alexis

Id. at pp. 6-7. Candelario asserts, however, that Fonseca "identified several alleged shooters that might have participated but did not mention [Candelario]" during this interview. (Docket No. 1819 at p. 5.) Furthermore, TFO Núñez purportedly "questioned [Fonseca] about . . . the identity of the shooters." Id.

Candelario grossly misconstrues TFO Núñez's report, contending that it "directly contradicts [Fonseca's] trial testimony." (Docket No. 1819 at p. 8.) The Court has closely reviewed this document. (Docket No. 1819, Ex. 3.) The report is devoid of any reference to "alleged shooters." Nothing in the report suggests that FBI agents or task force officers instructed Fonseca to identify the shooter. TFO Núñez's report and Fonseca's 2023 trial testimony do not contradict each other in any respect, providing no basis for impeachment. Accordingly, the United States motion to preclude TFO Núñez from testifying at trial is **GRANTED.**

**2. FBI Task Force Agent Cristóbal Rodríguez**

TFO Rodríguez interviewed Fonseca on November 9, 2009. (Docket No. 1819, Ex. 2.) He prepared the appurtenant 302 Report in Spanish. Id.[1] Candelario asserts that Fonseca informed TFO Rodríguez that "she could not identify the male voice that she heard." (Docket No. 1819 at p. 4.) During direct-examination, Fonseca acknowledged that she initially did "not tell the FBI that [she] heard [Candelario]." (Docket No. 1808 at p. 74.) Consequently, the November 9, 2009 report is consistent with

---

[1] Pursuant to the Jones Act, all "pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." 48 U.S.C. § 864. This Court cannot "consider any untranslated documents placed before [it]." United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir. 2014). Accordingly, the United States **SHALL** file a certified English translation of TFO Rodríguez's 302 Report **no later than July 17, 2023.**

Criminal No. 09-427 (FAB)                                              13

Fonseca's trial testimony.  That Fonseca initially refrained from identifying Candelario's voice to the authorities is not in dispute.  Accordingly, this report has no impeachment value.

Candelario also posits that the 302 Reports demonstrate that Fonseca misled the jury by testifying that: (1) she "quickly" identified Candelario's voice after the November 9, 2009 interview, (2) could not recall "that she was interviewed a second time by [TFO Núñez]," and that (3) she failed to identify Candelario's voice "due to her health conditions."  (Docket No. 1819 at p. 7.)

Evidence is collateral if "the matter itself is not relevant to the litigation to establish a fact of consequence, *i.e.*, not relevant for a purpose other than mere contradiction of the in-court testimony of the witness."  United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993).  The exclusion of collateral evidence is "analogous to Rule 403's relevancy balancing test, which calls for relevant evidence to be excluded when its 'probative value is substantially outweighed by . . . considerations of undue delay, [or] waste of time."  Catalán-Román, 585 F.3d at 469.  That Fonseca cannot recall who interviewed her June 24, 2010 is a collateral matter, falling beyond the scope of Rule 613.  See United States v. Tucker, 61 F.4th 194, 207 (1st Cir. 2023) (holding that "evidence is immaterial where it is

Criminal No. 09-427 (FAB)                                                14

cumulative or merely impeaches a witness on a collateral issue") (internal citation and quotation omitted).  Moreover, the impact of her "health conditions" and use of the word "quickly" have no bearing on any fact of consequence.  Accordingly, the United States' motion to preclude TFO Rodríguez from testifying at trial is **GRANTED**.

### III. Candelario's Motion to Compel Wilfredo "Rufo" Semprit-Santana to Testify at Trial as a Defense Witness

Candelario moves to compel Wilfredo "Rufo" Semprit-Santana to testify as a defense witness.  (Docket No. 1825.)  He also moves to admit certain excerpts of the 2013 trial transcripts.  Id.  The arguments set forth in support of these requests are, however, unavailing.

#### A. Semprit's 2009 FBI Interview and 2013 Trial Testimony

At Candelario's second trial, defense counsel asked Fonseca: "Isn't it a fact that [before 2013] you told your husband Rufo that the voice you heard yell 'Nobody gets out of here alive, God damnit' sounded like someone you knew from high school named Jay or Jason?"  (Docket No. 1808 at p. 121.)  Fonseca answered, "No." Id.  This question derives from two statements made by Semprit in 2009 and 2013, respectively.

First, FBI agents interviewed Semprit in November 2009. (Docket No. 1825, Ex. 2.)  According to Semprit, Fonseca stated

Criminal No. 09-427 (FAB)                                                  15

that "the voice of the unidentified male (UM) that shot [her] sounded like someone [she] knew from school by the name of Jason." Id. at p. 5.  Second, in 2013 Semprit testified that Fonseca "heard a voice" reminiscent of a voice belonging to "a kid she knew from school by the name of Jason."  (Docket No. 896 at p. 175.)  Semprit stipulated, however, that Fonseca "did not say what Jason said." Id.

Candelario argues that these statements contradict Fonseca's trial testimony.  (Docket No. 1825.)  They do not.  That the shooter sounded similar to Jason does not negate Fonseca's voice identification of Candelario. Moreover, Semprit specified that Fonseca "didn't say what Jason said."  (Docket No. 896 at p. 175.) At no point did Semprit state to the FBI or at the 2013 trial that Fonseca identified Jason as the person who yelled, "Nobody is getting out of here alive, God damnit." Id. at p. 10.  That Fonseca compared the shooter's voice to an acquaintance from school is a collateral matter. Accordingly, Candelario's motion to compel the appearance of Semprit at trial as a defense witness is **DENIED**. (Docket No. 1825.)  His request to admit excerpts of the 2013 trial transcripts is also **DENIED**

**B. Semprit's Testimony at 2011 Grand Jury Proceeding**

Candelario asserts that Semprit "[never] mention[ed] that his wife Fonseca-Matías . . . told him that she heard the voice of Mr.

Criminal No. 09-427 (FAB)                                                  16

Candelario-Santana during La Tombóla shooting" at the 2011 grand jury proceeding.  (Docket No. 1825 at p. 2.)  This omission, according to Candelario, suggests that Fonseca's voice identification is "questionable."  Id.  Essentially, Candelario seeks to impeach Fonseca with her husband's silence.

The First Circuit Court of Appeals has held that prior statements that omit "details in a witness's trial testimony are inconsistent if it would have been 'natural' for the witness to include the details in the earlier statement."  United States v. Meserve, 271 F.3d 314, 320-21 (1st Cir. 2001).  The standard for impeachment by omission is "an elastic one, because the naturalness of a witness's decision not to include certain information in an earlier statement may depend on the nuances of the prior statement's context, as well as the witness's own loquacity."  Id. at 312 (internal citation and quotation omitted).  The propriety of allowing impeachment by omission "lies within the sound discretion of the district court."  Umdemba, 237 F.3d at 18; Meserve, 271 F.3d at 312 (holding that "the district court did not abuse its wide discretion by refusing to allow [the defendant] to cross-examine Grant regarding the omission from her grand jury testimony of certain details about which she testified at trial").

Nothing in the record suggests that Semprit omitted Fonseca's voice identification from his testimony at the 2013 trial or 2011

grand jury proceeding.  For instance, in 2011 an Assistant United States Attorney asked Semprit: "Did you learn of the circumstances in which [Fonseca] received [nine] shots?"  (Docket No. 1825, Ex. 1 at p. 2.)  Semprit subsequently described Fonseca's injuries. Id.  This question does not call for an exhaustive account of every statement Fonseca made to Semprit regarding the shooting.  Because Semprit's putative testimony is irrelevant and consistent with Fonseca's voice identification, Candelario's motion to compel is **DENIED**.

**IV. Conclusion**

For the reasons set forth above, the United States' motion to preclude testimony from Federal Bureau of Investigation Task Force Officers Cristóbal Rodríguez and Antonio Núñez-Fox is **GRANTED**. (Docket No. 1816.)  Candelario's motion to compel Wilfredo "Rufo" Semprit-Santana to testify at trial as a defense witness is **DENIED**. (Docket No. 1825.)  Candelario's motion to admit excerpts of the 2013 trial transcripts is also  **DENIED**. Id.

The United States **SHALL** file a certified English translation

Criminal No. 09-427 (FAB)                                                    18

of TFO Rodríguez's 302 Report **no later than July 17, 2023.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, July 12, 2023.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        SENIOR UNITED STATES DISTRICT JUDGE